# EXHIBIT A

1   William E. Peterson (Nevada Bar #1528)
    SNELL & WILMER L.L.P.
2   50 West Liberty Street
    Suite 510
3   Reno, Nevada 89501
    Telephone: 775.785.5440
4   Facsimile: 775.785.5441
    Email: wpeterson@swlaw.com
5
    Attorneys for Plaintiff SCAP 9, LLC
6

7

8          IN THE NINTH DISTRICT COURT OF THE STATE OF NEVADA

9                  IN AND FOR THE COUNTY OF DOUGLAS

10

11  SCAP 9, LLC, a Nevada Limited Liability          Case No. 2022-CV-00130
    Company,                                         Dept. I
12                                                   SUMMONS -- CIVIL
                        Plaintiff,
13
    vs.
14
    FINANCIAL INDUSTRIES REGULATORY
15  AUTHORITY, INC., a Delaware Corporation,

16                      Defendant.

17

18          **NOTICE! YOU HAVE BEEN SUED. THE COURT MAY DECIDE AGAINST**

19  **YOU WITHOUT YOUR BEING HEARD UNLESS YOU RESPOND WITHIN 21 DAYS.**

20  **READ THE INFORMATION BELOW.**

21          **TO THE DEFENDANTS:** A civil Complaint has been filed by the Plaintiff against you

22  for the relief set forth in the Complaint.

23          1.      If you intend to defend this lawsuit, within 21 days after this Summons is served

24  on you, exclusive of the day of service, you must do the following:

25          (a)     File with the Clerk of this Court, whose address is shown below, a formal written

26  response to the Complaint in accordance with the rules of the Court, with the appropriate filing

27  fee.

28

                                                                          COMPLAINT

4855-1153-1819.1

1      (b)     Serve a copy of your response upon the attorney whose name and address are

2   shown below.

3      2.     Unless you respond, your default will be entered upon application of the Plaintiff

4   and failure to so respond will result in a judgment of default against you for the relief demanded

5   in the Complaint, which could result in the taking of money or property or other relief requested

6   in the Complaint.

7      3.     If you intend to seek the advice of an attorney in this matter, you should do so

8   promptly so that your response may be filed on time.

9      4.     The State of Nevada, its political subdivisions, agencies, officers, employees,

10   board members, commission members and legislators each have 45 days after service of this

11   Summons within which to file an Answer or other responsive pleading to the Complaint.

12

13   Submitted by:

14

15   SNELL & WILMER L.L.P.                        CLERK OF COURT

16   By: _____                 By: _____  7/22/22
17       William E. Peterson NSB #1528)              Deputy Clerk              Date
         50 West Liberty Street                      Regional Justice Center
18       Suite 510                                   200 Lewis Avenue
         Reno, Nevada  89501                         Las Vegas, Nevada  89155
19
         *Attorneys for Plaintiff SCAP 9, LLC*       Ninth Judicial District Court
20                                                   1038 Buckeye Rd
                                                     Minden, NV 89423
21

22

23

24

25

26

27

28

COMPLAINT

4855-1153-1819.1                    - 2 -

William E. Peterson (Nevada Bar #1528)
SNELL & WILMER L.L.P.
50 West Liberty Street
Suite 510
Reno, Nevada 89501
Telephone: 775.785.5440
Facsimile: 775.785.5441
Email: wpeterson@swlaw.com

Attorneys for Plaintiff SCAP 9, LLC

FILED

2022 JUL 22 PM 2: 14

DEBBIE R. WILLIAMS
CLERK

BY_____

RECEIVED

JUL 2 2 2022

Douglas County
District Court Clerk

IN THE NINTH DISTRICT COURT OF THE STATE OF NEVADA

IN AND FOR THE COUNTY OF DOUGLAS

SCAP 9, LLC, a Nevada Limited Liability
Company,

Plaintiff,

vs.

FINANCIAL INDUSTRIES REGULATORY
AUTHORITY, INC., a Delaware Corporation,

Defendant.

Case No. 2022-CV-0013D
Dept. I
COMPLAINT

Comes now SCAP 9, LLC., a Nevada Limited Liability Company ("SCAP 9") with its principal office in Nevada, and complains of Defendant Financial Industries Regulatory Authority, Inc., ("FINRA") as follows:

1.      SCAP 9 is a Nevada Limited Liability Company, with its principal place of business in Douglas County, Nevada.

2.      Contrary to popular belief, Defendant FINRA is not a government agency, but rather a private corporation incorporated in the State of Delaware that does business nationwide. FINRA is registered to do business in the State of Nevada and does business in the State of Nevada under foreign entity No. C5791-1991. FINRA is registered with the United States Securities and Exchange Commission ("SEC") as a private corporation that aids and assists the SEC in regulating securities and brokerage firms.

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775.785.5440

COMPLAINT

4856-5914-5513.1

3.      FINRA is not an arm of any government but a private organization that is subject to the jurisdiction of state and federal courts. *Ford v. Hamilton Investments, Inc.*, 29 F.3d 255, 259 (6th Cir. 1994). It is a private actor and not a state actor. *Scher v. NASD*, (386 F.Supp.2d 402, 407 (S.D.N.Y. 2005).

4.      Jurisdiction is proper in this Court as this is a civil matter involving a dispute between Plaintiff, a resident of the State of Nevada, and Defendant, a private company registered to do business and doing business in this state, arising from the wrongful acts and omissions of Defendant directed at a citizen of this state causing loss and damage to Plaintiff in this state. The Complaint exceeds the jurisdictional threshold of this court, as well as the threshold exceeding the amount for judicial arbitration.

5.      Venue is proper in this district as the loss or injury to Plaintiff occurred in Douglas County, Nevada, and Defendant, while doing business in Nevada, and subject to jurisdiction in Nevada, is not a resident of any county in Nevada.

6.      FINRA is a self-regulatory organization ("SRO"), a private organization that is delegated certain authority under the Securities Exchange Act to regulate entities engaged in the business of buying, selling and/or trading securities. FINRA maintains an Enforcement Division ("Enforcement") that pursues actions against FINRA member firms and has its own tribunals in which FINRA-paid Hearing Officers oversee the actions brought by Enforcement and render decisions.

7.      SCAP 9 is engaged in the real estate business. Among its other real estate business activities, SCAP 9 owns property that it leases out to various businesses under lease agreements that call for payment of rent, and contributions to various costs and expenses associated with operating, maintaining, and sometimes improving the property along with other tenants sometimes called Operating Cost Share Rent ("OCSR") and more commonly known as Common Area Maintenance ("CAM") charges. SCAP 9's contract rights, including its contract rights under the Lease Agreement, are property rights recognized by and protected under the United States and State of Nevada Constitutions.

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775.785.5440

8.      SCAP 9 is not engaged in the securities business, is not a registered dealer and is not subject to the supervision or control of FINRA for any purposes whatsoever.  SCAP 9 is an affiliate among other SCAP entities that lease space at arm's length rates to a number of businesses that are not regulated by FINRA and have nothing to do with the owners of SCAP 9.

9.      FINRA does not have any authority under the Securities Act of 1933 or the Securities Exchange Act of 1934 to regulate the private activities and business transactions of persons, entities or businesses that are not engaged in the securities business, such as SCAP 9.

10.     On December 14, 2016, Plaintiff entered into a lease agreement with Alpine Securities Corporation, a Utah Corporation, for the lease of office space in premises it owned. Under the terms of that lease at all times mentioned herein, Alpine agreed to pay rent under the terms and conditions of said lease, and, pursuant to paragraph 3.2, agreed to pay its fair share of Operating Cost Share Rent and Tax Share Rent charges associated with the operation and maintenance of that leased space. A true and correct copy of that lease agreement is attached hereto as **Exhibit 1,** the terms and conditions of which are fully incorporated herein by reference. As alleged above, SCAP 9's rights under that contract are property rights recognized and protected by the United States and State of Nevada Constitutions.

11.     Alpine Securities, as lessee, fell into arrears on payment of its OCSR and Tax Share Rent obligations and on demand of Plaintiff in March 2019 to honor its obligations under the Lease, paid Plaintiff the amount of the charges that were then due and unpaid in the amount of $610,373.

12.     In August 2019, FINRA's Department of Enforcement commenced an administrative proceeding against Alpine under and pursuant to FINRA's internal rules, policies and procedures governing membership in its organization. The Complaint alleged numerous violations of its rules and regulations by Alpine, largely based on activities relating to trading activities.  FINRA included charges that Alpine's payment of the OCSR and Tax Share Rent was improper because it was not authorized by FINRA.

13.     In support of that assertion, Enforcement relied on a FINRA rule that limits the amount of the capital withdrawals that can be taken by the firm's owners without FINRA's

COMPLAINT

4856-5914-5513.1                                          - 3 -

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775.785.5440

1   permission and approval.  Because that provision regarding capital withdrawals does not apply to

2   the firm's business expenses, Enforcement had to argue that the OCSR and Tax Share Rent

3   invoice was "not [a] normal business transaction" but was instead a "sham transaction."

4        14.    Alpine maintained that "the OCSR and Tax Share Rent invoice did not implicate

5   FINRA Rule 4110(c) because they were not capital withdrawals but rather were payments made

6   pursuant to a contractual obligation with an independent party" and constituted business

7   expenses.

8        15.    The undisputed evidence at the hearing confirmed that the OCSR and Tax Share

9   Rent invoice was sent after SCAP 9 employees calculated those outstanding fees owed by Alpine

10  to SCAP 9.

11       16.    Although the OCSR and Tax Share Rent charges were due and payable under and

12  pursuant to the lease agreement and would continue to be due and payable during the entire term

13  of the lease, FINRA's Office of Hearing Officers, in a Decision rendered at the conclusion of a

14  proceeding against Alpine on March 22, 2022, accepted Enforcement's argument that the invoice

15  was a "sham," not a business transaction, and could therefore be characterized as an unauthorized

16  capital withdrawal by Alpine (unauthorized because not approved by FINRA in advance).

17       17.    FINRA's Decision then ordered Alpine to "cease and desist" from making any

18  payments to "affiliates" that would "exceed 10% of Alpine Securities' excess net capital within

19  any 35 day rolling calendar period.  Because the SCAP 9 is considered an affiliate, the Decision

20  had the effect of precluding Alpine from paying rent, OCSR, Tax Share Rent or other contractual

21  obligations unless those amounts are less than 10% of its net capital in the relevant period *and* it

22  prevents the owner from receiving the ordinary capital withdrawals to which he is entitled if the

23  *total combined amount* exceeds 10% of net capital.

24       18.    FINRA's Decision also impairs the ability of SCAP 9 and other related entities to

25  enforce the OCSR and Tax Share Rent lease provision against other tenants, since the FINRA

26  Decision concludes that the obligation and the process set forth in the lease are somehow

27  inappropriate and do not constitute a normal and enforceable business transaction.  The FINRA

28  Decision thus interferes with SCAP 9 and related entities' ability to require that tenants comply

COMPLAINT

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada  89501
775.785.5440

4856-5914-5513.1                                    - 4 -

1   with a lease provision that is both customary in the industry and, under prior decisional authority,

2   fully enforceable.

3          19.     FINRA's actions as set forth above, impair and interfere with both Alpine's and

4   SCAP 9's rights and obligations under its contract and deprive SCAP 9 of property in violation of

5   its right to due process and compensation for deprivation of its contract rights, which are property

6   rights.

7          20.     Alpine and SCAP 9's lease agreement was a valid and binding contract and

8   FINRA was fully aware and had knowledge of that contract.

9          21.     FINRA intended or designed to interfere with and disrupt that contractual

10   relationship and by virtue of the foregoing acts or omissions succeeded in disrupting that contract

11   by precluding and preventing Alpine from performing its contractual obligations thereunder.

12          22.     As a result of the aforementioned acts and omissions, SCAP 9 sustained damages

13   substantially in excess of the jurisdictional limits of this court, and substantially in excess of the

14   limitations on reference to judicial arbitration ($50,000).

15          23.     SCAP 9 will continue to sustain and incur damages as a result of the foregoing acts

16   and omissions of FINRA.

17          24.     FINRA acted with an improper, ulterior and malicious motive in precluding

18   Alpine from performing its obligations under the contract as hereinabove alleged, in that FINRA

19   has long had a goal or objective to punish one of its former principals and owners, John Hurry,

20   and drive John Hurry out of the securities business.

21          25.     SCAP 9 has been forced to retain attorneys to protect and advance its property

22   interests and rights herein, has incurred costs and reasonable attorneys' and fees and will continue

23   to do so during the course of this litigation.

                                 FIRST CLAIM FOR RELIEF

25          26.     Plaintiff restates and incorporates herein all of its allegations above.

26          27.     Defendant, with knowledge of the contract for payment of rent, OCSR and Tax

27   Share Rent fees from Alpine to Plaintiff, has intentionally interfered with Plaintiff's rights under

28   that contract which interference proximately has and will continue to cause Plaintiff to suffer loss

COMPLAINT

1  and injury in an amount to be proved at trial, but well in excess of the jurisdictional limit of this
2  court and the amount referable to arbitration.

3     28.    Defendant's interference with contract proximately caused Plaintiff damages as
4  hereinabove alleged.

5                          SECOND CLAIM FOR RELIEF

6     29.    Plaintiff restates and incorporates herein all of its allegations above.

7     30.    While Plaintiff alleges FINRA is a private party and not an arm of any
8  government, FINRA itself claims that Congress, through the Securities Exchange Commission,
9  has delegated to it, certain power and authority to enforce various provisions of the Securities
10 Exchange Act of 1934.  By virtue of such claim and exercise of such authority, FINRA claims
11 that it possesses and enjoys certain sovereign or governmental immunities from actions and
12 liabilities when engaged in or performing its delegated regulatory functions.

13    31.    To the extent that FINRA is acting with delegated governmental authority and
14 therefore possesses governmental immunity, it is required and obligated to comply with the
15 United States Constitution.  By virtue of the aforementioned acts and omissions, FINRA, acting
16 in its delegated regulatory capacity has deprived Plaintiff of its constitutionally protected right to
17 property without due process of law and without just compensation in violation of the 5th
18 Amendment to the U.S. Constitution thereby justifying an award from this court in an amount that
19 would fairly compensate Plaintiff for such loss.

20                          THIRD CLAIM FOR RELIEF

21    32.    Plaintiff restates and incorporates by reference each of the allegations set forth in
22 its Second Claim for Relief, including those allegations incorporated in such claim

23    33.    The immunities claimed and enjoyed by FINRA do not include immunity from
24 actions and liabilities for deprivation of constitutional rights and privileges under the Constitution
25 of the State of Nevada which confers rights and privileges on all Nevada citizens and residents,
26 including Plaintiff.

27    34.    By virtue of the aforementioned acts and omissions, FINRA has deprived Plaintiff
28 of property without due process or just compensation in violation of Article 1 section 8 of the

4856-5914-5513 1                          - 6 -                          COMPLAINT

Snell & Wilmer
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775.785.5440

1  Nevada Constitution thereby entitling Plaintiff to an award from the court in an amount that

2  would fairly compensate Plaintiff for such loss.

3                              FOURTH CLAIM FOR RELIEF

4      35.    Plaintiff restates and incorporates herein by reference all of its allegations above.

5      36.    A real and present controversy exists between Plaintiff and Defendant in that

6  Plaintiff claims that Defendant has committed acts and omissions that have tortiously interfered

7  with its contract with Alpine, and that Defendant, as a private party is liable for all losses and

8  damages resulting from such interference, and Defendant claims that it is protected and immune

9  from such loss and liability. Plaintiff further claims that to the extent Defendant claims such

10  immunity as acting in a regulatory capacity as an arm or adjunct of government, Defendant is

11  liable to Plaintiff for deprivation and loss of property without due process and just compensation

12  in violation of the 5th Amendment to the Constitution and Article 1 Section 8 of the Nevada

13  Constitution, and Defendant denies and disclaims any such liability.

14      WHEREFORE PLAINTIFF PRAYS

15      1.    For damages in such amount as will be proved at trial;

16      2.    For costs and reasonable attorneys' fees incurred in this action;

17      3.    For such other and further relief as the Court deems warranted and justified based

18  on the proof at trial;

19      4.    For an order and decree that Plaintiff's due process rights have been violated and

20  its property taken in violation of the State and Federal Constitutions; and

21      5.    For such equitable relief as may be necessary and appropriate to enjoin or prevent

22  Plaintiff from further violation of its state and federal constitutional rights.

23  Dated: July 22, 2022                          SNELL & WILMER, L.P.

24                                          By: _____

25                                              William E Peterson
                                                50 West Liberty Street
26                                              Suite 510
                                                Reno, Nevada 89501
27
                                                *Attorneys for Plaintiff SCAP 9, LLC*
28

Snell & Wilmer
L.L.P.
LAW OFFICES
50 West Liberty Street, Suite 510
Reno, Nevada 89501
775.785.5440

4856-5914-5513.1                        - 7 -                        COMPLAINT

# EXHIBIT 1

# EXHIBIT 1

## LEASE AGREEMENT

THIS LEASE AGREEMENT (this "Lease") is made as of the *14*th day of December 2016, by and between SCAP 9, LLC, an Nevada Limited Liability Company "Landlord"), and the Tenant named in the Summary of Lease below.

## SUMMARY OF LEASE

The following terms and provisions of this Lease, as modified by other terms and provisions hereof, are included in this Summary of Lease for summary and definitional purposes only. If there is any conflict or inconsistency between any term or provision in this Summary of Lease and any other term or provision of this Lease, the other term or provision of this Lease shall control:

A.  **Landlord: SCAP 9, LLC, an Nevada Limited Liability Company**
B.  **Address of Landlord for Notices:** 7170 E. McDonald Drive, Suite 4, Scottsdale, Arizona 85253
C.  Tenant: Alpine Securities Corporation
D.  Address of Tenant for Notices: The Premises : 39 Exchange Place, Salt Lake City Utah, 84111
E.  **Lease Term:** ) One year One(1) Years(the "Term"), beginning on June 1, 2016, (the "Commencement Date"), and expiring May 31, 2017
F.  Rentable Square Feet ("RSF") of Premises: Approximately twenty thousand five hundred twenty five (20,525) square feet subject to a load factor of approximately 20% not to exceed the above square feet in total Lease including load factor and not to be any less than the above regardless of load factor)
G.  Tenant's Proportionate Share: Shall be determined by dividing the RSF into the total leased space of the buildings located at 39 Exchange Place, Salt Lake City Utah, 84111(the "Project") which is hereby defined as the total space leased within the project during the applicable comparison year for which the operating cost calculation is determined) The Tenant rents 100% of the space of the Premises.
H.  Base Rent:

| Period | | Annual Rate Per RSF | Annual Base Rent | Monthly Base Rent |
|---|---|---|---|---|
| Months | 1 – 12 | $28(subject to adjustment in accordance with the provisions of Paragraph 3 below) | $574,700 (subject to adjustment in accordance with the provisions of Paragraph 3 below) | $47,891.67 (subject to adjustment in accordance with the provisions of Paragraph 3 below) |

I.  Base Year: 2012 Base Year Month November
J.  Security Deposit 00.00 or Cleaning Deposit: 00.00
K.  Parking Spaces: on the terms and conditions more specifically set forth in Article 5 below
L.  Guarantor: N/A
O.  Tenant's Real Estate Broker for this Lease: N/A
P.  Landlord's Real Estate Broker for this Lease: N/A

## ARTICLE 1: THE PREMISES

1.1   On the terms stated in this Lease, Landlord leases the Premises to Tenant, and Tenant leases and accepts the Premises from Landlord, for the Term beginning on the Commencement Date and ending on the Expiration Date unless extended or sooner terminated pursuant to this Lease.

1.2   The Premises contain a net rentable area of approximately twenty thousand five hundred twenty five (20,525) square feet rentable square feet. Landlord and Tenant agree that the approximate net rentable area of the Premises set forth in this Section 1.2 is conclusively deemed to be the actual net rentable area thereof. Landlord and Tenant specifically understand and agree that the amount of Base Rent and Tenant's

Proportionate Share, as defined in Article 3 of this Lease, and other charges to be paid by Tenant based upon the size of the Premises shall not be adjusted either upward or downward, notwithstanding any subsequent re-measurement of the Premises or the Building.

1.3     Landlord reserves the right to add to, improve or alter the size, layout and location of the Building, common areas or facilities of the Building or Project, as well as to expand or reduce the size of, or to change the name or street address, of the Building or Project, or any portion thereof, provided the Premises are not materially and adversely affected.

## ARTICLE 2: TERM / DELAY IN POSSESSION

The term of this Lease shall be for a period of one (1) year and any partial month within which the Commencement Date falls, beginning on the Commencement Date and ending on the Expiration Date. In the event that Landlord, for any reason, cannot tender possession of the Premises to Tenant on or before the Commencement Date, this Lease shall not be void or voidable, nor shall Landlord be liable to Tenant in any way as a result of such failure to tender possession. In the event that Landlord cannot tender possession of the Premises to Tenant for any reason, other than the acts or omissions of Tenant and force majeure, Tenant shall not be obligated to pay rent hereunder until such time as Landlord tenders possession of the Premises to Tenant, and the term of this Lease shall commence at the time that the Premises are ready for occupancy by Tenant.

## ARTICLE 3: RENT / SECURITY DEPOSIT

3.1     Base Rent. Commencing on the Commencement Date, Tenant agrees to pay to Landlord at the address set forth in the Summary of Lease, or such other address as Landlord may direct in writing, without deduction, offset, prior notice or demand, for the use and occupancy of the Premises, the Base Rent (subject to the CPI adjustment [defined below]) set forth in the Summary of Lease, payable in advance on the first day of each and every month throughout the term of this Lease. Monthly installments of Base Rent for any period during the Lease Term which is for less than one (1) full calendar month shall be a prorated portion of the monthly installment herein, based upon the actual number of days in such calendar month. The Base Rent shall be adjusted annually on the anniversary of the Commencement Date by comparing the percentage increase of the Consumer Price Index as published by the Bureau of Labor Statistics, United States Department of Labor (All items, 1982-1984 =100)["CPI"] for the month of June of the Base Year (the "Base Month"), to the month of June for the year of the adjustment (the "Comparison Year") and multiplying the percentage increase over the Base Year times the Base Rent then applicable and the result shall be the Base Rent for the succeeding year. Thus, if, for example, the index for the Base Month is 102 and the index for the Comparison Month is 106, then the Base Rent for the succeeding year will be 106 divided by 102 multiplied by the Base Rent [(106/102) * (Base Rent)]. There shall not be any decrease in the Base Rent.

3.2     Operating Cost Share Rent; Tax Share Rent. For the entire term of this Lease, Tenant shall pay all "Operating Cost Share Rent" in an amount equal to Tenant's Proportionate Share of Operating Costs (defined within the lease) for the applicable fiscal year of the Lease (the "Operating Costs"), paid monthly in advance in an estimated amount. **"Operating Costs"** means any expenses, costs and disbursements of any kind, paid or incurred by Landlord in connection with the ownership, management, maintenance, operation, insurance, repair and other related activities in connection with any part of the Project and of the personal property, fixtures, machinery, equipment, systems and apparatus used in connection therewith, including the cost of providing those services required to be furnished by Landlord under this Lease. Operating Costs shall also include the costs of any capital improvements which are intended to reduce Operating Costs or improve safety or appearance, and those made to keep the Project in compliance with governmental requirements applicable from time to time (collectively, "Included Capital Items"); provided, that the costs of any Included Capital Item shall be amortized by Landlord, together with an amount equal to interest at ten percent (10%) per annum, over the estimated useful life of such item and such amortized costs are only included in Operating Costs for that portion of the useful life of the Included Capital Item which falls within the Lease Term.

If the Project is not fully occupied during any portion of any fiscal year, Landlord may adjust (an "Equitable Adjustment") Operating Costs to equal what would have been incurred by Landlord had the Project been fully occupied. This Equitable Adjustment shall apply only to Operating Costs that are variable and therefore

increase as occupancy of the Project increases. Landlord may incorporate the Equitable Adjustment in its estimate of Operating Costs.

For the entire term of this Lease, Tenant shall also pay all "Tax Share Rent" in an amount equal to Tenant's Proportionate Share of the Taxes (defined below) for the applicable fiscal year of this Lease, paid monthly in advance in an estimated amount. "Taxes" means any and all taxes, assessments and charges of any kind, general or special, ordinary or extraordinary, levied against the Project, which Landlord shall pay or become obligated to pay in connection with the ownership, leasing, renting, management, use, occupancy, control or operation of the Project or of the personal property, fixtures, machinery, equipment, systems and apparatus used in connection therewith. Taxes shall include real estate taxes, personal property taxes, sewer rents, water rents, special or general assessments, transit taxes, ad valorem taxes. Taxes shall also include all fees and other costs and expenses paid by Landlord in reviewing any tax and in seeking a refund or reduction of any Taxes, whether or not the Landlord is ultimately successful. For any year, the amount to be included in Taxes (a) from taxes or assessments payable in installments, shall be the amount of the installments (with any interest) due and payable during such year, and (b) from all other Taxes, shall at Landlord's election be the amount accrued, assessed, or otherwise imposed for such year or the amount due and payable in such year. Taxes shall not include any net income (except Rent Tax), capital, stock, succession, transfer, franchise, gift, estate or inheritance tax, except to the extent that such tax shall be imposed in lieu of any portion of Taxes. Tenant shall be entitled to any refunds of Taxes or adjustments.

Landlord shall estimate the Operating Costs and Taxes of the Project by April 1 of each fiscal year, or as soon as reasonably possible thereafter. Landlord may revise these estimates whenever it obtains more accurate information, such as upon its receipt of the actual real estate tax assessment or tax rate for the Project. Within ten (10) days after receiving the original or revised estimate from Landlord, Tenant shall pay Landlord one-twelfth (1/12th) of Tenant's Proportionate Share of the estimated Operating Costs and Taxes, multiplied by the number of months that have elapsed in the applicable fiscal year to the date of such payment including the current month, minus payments previously made by Tenant for the months elapsed. On the first day of each month thereafter, Tenant shall pay Landlord one-twelfth (1/12th) of Tenant's Proportionate Share of this estimate, until a new estimate becomes applicable.

Landlord shall deliver to Tenant a report for the previous fiscal year (the "Operating Cost Report") by April 1 of each year, or as soon as reasonably possible thereafter, setting forth the amount of Operating Cost Share Rent and Tax Share Rent due from Tenant. Within twenty (20) days after such delivery, Tenant shall pay to Landlord the amount due. If the amount previously paid by Tenant exceeds the amount due, Landlord shall apply the excess to Tenant's next payment(s) of Operating Cost Share Rent and Tax Share Rent. Landlord's failure to provide the Operating Cost Report by April 1 of each year or as soon as reasonably possible thereafter, or in the manner provided herein, shall in no way excuse Tenant from its obligation to pay Operating Cost Share Rent and Tax Share Rent or constitute a waiver of Landlord's right to bill and collect Operating Cost Share Rent and Tax Share Rent from Tenant in accordance with the terms of this Lease.

G. Tenant's Proportionate Share: Shall be determined by dividing the RSF into the total leased space of the buildings located at 39 Exchange Place, Salt Lake City Utah, 84111(the "Project") which is hereby defined as the total space leased within the project during the applicable comparison year for which the operating cost calculation is determined)

3.3    Security Deposit. Tenant shall deposit with Landlord upon execution of this Lease the sum provided in Item I of the Summary of Lease ("Security Deposit"), which sum shall be held by Landlord in its general accounts, without obligation for interest, as security for the performance of all of Tenant's covenants and obligations under this Lease, it being expressly understood and agreed that the Security Deposit is not an advance rental deposit or a measure of Landlord's damages in case of Tenant's default. Upon the occurrence of any default (as described in Article 22 below) by Tenant, Landlord may, without prejudice to any other remedy provided herein or provided by law, use the Security Deposit to the extent necessary to make good any arrears of Rent or other payments due Landlord hereunder, all of which shall be deemed to be Rent, and any other damage, injury, expense or liability caused by such default; and Tenant shall pay to Landlord on demand the amount so applied in order to restore the Security Deposit to its original amount. Any remaining balance of the Security Deposit shall be returned by Landlord to Tenant within one hundred and twenty (120) days after the later of the end of the Term of this Lease

and the date the Premises have been vacated and possession thereof delivered to Landlord pursuant to Article 24 below, provided all of Tenant's obligations under this Lease have been fulfilled.  No part of the Security Deposit shall be considered to be held in trust, to bear interest or to be a prepayment of any Rent.  Tenant acknowledges and agrees that the security deposit may be applied towards any rent or other sum in default or otherwise owing to Landlord by Tenant following the expiration or earlier termination of this Lease,.

### ARTICLE 4: LANDLORD'S OBLIGATIONS / TENANT'S OBLIGATIONS

4.1     Landlord's Obligations. Landlord shall, for the entire term of this Lease, maintain the roof, refrigeration and heating units, and the exterior of the Premises herein demised to Tenant. Landlord shall be obligated and shall pay all costs incurred relating to such maintenance, and, if necessary, replacements thereof. Landlord shall, for the entire term of this Lease, pay all costs relating to utilities  (except as provided below), insurance, real property taxes, garbage and sewer services, exterior maintenance and landscaping, and all other costs associated with operating the Premises, except those which are specifically the responsibilities of Tenant, or as provided in Section 4.2 below.  The cost of these Landlord obligations shall be included in the calculation of the Tenant's Operating Cost Share Rent. Landlord shall not provide janitorial service to the Premises. The Landlord will not provide janitorial. The Landlord may at its discretion defer and transfer its obligations under 4.1 Landlord's Obligations in part or in whole to the Tenant at the Landlord's sole discretion.

4.2     Tenant's Obligations. Tenant shall be liable for and shall pay directly all costs relating to interior construction and maintenance, telephone service, personal property taxes, insurance of contents and business interruption, and other costs incurred in maintaining the Premises demised hereunder which are not the express obligation of Landlord, including but not limited to the door to the Premises and the exterior glass windows. The Tenant will also be responsible for the cost of repair and maintenance of the heating system and any electric utility expense or any other utility expenses directly linked metered to the Tenant's space.

### ARTICLE 5: PARKING

Landlord will not offer any parking.

### ARTICLE 6: RENT TAX / PERSONAL PROPERTY TAXES

6.1     Tenant agrees to pay to Landlord, in addition to, and simultaneous with any other amounts payable to Landlord under this Lease, a sum equal to the aggregate of all applicable municipal, county, state or federal excise, sales, use, or transaction privilege taxes now or hereafter legally levied or imposed against or on account of any or all amounts payable under this Lease by Tenant or the receipts thereof by Landlord (except income taxes attributable to Landlord).

6.2     Tenant shall pay, prior to delinquency, all taxes levied upon the fixtures, furnishings, equipment and personal property placed on the Premises by Tenant. If any or all of Tenant's fixtures, furnishings, equipment or personal property shall be assessed and taxed with the Landlord's real property, Tenant shall reimburse Landlord for such taxes within thirty (30) days after delivery to Tenant by Landlord of a statement in writing setting forth the amount of such taxes applicable to the Tenant's property.

## ARTICLE 7:  PAYMENT OF LATE CHARGES AND INTEREST

In the event any payment of rent required to be made by Tenant under this Lease is not received within five (5) business days after the due date, Tenant shall be subject to a late charge equal to ten percent (10%) of the overdue amount ("Late Charge").  Payment of any Late Charge shall not excuse Tenant for any other default hereunder.  In addition to any Late Charge, all amounts not paid when due shall bear interest from the due date until paid at the lesser of (a) eighteen percent (18%) per annum, or (b) the maximum rate then allowed by applicable law. The term "rent(s)" or "Rent(s)" as used in this Lease means Base Rent, Operating Cost Share Rent, Tax Share Rent, and any and all other costs, expenses, liabilities, and amounts that Tenant is required to pay under this Lease, including interest.

## ARTICLE 8: CONSTRUCTION AND ALTERATIONS OF THE PREMISES

8.1     Landlord is leasing the Premises to Tenant in its current "AS IS" and "WHERE IS" condition, without any obligation to alter, remodel, improve, repair or decorate any part of the Premises,

8.2     After occupancy, Tenant shall not make, or cause to be made any additions, alterations, improvements, repairs or other work affecting the Premises, or any part thereof, without the prior written consent of Landlord.

8.3     Any work performed by Tenant, or any fixtures or personal property moved onto the Premises, shall be at Tenant's own risk and neither Landlord nor Landlord's agents or contractors shall be responsible to Tenant for damage or destruction of Tenant's work or property. Tenant shall provide Landlord with lien waivers and the like, when requested by Landlord.  Tenant shall indemnify, defend and hold harmless Landlord and its members, managers, officers, directors, partners, shareholders, employees, and agents, and any mortgagee (including a beneficiary and trustee under a deed of trust) of Landlord from and against all claims made with respect to damage or destruction of property of Tenant or third persons moved on the Premises.

## ARTICLE 9: FIXTURES / PERSONAL PROPERTY

All moveable furniture that is not permanently affixed to the Premises shall remain the property of Tenant and shall be removed by Tenant not later than the Expiration Date, provided that Tenant has not been in default hereunder. Tenant shall promptly repair, at its own expense, any damages occasioned by such removal and return the Premises in good condition, normal wear and tear excepted.  All fixtures, wall coverings, floor coverings, window coverings, doors, lighting and other special fixtures that may be placed upon, installed in or attached to the Premises by or on behalf of Tenant shall, at the Expiration Date or earlier termination of this Lease, be the property of Landlord and remain upon and be surrendered with the Premises, without disturbance, molestation or injury.

## ARTICLE 10: LIENS

Tenant shall keep the Premises and the Project free from any liens arising out of work performed, material furnished, or obligations incurred due to Tenant's actions.  In the event any such lien does attach against the Premises, and Tenant does not discharge the lien or post bond (which under law would prevent foreclosure or execution under the lien) within ten (10) days after the lien so attaches, Tenant shall be in default of this Lease, and Landlord may proceed with any remedy provided in Article 23 and/or Landlord may take any action necessary to discharge the lien.

## ARTICLE 11: USE OF PREMISES / RULES AND REGULATIONS / SIGNS

11.1    Tenant shall use the Premises for office purposes only and subject to any city or governmental use laws and restrictions that are currently in effect or will be in effect. Any change from current use will require approval of Landlord. The Landlord will consider any reasonable request to add additional business to the Tenant's space provided such is in compliance with all City and Governmental laws and does not negatively impact other Tenants in any way or would reduce the value of the property. Any changes to the space or its structure will require Landlord, City and Governmental approval and would be at the Tenant's sole cost and expense. Throughout the Lease Term, Tenant shall maintain the Premises in its condition as of the date of delivery of possession to Tenant, loss or damage caused by the elements, ordinary wear, and fire and other casualty not caused by Tenant excepted, and at the termination of this Lease or Tenant's right to possession, Tenant shall return the Premises to Landlord in broom-clean condition. To the extent Tenant fails to perform either obligation, Landlord may, but need not, restore the Premises to such condition and Tenant shall pay the cost thereof.

11.2    Tenant, at its sole expense, shall use and occupy the Premises in accordance with, and make necessary modifications, alterations, or additions (whether substantial or insubstantial, structural or nonstructural, foreseen or unforeseen) required by all governmental laws, ordinances and regulations, orders, judgments, ordinances, regulations, codes, directives ("**Governmental Requirements**"), regulations of any fire insurance underwriters or rating bureaus, permits, licenses, covenants and restrictions now or hereafter applicable to the Building or accessways and other areas serving the Building or Tenant's use thereof and whether or not reflecting a change in policy from that now existing, including but not limited to, obtaining all licenses and permits required by any governmental authority. The Tenant is responsible for any structural or improvement costs required to the Project or Premise by Landlord as a direct result of the Tenants occupancy. With respect to the Americans with Disabilities Act of 1990 (as amended or as supplemented by further laws from time to time, the "ADA"), Tenant shall bear the cost of modifications, alterations, or additions to the Premises required for compliance with (i) the ADA as in effect on the Commencement Date, and (ii) further laws in amendment or supplement to the ADA first in effect after the Commencement Date only if the Premises are not in compliance with such further laws as a result of Tenant's particular use of the Premises. Tenant shall not use or permit the Premises to be used in whole or in part for any purpose or use in violation of any of the laws, ordinances, regulations or rules of any public authority at any time applicable thereto. Tenant shall comply with the Rules and Regulations attached to this Lease as Exhibit "B" and all reasonable rules established for the Project from time to time by Landlord.

11.3    Tenant shall not: (a) commit, or suffer to be committed, any waste upon the Premises; (b) use the Premises for or carry on or permit any offensive, noisy, or dangerous trade, business, manufacture or occupation, or any nuisance or anything against public policy; (c) use the exterior of the roof or walls of the Building for any purpose, or use the automobile parking area for any unauthorized use; (d) dispose of, store or allow to be disposed or stored in the Premises, the Building or the Project, any hazardous or toxic wastes or materials in contravention of any local, state or federal law, rule or regulation, or other regulations promulgated by Landlord; (e) allow any use of the Premises which will increase the cost of Landlord's insurance on the Building or Project, or which would cause the value or utility of any part of the Project to diminish or which would interfere with any other tenant or with the operation of the Building by Landlord; or (f) smoke or permit any of its employees, agents, or invitees to smoke on or about the Premises or the Building, except in those areas located outside of the Building designated by Landlord as a designated smoking area, if any.

## ARTICLE 12: RIGHTS RESERVED BY LANDLORD

Landlord shall have the following rights, without liability to Tenant for damage or injury to property, persons or business and without effecting an eviction, constructive or actual, or disturbance of Tenant's use or possession giving rise to any claim for set-off or abatement of Rent: (a) to approve the tenant improvements and other improvements to be constructed by Tenant; (b) to designate and approve, prior to installation, all types of window shades, blinds, drapes, awnings, window ventilators and other similar equipment; (c) to retain at all times, and to use in appropriate instances, keys to all doors within and into the Premises (no locks shall be changed or added without the prior written consent of Landlord, such consent not to be unreasonably withheld). (d) to have and retain a paramount title to the Premises free and clear of any act of Tenant purporting to burden or encumber it; (e) to approve the weight, size and location of safes and other heavy equipment and articles in and about the Premises;

and (f) to relocate the Tenant, upon thirty (30) days prior written notice to Tenant, from all or part of the Premises (the "Old Premises") to another area in Project (the "New Premises"), provided that (i) the size of the New Premises is at least equal to the size of the Old Premises; and (ii) Landlord pays the costs of moving Tenant and improving the New Premises to the standard of the Old Premises. Reservation of the rights set forth in this Article 12 shall, however, impose no obligation or duty upon Landlord to exercise said rights, or be liable to the Tenant for any damages resulting from such exercise. While Tenant is paying the Rent and keeping and performing all of the terms of this Lease, Landlord will do nothing that will prevent Tenant from peaceably and quietly enjoying, holding and occupying the Premises during the Lease Term. This covenant shall not extend to any disturbance, act or condition brought about by any third party and shall be subject to the rights of Landlord set forth in this Lease. This Lease is subject to any easements, covenants and restrictions of record for the Project. (g) if in connection with Landlord's expansion, reduction, removal, renovation or construction of new or existing improvements, Landlord determines that it is necessary that Tenant vacate the Leased Premises or that the Leased Premises be altered, Landlord may require with 30 days written notice to Tenant that Tenant surrender possession of the Premises, provided Landlord, in its sole and absolute discretion but subject to the terms of any other agreement affecting the building either (i) amends the Lease to lease Tenant other comparable premises within the Building on the same terms and conditions as those contained in the Lease for the balance of the remaining Lease Term, or (ii) terminates this Lease and pays Tenant an amount equal to the yet unamortized net cost to Tenant of its improvements, calculated using a straight-line amortization schedule and an amortization period equal to the Lease Term. The relocation of the Premises in accordance with (i) herein or the payment of the consideration in accordance with (ii) herein shall be Tenant's sole remedy in the event Tenant is required to surrender possession of the Leased Premises as provided in this section. (h) The Landlord has the option of terminating this Lease should the city or government cause the Landlord to make any improvements or modifications to the structure as a result of the Tenants business. If the Landlord elects not to cancel this Lease and make any improvements or modifications, the Tenant shall be liable for all of such cost. (i) In any case of receivership, change in ownership or control by Tenant, the Landlord may at its sole discretion do one or all in part or in whole the following: cancel this Lease upon 30 day notice, increase its rent by 500%, and, or demand that the Tenant purchase the building at the greater of ($20,000,000) twenty million dollars or twice market value. Such a liability shall be subordinated to nothing. In Such a case, the Tenant submits to immediate payment or summary judgement, unless a change of control of the Landlord in which case Article 12 (i) shall be null and void.

## ARTICLE 13: MAINTENANCE AND SANITATION

13.1    Tenant hereby waives all rights to make repairs at the expense of Landlord, and Landlord shall not be liable to Tenant for failure to make repairs as required herein unless Tenant has previously notified Landlord, in writing, of the need for such repairs and Landlord has failed to commence said repairs within thirty (30) days following receipt of Tenant's written notification.

13.2    In the event Landlord should be required to perform any maintenance or make any repairs because of: (a) modifications from those approved by Landlord in Tenant's plans and specifications for tenant improvements; (b) Tenant's installation of improvements, fixtures or equipment which has not been approved by Landlord; (c) Tenant's or Tenant's employees' or customers' negligence or wrongful act; or (d) Tenant's failure to perform any agreements contained in this Lease, Landlord may perform the maintenance or repairs or require Tenant to do so. If Landlord performs the maintenance or repair arising under this Section, Tenant shall pay Landlord the cost thereof plus a reasonable amount (15% of costs) for Landlord's overhead upon receipt of Landlord' invoice.

## ARTICLE 14: ENTRY AND INSPECTION

14.1    Landlord and Landlord's agents shall have the right to enter into and upon the Premises at all reasonable times for the purpose of inspecting the same, performing Landlord's maintenance and repair obligations under this Lease, or exhibiting the Premises to potential tenants and purchasers, so long as Tenant's business is not unreasonably disturbed by Landlord's entry.

14.2    If Tenant shall not be personally present to open and permit an entry into said Premises, at any time, when for any reason an entry therein shall be necessary or permissible, Landlord or Landlord's agents may use a master key to enter, without rendering Landlord or such agents liable therefore, and without in any manner affecting the obligations and covenants of this Lease. Landlord shall be permitted to take any action under this

Article without any abatement of Rent and without any liability to Tenant for any loss of occupation or quiet enjoyment of the Premises thereby occasioned, nor shall such action by Landlord be deemed an actual or constructive eviction.

## ARTICLE 15:  ACCEPTANCE OF THE PREMISES "AS IS"
## AND INDEMNIFICATION OF LANDLORD

15.1    All merchandise, furniture, floor and wall covering and personal property and fixtures belonging to Tenant and all persons claiming by or through Tenant which may be on the Premises shall be there at Tenant's sole risk. Tenant hereby waives all claims against Landlord for loss, injury or damage to all persons and property on the Premises from theft, fire, water, gas or otherwise, including roof leaks, sprinkler leakage or bursting pipes. Tenant accepts the Premises in good condition and satisfactory for all purposes of this Lease, "AS IS", with no warranty or representations having been made by Landlord as to the condition of the Premises or its suitability for Tenant's purposes.

15.2    Tenant shall indemnify, defend and hold harmless Landlord and its members, managers, officers, directors, partners, shareholders, employees, and agents, and any mortgagee (including a beneficiary and trustee under a deed of trust) of Landlord against all claims arising from Tenant's possession, use, maintenance and repair of the Premises; any act or omission or negligence of Tenant or Tenant's invitees, agents and employees; any default of Tenant under this Lease; or other acts or omissions or negligence which result in personal injury, loss of life or property damage sustained in and about the Premises.

## ARTICLE 16: INSURANCE

16.1    Upon taking possession of the Premises and thereafter during the Lease Term, the Tenant shall, at Tenant's sole cost and expense, maintain commercial general liability insurance, including, without limitation, premises liability and contractual liability endorsements, against Claims for personal injury, death, or property damage occurring in, upon, or about the Premises. The limits of liability of such insurance shall not be less than Three Million Dollars ($3,000,000) combined single limit or in such higher amounts as Landlord may require. All such policies of insurance shall name Landlord and/or such other party or parties as Landlord may require as additional insureds.

16.2    Tenant shall maintain fire and extended coverage insurance with a business interruption endorsement on merchandise, personal property, equipment and trade fixtures owned or used by Tenant and other property that Tenant may remove on the Expiration Date.

16.3    Tenant's insurance shall be maintained with an insurance company qualified to do business in the State of Utah, with a company acceptable to Landlord.  Tenant's insurance policies will contain endorsements stating that the insurance will not be canceled nor will the carrier fail to renew or materially change the policy without first giving the Landlord thirty (30) days written notice. Before entry into the Premises and before expiration of any policy, Tenant shall provide Landlord with evidence that the requirements of this Article have been met and that the applicable premiums or renewal premiums have been paid. Tenant's insurance shall name as additional insureds and loss payees, Landlord and any mortgagees or beneficiaries of any Deed of Trust securing the Premises.

16.4    Landlord shall maintain fire and full extended coverage insurance ("all risk") throughout this Lease Term on the Premises and may name the holder of a first mortgage or deed of trust as additional insured. At Landlord's option, the policy of insurance may include a business interruption insurance endorsement for loss of rents. The Landlord may at its option carry Earthquake and Flood Insurance or if required by any lender.

16.5    Landlord shall not be responsible or liable to Tenant for any Claims for loss or damage caused by the acts or omissions of any third persons entering upon or occupying space in the Building.

16.6    Tenant hereby waives any right of recovery from Landlord, and Landlord's agents, officers and employees, and Landlord hereby waives any right of recovery from Tenant and Tenant's agents, officers or employees, for any loss or damage (including consequential loss) resulting from any of the perils insured against by either's liability, fire and extended coverage policy. The parties shall give their respective insurance carriers notice of this waiver and secure an endorsement from each carrier to the effect that the waivers given under this Section

shall not adversely affect or impair the policies of insurance or prejudice the right of the named insured on the policy to recover thereunder. A waiver given under this Section shall apply only to losses occurring during the time that such an endorsement is in effect.

16.7    As used in this Article, "Claims" means any claims, suits, proceedings, actions, causes of action, responsibility, liability, demands, judgments and executions.

16.8    The Tenant's policy under this Article 16 must be issued in the names of the Landlord and the Tenant. The Tenant must further provide proof of such insurance at any time the Landlord shall request such in addition to the above requirements.

## ARTICLE 17: DAMAGE AND DESTRUCTION OF PREMISES

17.1    In the event of fire or other casualty damage to the Premises, or the Premises being declared unsafe or unfit for occupancy by any authorized public or governmental authority for any reason other than Tenant's act, use or occupation, which declaration or fire or casualty damage requires repairs to the Premises, Landlord shall commence to make said repairs within sixty (60) days after written notice by Tenant of the necessity therefore. No such destruction (including any destruction necessary in order to make repairs) shall void this Lease. The Base Rent shall be proportionately reduced while such repairs are being made, based upon the extent to which the making of such repairs shall interfere with the business carried on by Tenant in the Premises, but not to exceed the proceeds Landlord receives from rental value insurance. Upon substantial completion of the repairs, the Base Rent shall be restored to the amount in effect prior to the damage of destruction.

17.2    In the event Landlord determines that repairs are not desired for any reason, Landlord shall have the right, to be exercised by notice in writing to Tenant given within ninety (90) days from said occurrence, to cancel and terminate this Lease. Upon notice to Tenant, the Lease Term shall expire by lapse of time upon the third day after such notice is given, and Tenant shall vacate the Premises and surrender the same to Landlord. If Landlord elects to terminate this Lease under this Section, all Rents shall be prorated as of the date of damage or destruction and Landlord shall be released from liability or obligation to Tenant. With respect to any destruction (including any destruction necessary in order to make repairs) which Landlord is obligated to repair or may elect to repair under the terms of this Article, Tenant waives any statutory or other right Tenant may have to cancel this Lease as a result of such destruction and no such destruction shall annul or void this Lease.

## ARTICLE 18: EMINENT DOMAIN

If a part of the Project is taken by eminent domain or deed in lieu thereof which is so substantial that the Premises cannot reasonably be used by Tenant for the operation of its business, then either party may terminate this Lease effective as of the date of the taking. If any substantial portion of the Project is taken without affecting the Premises, then Landlord may terminate this Lease as of the date of such taking. Rent shall abate from the date of the taking in proportion to any part of the Premises taken. The entire award for a taking of any kind shall be paid to Landlord, and Tenant shall have no right to share in the award. All obligations accrued to the date of the taking shall be performed by the party liable to perform said obligations, as set forth herein.

## ARTICLE 19: ASSIGNMENT AND SUBLEASES

19.1    Tenant shall not transfer, sublease or assign this Lease, or any interest herein, including spaces in the automobile parking area, without Landlord's consent, such consent not to be unreasonably withheld. Consent by Landlord to one assignment, subletting, occupation or use by another person shall not be deemed to be a consent to any subsequent assignment, subletting, occupation or use by another person. Neither this Lease nor any interest therein shall be assignable, as to the interest of Tenant, by operation of law, without the prior written consent of Landlord. Any attempted transfer, assignment or subletting without the prior written consent of Landlord shall be void. Tenant shall remain primarily liable for all of its obligations under this Lease, notwithstanding any assignment or transfer.

19.2    If Tenant shall assign this Lease or sublet any part of the Premises for consideration in excess of the pro-rata portion of Rent applicable to the space subject to the assignment or sublet, then Tenant shall pay to Landlord as additional Rent 100% of any such excess immediately upon receipt.

## ARTICLE 20: SALE OF PREMISES BY LANDLORD / SUBORDINATION / ESTOPPEL CERTIFICATES

20.1    In the event of any sale of the Premises or the Project, or the assignment of this Lease by Landlord, Landlord shall be and is hereby relieved of all liability under any and all of Landlord's covenants and obligations contained in this Lease or arising out of any act, occurrence or omission occurring thereafter. Tenant's interest under this Lease shall be subordinate to all terms of the lien of any first deed of trust or first mortgage or any second or third mortgage (if they exist (hereinafter collectively referred to as "mortgage") now or hereafter placed on Landlord's interest in the Premises or the Project. If the Premises is sold pursuant to default on the mortgage, or pursuant to a transfer in lieu of foreclosure, Tenant shall, at mortgagee's or purchaser's election, not disaffirm this Lease but shall attorn to the mortgagee or purchaser. This Article shall be self-operative, and Tenant agrees to execute and deliver, if Landlord shall so request, such further instruments necessary to subordinate this Lease to a lien of any mortgage and to affirm the attornment provisions set forth herein.

20.2    Tenant agrees at any time, and from time to time, upon request by the Landlord, to execute, acknowledge and deliver to Landlord a statement within five (5) calendar days of demand in writing certifying (a) that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating such modifications), (b) the dates to which the Base Rent and other charges have been paid in advance, if any, (c) Tenant's acceptance and possession of the Premises, (d) the Commencement Date of this Lease, (e) the Expiration Date of this Lease, (f) that Landlord is not in default under this Lease (or if Tenant claims such default, the nature thereof), (g) that Tenant claims no offsets against the Rent, and (h) such other information as shall be reasonably necessary to establish the status of the tenancy created by this Lease. Failure to deliver such statement within the time required shall be conclusive evidence against the non-certifying party that this Lease, with any amendments identified by the Landlord, is in full force and effect, that there are no uncured defaults by Landlord, that not more than one month's rent has been paid in advance, that Tenant has not paid any security deposit, and that Tenant has no claims or offsets against Landlord.  It is intended that any such statement delivered pursuant to this Article may be relied upon by any prospective purchaser, mortgagee or assignee of any mortgage of the Premises or the Building.

## ARTICLE 21: LANDLORD'S RIGHT TO CURE

In the event of breach, default, or noncompliance hereunder by Landlord, Tenant shall, before exercising any right or remedy available to it, give Landlord written notice of the claimed breach, default, or noncompliance. If prior to its giving such notice Tenant has been notified in writing of the address of a lender which has furnished financing to the Project, concurrently with giving the aforesaid notice to Landlord, Tenant shall also give notice by registered mail to such lender. For the thirty (30) days following such notice (or such longer period of time as may be reasonably required to cure a matter which, due to its nature, cannot be reasonably remedied within thirty (30) days), Landlord shall have the right to cure the breach, default, or noncompliance involved. If Landlord has failed to cure a default within said period, any such lender shall have an additional thirty (30) days within which to cure the same, or if such default cannot be cured within that period, such additional time as may be necessary if within such thirty (30) day period said lender has commenced and is diligently pursuing the actions or remedies necessary to cure the breach, default, or noncompliance involved (including but not limited to, commencement and prosecution of proceedings to foreclose or otherwise exercise its rights under its mortgage or other security instrument, if necessary to effect such cure), in which event this Lease shall not be terminated by Tenant so long as such actions or remedies are being diligently pursued by said lender.

## ARTICLE 22: ELEMENTS OF DEFAULT

The following events, actions and occurrences shall constitute a default under this Lease by Tenant:

(a)    if Tenant fails pay any Rent when due; or

(b)     If Tenant fails to perform any other obligation to Landlord under this Lease, and, in the case of only the first (2) of such failures during the Term of this Lease, this failure continues for ten (10) days after written notice from Landlord, except that if Tenant begins to cure its failure within the ten (10) day period but cannot reasonably complete its cure within such period, then, so long as Tenant continues to diligently attempt to cure its failure, the ten (10) day period shall be extended to twenty (20) days, or such lesser period as is reasonably necessary to complete the cure; or

(c)     If one of the following credit defaults occurs:

(1)     Tenant commences any proceeding under any law relating to bankruptcy, insolvency, reorganization or relief of debts, or seeks appointment of a receiver, trustee, custodian or other similar official for the Tenant or for any substantial part of its property, or any such proceeding is commenced against Tenant and either remains undismissed for a period of thirty (30) days or results in the entry of an order for relief against Tenant which is not fully stayed within seven (7) days after entry; or

(2)     Tenant becomes insolvent or bankrupt, does not generally pay its debts as they become due, or admits in writing its inability to pay its debts, or makes a general assignment for the benefit of creditors; or

(3)     Any third party obtains a levy or attachment under process of law against Tenant's leasehold interest; or

(d)     If Tenant vacates or abandons the Premises.

### ARTICLE 23: LANDLORD'S REMEDY UPON TENANT'S DEFAULT

23.1     Upon default of Tenant as provided above, Landlord or Landlord's agents and employees shall have the right and option, without prejudicing its right to pursue other remedies available at law or in equity, and without any further notice, demand or delay, to:

(a)     prosecute and maintain an action or actions, as often as Landlord deems advisable, for collection of all rents, other charges and damages as the same accrue, without entering into possession and without terminating this Lease. No judgment obtained shall constitute a merger or otherwise bar prosecution of subsequent actions for all rents and other charges and damages as they accrue;

(b)     re-enter and take possession of the Premises and remove Tenant, Tenant's agents, any subtenants, licensees, concessionaires, or invitees and any or all of their property from the Premises, by summary proceedings or otherwise as provided by law. Landlord shall not be liable to Tenant in any way in connection with any action taken under this Article. No action taken, commenced or prosecuted by Landlord, no execution on any judgment and no act or forbearance on the part of Landlord in taking or accepting possession of the Premises shall be construed as an election to terminate this Lease unless Landlord expressly exercises this option in writing. Upon taking possession of the Premises Landlord may from time to time, without termination of this Lease, relet the Premises or any part thereof as agent for Tenant, upon such rental terms and conditions (which may be for a term extending beyond the Lease Term) as Landlord, in its sole discretion, may deem advisable, with the right to make alterations and repairs to said Premises required for reletting. The rents received by Landlord from such reletting shall be applied first to the payment of any costs of reletting, second to the payment of rent due and unpaid hereunder, and third, to any other damages suffered by Landlord as the result of Tenant's default. The residue, if any, shall be held by Landlord and applied in payment of future rent as the same may become due and payable hereunder. If the rents received from such reletting during any month are insufficient to reimburse Landlord for any costs of reletting or rent due and payable, Tenant shall pay any deficiency to Landlord. Such deficiency shall be calculated and paid monthly. Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect to terminate this Lease for such previous breach;

(c)     elect to terminate this Lease by written notice to Tenant. In the event of such termination, Tenant agrees to immediately surrender possession of the Premises. If Tenant fails or refuses to surrender the Premises, Landlord may take possession as provided above. Should Landlord terminate this Lease,

Tenant shall have no further interest in this Lease or in the Premises, and the Landlord may recover from Tenant all damages it may incur by reason of Tenant's default, including the cost of reletting the Premises, and the worth at the time of such termination of the excess, if any, of the amount of rent and charges equivalent to rent reserved in this Lease for the remainder of the Lease Term over the amount of such rental loss which Tenant proves Landlord could have reasonably avoided, all of which amounts shall be immediately due and payable at Landlord's election from Tenant to Landlord; or

(d)     obtain the appointment of a receiver in any court of competent jurisdiction, and the receiver may take possession of any personal property belonging to Tenant and used in the conduct of the business of Tenant being carried on in the Premises. Tenant agrees that the entry upon the Premises or possession of said personal property by said receiver shall not constitute an eviction of Tenant from the Premises or any portion thereof, and Tenant hereby agrees to save and hold Landlord harmless from any claim of any character by any person arising out of or in any way connected with the entry by said receiver in taking possession of the Premises and/or said personal property.

"**Costs of reletting**" as used in this Lease means any reasonable costs necessary to take possession of the Premises and lease the Premises to another tenant, including, but not limited to legal and brokerage costs and expenses of recovery and reletting of the Premises, including court costs and attorneys' fees, costs and expenses of alterations, repairs and improvements, and removal and storage of Tenant's property and protection of the Premises.

23.2     No act or conduct of the Landlord, whether by re-entry, taking possession, reletting the Premises, obtaining appointment of a receiver or otherwise, prior to the expiration of the Lease Term, shall be deemed to be or constitute an acceptance of the surrender of the Premises by Landlord or an election to terminate this Lease unless Landlord exercises its election in writing under this Article 23. Such acceptance or election by Landlord shall only be effected, and must be evidenced by written acknowledgment of acceptance of surrender or notice of election to terminate signed by Landlord.

23.3     No remedy herein conferred upon Landlord shall be considered exclusive of any other remedy, but the same shall be cumulative and shall be in addition to every other remedy given hereunder, or now or hereafter existing at law or equity. No delay or omission of Landlord to exercise any right or power arising from any default shall impair any such right or power, or shall be construed to be a waiver of any such default or an acquiescence therein.

## ARTICLE 24: SURRENDER OF PREMISES

At the Expiration Date, Tenant shall surrender the Premises in good order and condition, reasonable wear and tear excepted, and shall deliver all keys to Landlord. Before surrendering the Premises, Tenant shall remove all of its personal property and trade fixtures and shall repair any damage caused by such property or the removal thereof. If Tenant fails to remove its personal property and fixtures on or before the Expiration Date, the same shall be deemed abandoned and shall become the property of Landlord.

## ARTICLE 25: TENANT'S HOLDING OVER

If Tenant shall holdover after the Expiration Date, Tenant shall become a tenant on a month-to-month basis upon all of the terms of this Lease as might be applicable to such month-to-month tenancy, except that Tenant shall pay Rent at double (200%) the Base Rent in effect immediately prior to such holdover, computed on a monthly basis for each full or partial month Tenant remains in possession, which rental shall be payable in advance on the first day of such holdover period and on the first day of each month thereafter. Nothing contained herein shall give Tenant the right to holdover the Premises after the expiration or earlier termination of this Lease.

## ARTICLE 26: MISCELLANEOUS

26.1     This Lease shall be construed and enforced in accordance with the laws of the State of Utah.

26.2    If any terms, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

26.3    The various headings and numbers herein and the grouping of the provisions of this Lease into separate articles and paragraphs are for the purpose of a convenience only and shall not be considered a part hereof. The use of singular term in this Lease shall include the plural and the use of the masculine, feminine or neuter genders shall include all others.

26.4    Time is of the essence in performance of each and every obligation of this Lease.

26.5    In the event either party initiates legal proceedings to enforce any right or obligation under this Lease or to obtain relief for the breach of any covenant hereof, the party ultimately prevailing in such proceedings shall be entitled to recover from the defaulting party the costs of such proceedings, including reasonable attorneys' fees.

26.6    This Lease, and any Exhibits or Addendums attached hereto, sets forth the entire agreement of the parties. No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by both parties.

26.7    This Lease shall apply to and bind the heirs, successors, executors, administrators and assigns of all the parties hereto.

26.8    WAIVER OF TRIAL BY JURY TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH PARTY WAIVES TRIAL BY JURY IN THE EVENT OF ANY LEGAL PROCEEDING BROUGHT BY THE OTHER IN CONNECTION WITH THIS LEASE. EACH PARTY SHALL BRING ANY ACTION AGAINST THE OTHER IN CONNECTION WITH THIS LEASE IN A FEDERAL OR STATE COURT LOCATED IN SALT LAKE CITY UTAH, CONSENTS TO THE JURISDICTION OF SUCH COURTS, AND WAIVES ANY RIGHT TO HAVE ANY PROCEEDING TRANSFERRED FROM SUCH COURTS ON THE GROUND OF IMPROPER VENUE OR INCONVENIENT FORUM.

### ARTICLE 27: NOTICES

Unless otherwise expressly provided in this Lease, wherever in this Lease it is required or permitted that notice or demand be given or served by either party to or on the other, such notice or demand shall be given or served in writing and (a) delivered personally, (b) deposited with the United States Postal Service as registered or certified mail, return receipt requested, or (c) sent by overnight mail by a reputable overnight courier, to the parties at the addresses set forth in the Summary of Lease. Service of any notice or demand shall be deemed completed (a) on the earlier of actual deliver or three (3) business days after deposit thereof, if deposited with the United States Postal Service as registered or certified mail, or (b) upon receipt if delivered by overnight courier or in person. Either party may change its address from time to time by giving at least ten (10) days prior written notice to the other in the manner provided in this Article.

### ARTICLE 28: BROKER'S COMMISSIONS

Tenant represents to Landlord that Tenant has not dealt with any real estate broker with respect to this Lease except for any broker(s) listed in the Schedule, and no other broker is in any way entitled to any broker's fee or other payment in connection with this Lease. Tenant shall indemnify and defend Landlord against any claims by any other broker or third party for any payment of any kind in connection with this Lease.

## ARTICLE 29: EXCULPATION

Landlord shall have no personal liability under this Lease; its liability shall be limited to the value to Landlord of the remaining payments due under this Lease, and shall not extend to any other properties or assets of the Landlord.  In no event shall any officer, director, employee, agent, shareholder, partner, manager, member or beneficiary of Landlord be personally liable for any of Landlord's obligations hereunder.

## ARTICLE 30: SIGNAGE

Tenant shall have the right to place building standard signage on or near the door to the Premises, at Tenant's sole cost and expense, subject to Landlord's prior written approval as to the location, size, design, color and materials used in said signage, and subject to Tenant's compliance with all applicable laws, rules and regulations (including but not limited to the Rules and Regulations attached to this Lease as Exhibit "B") governing same.  Tenant shall be responsible for all costs and expenses incurred during the term of the Lease for the maintenance, repair and/or replacement of said signage. Tenant shall, at its cost and expense, remove its signage at the expiration or earlier termination of the Lease and return the area under and around the location of all of Tenant's signs to the condition it was in prior to the installation thereof.  Tenant will also pay for and maintain its single listing in the Building directory.  Tenant shall not be entitled to any additional signage unless expressly agreed to in writing by Landlord.

## ARTICLE 31: ELECTRICAL

Tenant acknowledges that electrical utilities are separately metered to the Premises.  Tenant, at Tenants sole cost and expense agrees to arrange with the Public or Private utility furnishing service to the Premises to have the cost of such electrical utilities billed directly to Tenant.

## ARTICLE 32: ZONING

In the event that the Tenant does not meet the current zoning requirements or the government authority requires significant improvements to the Project as a result of the Tenant, the Landlord has the option to terminate this lease.

## ARTICLE 33: GUARANTOR

The obligations of the Tenant under this Lease shall be guaranteed by the Guarantors. The Tenant shall also guarantee the Lease.

## ARTICLE 34: REPLACMENT AND CONSIDERATION

This Lease replaces the prior lease signed in May 15, 2016 beginning in June 1, 2016 known as the original Lease for SCAP 9 LLC and any other prior Leases. In exchange for the new Lease the term limit has been greatly increased and the rent has been adjusted to reflect a more marketable rate.

**IN WITNESS WHEREOF**, the parties have duly executed this Lease as of the date set forth below their signatures.

"TENANT"   Alpine Securities Corp

C Fuhl CEO

Date: 12/14/2016

_____

Date: _____

"GUARANTOR"

_____

Date: _____

_____

Date: _____

"LANDLORD"

SCAP 9 LLC

By: _____

NEWMGT LLC
Managing Member

Date: 12/14/2016

**EXHIBIT "A"**

**PLAN OF THE PREMISES**
Intentionally left blank

**EXHIBIT "A"**

S9668.0001 BN 879351v2

## EXHIBIT "B"

## RULES AND REGULATIONS

1. Tenant shall not place anything, or allow anything to be placed near the glass of any window, door, partition or wall that may, in Landlord's judgment, appear unsightly from outside of the Premises or the Project.

2. The Project directory shall be available to Tenant solely to display names and its location in the Project, which display shall be as directed by Landlord.

3. The sidewalks, halls, passages, exits, entrances, elevators and stairways shall not be obstructed by Tenant or used by Tenant for any purposes other than for ingress to and egress from the Premises. Tenant shall lend its full cooperation to keep such areas free from all obstruction and in a clean and sightly condition, and shall move all supplies, furniture and equipment as soon as received directly to the Premises and move all such items and waste being taken from the Premises (other than waste customarily removed by employees of the Building) directly to the shipping platform at or about the time arranged for removal therefrom. The halls, passages, exits, entrances, elevators, stairways, balconies and roof are not for the use of the general public and Landlord shall, in all cases, retain the right to control and prevent access thereto by all persons whose presence in the judgment of Landlord, reasonably exercised, shall be prejudicial to the safety, character, reputation and interests of the Project. Neither Tenant nor any employee or invitee of Tenant shall go upon the roof of the Project.

4. The toilet rooms, urinals, wash bowls and other apparatuses shall not be used for any purposes other than that for which they were constructed, and no foreign substance of any kind whatsoever shall be thrown therein, and to the extent caused by Tenant or its employees or invitees, the expense of any breakage, stoppage or damage resulting from the violation of this rule shall be borne by Tenant.

5. Tenant shall not cause any unnecessary janitorial labor or services by reason of Tenant's carelessness or indifference in the preservation of good order and cleanliness.

6. Tenant shall not: (a) install or operate any refrigerating, heating or air conditioning apparatus, or vending machines, without the prior written consent of Landlord; (b) use the Premises for housing, lodging or sleeping purposes; or (c) permit preparation or warming of food in the Premises (warming of coffee and individual meals with employees and guests excepted). Tenant shall not occupy or use the Premises or permit the Premises to be occupied or used for any purpose, act or thing which is in violation of any Governmental Requirement or which may be dangerous to persons or property.

7. Tenant shall not bring upon, use or keep in the Premises or the Project any kerosene, gasoline or inflammable or combustible fluid or material, or any other articles deemed hazardous to persons or property, or use any method of heating or air conditioning other than that supplied by Landlord.

8. Landlord shall have sole power to direct electricians as to where and how telephone and other wires are to be introduced. No boring or cutting for wires is to be allowed without the consent of Landlord. The location of telephones, call boxes and other office equipment affixed to the Premises shall be subject to the approval of Landlord.

9. No additional locks shall be placed upon any doors, windows or transoms in or to the Premises. Tenant shall not change existing locks or the mechanism thereof. Upon termination of the lease, Tenant shall deliver to Landlord all keys and passes for offices, rooms, parking lot and toilet rooms which shall have been furnished Tenant.

In the event of the loss of keys so furnished, Tenant shall pay Landlord therefore. Tenant shall not make, or cause to be made, any such keys and shall order all such keys solely from Landlord and shall pay Landlord for any keys in addition to the two sets of keys originally furnished by Landlord for each lock.

**EXHIBIT "B"**
**Page 1 of 3**

10.     Tenant shall not install linoleum, tile, carpet or other floor covering so that the same shall be affixed to the floor of the Premises in any manner except as approved by Landlord.

11.     No furniture, packages, supplies, equipment or merchandise will be received in the Project or carried up or down in the freight elevator, except between such hours and in such freight elevator as shall be designated by Landlord.  Tenant shall not take or permit to be taken in or out of other entrances of the Building, or take or permit on other elevators, any item normally taken in or out through the trucking concourse or service doors or in or on freight elevators.

12.     Tenant shall cause all doors to the Premises to be closed and securely locked and shall turn off all utilities, lights and machines before leaving the Project at the end of the day.

13.     Without the prior written consent of Landlord, Tenant shall not use the name of the Project or any picture of the Project in connection with, or in promoting or advertising the business of, Tenant, except Tenant may use the address of the Project as the address of its business.

14.     Tenant shall cooperate fully with Landlord to assure the most effective operation of the Premises' or the Project's heating and air conditioning, and shall refrain from attempting to adjust any controls, other than room thermostats installed for Tenant's use.  Tenant shall keep corridor doors closed and window coverings and/or blinds in their down position.

15.     Tenant assumes full responsibility for protecting the Premises from theft, robbery and pilferage, which may arise from a cause other than Landlord's negligence, which includes keeping doors locked and other means of entry to the Premises closed and secured.

16.     Peddlers, solicitors and beggars shall be reported to the office of the Project or as Landlord otherwise requests.

17.     Tenant shall not advertise the business, profession or activities of Tenant conducted in the Project in any manner that violates the letter or spirit of any code of ethics adopted by any recognized association or organization pertaining to such business, profession or activities.

18.     No bicycle or other vehicle and no animals or pets shall be allowed in the Premises, halls, freight docks, or any other parts of the Building, except that blind persons may be accompanied by "seeing eye" dogs.  Tenant shall not make or permit any noise, vibration or odor to emanate from the Premises, or do anything therein tending to create or maintain a nuisance, or do any act tending to injure the reputation of the Building.

19.     Tenant acknowledges that Building security problems may occur which may require the employment of extreme security measures in the day-to-day operation of the Project.

Accordingly:

(a)     Landlord may, at any time, or from time to time, or for regularly scheduled time periods, as deemed advisable by Landlord and/or its agents, in their sole discretion, require that persons entering or leaving the Project or the Building identify themselves to watchmen or other employees designated by Landlord, by registration, identification or otherwise.

(b)     Tenant agrees that it and its employees will cooperate fully with Project employees in the implementation of any and all security procedures.

(c)     Such security measures shall be the sole responsibility of Landlord, and Tenant shall have no liability for any action taken by Landlord in connection therewith, it being understood that Landlord is not required to provide any security procedures and shall have no liability for such security procedures or the lack thereof.

20.    Tenant shall not do or permit the manufacture, sale, purchase, use or gift of any fermented, intoxicating or alcoholic beverages without obtaining written consent of Landlord.

21.    Tenant shall not disturb the quiet enjoyment of any other tenant.

22.    Tenant shall not provide any janitorial services or cleaning without Landlord's written consent and then only subject to supervision of Landlord and at Tenant's sole responsibility and by janitor or cleaning contractors or employees at all times satisfactory to Landlord.

23.    Landlord may retain a pass key to the Premises and be allowed admittance thereto at all times to enable its representatives to examine the Premises from time to time and to exhibit the same and Landlord may place and keep on the windows and doors of the Premises at any time signs advertising the Premises for rent.

24.    No equipment, mechanical ventilators, awnings, special shades or other forms of window covering shall be permitted either inside or outside the windows of the Premises without the prior written consent of Landlord, and then only at the expense and risk of Tenant, and they shall be of such shape, color, material, quality, design and make as may be approved by Landlord.

25.    Tenant shall not canvas or solicit other tenants of the Building for any purpose.

26.    Tenant shall not install or operate any phonograph, musical or sound-producing instrument or device, radio receiver or transmitter, TV receiver or transmitter, or similar device in the Building, nor install or operate any antenna, aerial, wires or other equipment inside or outside the Building, nor operate any electrical device from which may emanate electrical waves which may interfere with or impair radio or television broadcasting or reception from or in the Building or elsewhere, without in each instance obtaining the prior written approval of Landlord. The use thereof, if permitted, shall be subject to control by Landlord to the end that others shall not be disturbed.

27.    Tenant shall promptly remove all rubbish and waste from the Premises. Tenant shall break large boxes down to a "flat" condition prior to placement in the trash.

28.    Tenant shall not exhibit, sell or offer for sale, rent or exchange in the Premises or at the Project any article, thing or service, except those ordinarily embraced within the use of the Premises specified in Article 11 of this Lease, without the prior written consent of Landlord.

29.    Tenant shall list all furniture, equipment and similar articles Tenant desires to remove from the Premises or the Building and deliver a copy of such list to Landlord.

30.    Tenant shall not overload any floors in the Premises or any public corridors or elevators in the Building.

31.    Tenant shall not do any painting in the Premises, or mark, paint, cut or drill into, drive nails or screws into, or in any way deface any part of the Premises or the Building, outside or inside, without the prior written consent of Landlord.

32.    Whenever Landlord's consent, approval or satisfaction is required under these Rules and Regulations, then unless otherwise stated, any such consent, approval or satisfaction must be obtained in advance; such consent or approval may be granted or withheld in Landlord's sole discretion, and Landlord's satisfaction shall be determined in its sole judgment.

33.    Tenant and its employees shall cooperate in all fire drills conducted by Landlord in the Building.

**EXHIBIT "C"**

**COMMENCEMENT DATE CONFIRMATION**

Landlord:    SCAP 9 LLC, an Nevada limited liability company

Tenants:    Alpine Securities Corp

        This Commencement Date Confirmation is made by Landlord and Tenant pursuant to that certain Lease dated as of 6/1, 2016 (the "Lease") for certain premises (the "Premises") known as Suite ___ in the building commonly known as Salt Lake Stock EX. This Confirmation is made pursuant to Item E of the Summary of Lease.

        1.    Lease Commencement Date, Expiration Date. Landlord and Tenant hereby agree that the Commencement Date of the Lease is June 1, 2016 and the Expiration Date of the Lease is 5/31, 2017.

        2.    Acceptance of Premises. Tenant has inspected the Premises and affirms that the Premises is acceptable in all respects in its current "as is" condition.

        3.    Incorporation. This Confirmation is incorporated into the Lease, and forms an integral part thereof. This Confirmation shall be construed and interpreted in accordance with the terms of the Lease for all purposes.

"TENANT"    Alpine Securities Corp

Date: 12/14/2016

Date: _____

"LANDLORD"

SCAP 9 LLC

By: _____
    John Hurry
    Managing Member
Date: _____

**EXHIBIT "C"**
**Page 1 of 1**

**JX-29**
**Page 20 of 20**