# EXHIBIT B

**FINANCIAL INDUSTRY REGULATORY AUTHORITY**
**OFFICE OF HEARING OFFICERS**

| | |
|---|---|
| DEPARTMENT OF ENFORCEMENT, | Disciplinary Proceeding |
| Complainant, | No. 2019061232601 |
| v. | Hearing Officer–CC |
| ALPINE SECURITIES CORPORATION (CRD No. 14952), | **EXTENDED HEARING PANEL DECISION** |
| Respondent. | March 22, 2022 |

> **Member firm Alpine Securities Corporation converted and misused customer funds and securities, engaged in unauthorized trading, charged and paid customers unfair prices in securities transactions, charged customers unreasonable and discriminatory fees, and made an unauthorized capital withdrawal. For this misconduct, the member firm is expelled and ordered to pay restitution. Additionally, FINRA imposes a permanent cease and desist order against the firm.**

*Appearances*

For the Complainant: Savvas A. Foukas, Esq., Kevin Hartzell, Esq., and Pearline M. Hong, Esq., Department of Enforcement, Financial Industry Regulatory Authority

For the Respondent: Maranda E. Fritz, Esq., Maranda E. Fritz, P.C. and Brian P. Lanciault, Esq., Thompson Hine LLP, and Michael D. Cruz, Esq., Alpine Securities Corporation

**DECISION**

## I.      Introduction

At issue in this case is whether Respondent Alpine Securities Corporation acted properly in response to the firm's mounting financial challenges. The firm asserts that, because of an increase in clearing-related expenses, regulatory compliance costs, and legal expenses, its profits declined precipitously in 2018, making it difficult to continue its retail securities business. As a result, Alpine Securities contends, in August 2018, it advised customers that it would stop carrying retail accounts and impose additional fees, including a $5,000 monthly account fee, on retail customers who did not close their accounts. FINRA's Department of Enforcement alleges that the firm's many new charges were excessive and imposed in a discriminatory manner.

Enforcement also alleges that, by declaring customer accounts abandoned and customers' securities worthless, and by moving customer funds and securities out of customer accounts without authorization and into firm proprietary accounts, Alpine Securities engaged in unauthorized trading, conversion, and misuse of customer funds and securities. Additionally, Enforcement alleges that seven of the firm's payments to an affiliated lender and one payment to an affiliated landlord were, in effect, unauthorized capital withdrawals. Alpine Securities denies all allegations and argues that increased regulatory scrutiny on the microcap market is to blame for many of the firm's woes. It argues that, in order to stay profitable, it was forced to amend its business plan and charge higher fees.

After considering all of the evidence, we find that (1) Alpine Securities' $5,000 monthly account fee, 1% per day illiquidity and volatility fee, and $1,500 certificate withdrawal fee were unreasonable and the $5,000 fee was applied in a discriminatory manner (cause five); (2) the firm's appropriation of customer positions valued at $1,500 or less for one penny per position and 2.5% market-making/execution fee resulted in unfair prices and commissions (cause four); (3) the firm converted and misused customer funds and securities by removing customer securities it improperly deemed "abandoned" and "worthless" and seizing customer securities to cover debits related to excessive and unreasonable fees (causes one and two); (4) the firm engaged in unauthorized trading by moving customers' securities from customer accounts to firm proprietary accounts without customer authorization purportedly to cover outstanding debits and because the firm improperly identified the securities as "worthless," and by moving customers' securities from customer accounts to the firm's abandoned securities accounts without customer authorization because the firm improperly identified the accounts as "abandoned" (cause three); and (5) the firm executed one unauthorized capital withdrawal (cause six). We dismiss Enforcement's allegations in cause six that Alpine Securities executed an additional seven unauthorized capital withdrawals.

As discussed below, for these violations, we expel the firm, order restitution, and impose a permanent cease and desist order.

## II.   Procedural History

Enforcement's investigation of Alpine Securities began when some of Alpine Securities' customers complained to FINRA about, among other things, the firm's $5,000 monthly account fee.[1] At the time, regulators from the state of Utah were also investigating the firm.[2]

Following the investigation, Enforcement filed an Amended Complaint on August 21, 2019.[3] Causes one and two of the Complaint allege that Alpine Securities violated FINRA Rules

---

[1] Hearing Transcript ("Tr.") 329-32 (FINRA Member Supervision Examination Manager Stacie Jungling).

[2] Tr. 332-33 (Jungling).

[3] Enforcement filed the original Complaint on July 25, 2019, and amended the Complaint on August 21, 2019, before Alpine Securities filed an Answer. Alpine Securities filed an Answer on September 9, 2019. For purposes of

2150 and 2010 by converting customer funds and securities (cause one) and misusing customer assets (cause two). Specifically, the Complaint alleges that Alpine Securities engaged in the following violative conduct: (1) between October 2018 and July 2019, improperly taking customer funds and securities purportedly to pay the firm's $5,000 monthly account fee; (2) between March and July 2019, misappropriating customer positions valued at $1,500 or less improperly on the grounds that they were worthless; and (3) in June and July of 2019, improperly identifying customer accounts as abandoned and moving customer securities into Alpine Securities' abandoned securities account.

Cause three of the Complaint alleges that Alpine Securities violated FINRA Rule 2010 by undertaking the following conduct without customer authorization: (1) between January and July 2019, moving customer securities from customer accounts to the firm's proprietary accounts to cover outstanding debits resulting from Alpine Securities' excessive fees, including a $5,000 monthly account fee; (2) between March and July 2019, selling hundreds of customers' positions to itself for one penny per position; and (3) in June and July 2019, moving customers' securities to Alpine Securities' abandoned securities account.

Cause four of the Complaint alleges that, between March and July 2019, Alpine Securities violated FINRA Rules 2121 and 2010 by (1) selling hundreds of customer positions to itself for one penny per position, which was an unfair price and not reasonably related to the current market price; and (2) charging customers a 2.5% market-making/execution fee which, when combined with other charges, resulted in unfair prices and commission in excess of 5% and not warranted by the circumstances.

Cause five alleges that Alpine Securities violated FINRA Rules 2122 and 2010 by (1) charging customers an unreasonable and unnecessary $5,000 monthly fee for simply having an account; (2) assessing the $5,000 monthly fee inconsistently, such that the fee was discriminatory and unfair; (3) charging customers an unreasonable illiquidity and volatility fee; and (4) charging customers an unreasonable $1,500 fee for Depository Trust and Clearing Company ("DTC") certificate withdrawals.

Cause six alleges that, from March through July 2019, Alpine Securities violated FINRA Rules 4110(c) and 2010 by disguising eight capital withdrawals as payments to its affiliated landlord and lender. Cause six alleges that, in doing so, Alpine Securities withdrew more than $2.8 million from the firm's capital (well in excess of 10% of its excess net capital) without FINRA approval, thereby improperly dissipating the firm's assets.

Alpine Securities' Answer states that the regulatory environment changed significantly in 2018, causing the firm to transition away from carrying customer accounts. The firm began the transition by imposing new and increased fees, deeming "worthless" customers' securities valued at less than the cost of transfer, and removing securities from customer accounts that the firm

this decision, the Amended Complaint will be called "the Complaint." Also, in this decision, all dollar figures will be rounded to the nearest dollar.

deemed abandoned. Although the firm placed debits in customers' accounts for its new fees and moved securities to proprietary accounts for liquidation, it contends that it never actually liquidated any customer securities. Alpine Securities states that it provided its customers with multiple notifications beginning in August 2018 and a negative response letter to alert them to the firm's intended business changes and to encourage them to close their accounts. The firm argues that its customers had a duty to act in response to the firm's notices. The firm also contends that it intended for the new $5,000 monthly account fee to encourage inactive customers to close their accounts, not to generate revenue for the firm.

As to the allegations that Alpine Securities executed unauthorized capital withdrawals, the firm argues that it was forced to renegotiate its line of credit because of its declining profits and increased risk status. It states that its lease and loan payments were part of the firm's operating expenses and did not require FINRA approval.

In conjunction with the filing of the Complaint, Enforcement also initiated a temporary cease and desist proceeding under the FINRA Rule 9800 Series. On August 4, 2019, Alpine Securities agreed to a Temporary Cease and Desist Order ("TCDO") entered in connection with this case.

Under the terms of the TCDO, a Hearing Officer ordered Alpine Securities to engage in numerous undertakings, including reversing a $5,000 monthly account fee assessed in all open customer accounts and restoring securities sold, journaled, or otherwise transferred from customer accounts on the grounds that Alpine Securities deemed them worthless, and the accounts abandoned. The TCDO also required Alpine Securities to provide a full accounting to Enforcement within 10 days of the issuance of the TCDO. Specifically, the TCDO ordered an accounting of: (1) debits in customer accounts since October 2018 resulting from a $5,000 monthly account fee, a $1,500 recertification fee, and an illiquidity and volatility fee; (2) cash transferred from customer accounts to cover debits resulting from a $5,000 monthly account fee, a $1,500 recertification fee, and an illiquidity and volatility fee; (3) securities sold, journaled, or otherwise transferred from customer accounts to firm-owned accounts to satisfy debits resulting from a $5,000 monthly account fee, a $1,500 recertification fee, and an illiquidity and volatility fee; and (4) all securities sold, journaled, or otherwise transferred from customer accounts to firm-owned accounts on the grounds that Alpine Securities has deemed the securities worthless or the accounts abandoned.

The hearing in this matter was scheduled to take place from February 18 – 28, 2020, in Salt Lake City, Utah. The hearing began as scheduled on February 18. Late in the day on February 22, after several days of testimony, the Hearing Officer temporarily adjourned the hearing at the request of Alpine Securities' counsel because of a family emergency. As a result of several postponements necessitated by the COVID-19 pandemic and because of continued health concerns posed by the COVID-19 pandemic related to in-person hearings, the remainder of the hearing occurred by videoconference. The Extended Hearing Panel reconvened for five videoconference hearing days during the summer of 2020 and, over the objection of Alpine

Securities, ten videoconference hearing days in September and October 2021.[4] In total, the parties participated in 19 days of hearing, and the Hearing Panel accepted hundreds of exhibits into the record.

## III.     Facts

### A.      Alpine Securities and Its Affiliated Entities

Alpine Securities is a registered broker-dealer located in Salt Lake City, Utah.[5] In the years leading up to 2018, Alpine Securities was one of the largest clearing firms in the United States and it focused largely in the microcap market.[6] The firm cleared transactions in microcap stocks for itself, its retail clients, and the clients of its correspondent firms.[7]

#### 1.      Alpine Securities' Management

From May 2017 until August 2018, Alpine Securities' three-person board of directors consisted of Christopher Frankel, Justine Hurry, and Richard Nummi.[8] After August 1, 2018, Alpine Securities replaced its three-person board with a one-person board. Robert Tew served as Alpine Securities' sole director from August through December 2018.[9] From December 2018 through June 2021, Christopher Doubek served as Alpine Securities' sole director.[10] Doubek testified that, as the sole board member, he reported directly to indirect owner John Hurry.[11]

---

[4] The Extended Hearing Panel consisted of the Hearing Officer and one industry panelist. Originally, the Chief Hearing Officer appointed two industry panelists to serve on the Extended Hearing Panel. On day four of the hearing, one industry panelist withdrew. Tr. 1490-91. Given that the hearing had already progressed through four days of testimony when the panelist withdrew, the Chief Hearing Officer did not appoint a replacement panelist. Tr. 1491-92. *See also* FINRA Rule 9234(a) (stating that, in the event a panelist withdraws, the Chief Hearing Officer *may*, in the exercise of her discretion, determine whether to appoint a replacement panelist). For purposes of this decision, the Extended Hearing Panel will be referred to as the "Hearing Panel."

[5] Joint Stipulations ("Stip.") ¶¶ 1, 3. Under Article IV of FINRA's By-Laws, FINRA has jurisdiction to bring this case because Alpine Securities is a member firm currently operating as a broker-dealer.

[6] Tr. 2654-55 (Alpine Securities' board member Richard Nummi). The term "microcap" applies to the securities of companies "with low or 'micro' capitalizations," meaning the total value of the company's stock or market capitalization is less than $250 or $300 million. *See Microcap Stock: A Guide for Investors*, https://www.sec.gov/reportspubs/investor-publications/investorpubsmicrocapstockhtm.html. The smallest public companies, with market capitalization of less than $50 million may also be included. *Id.* Many microcap stocks trade in the "over-the-counter" or "OTC" market, rather than on a national exchange such as NASDAQ. *Id.*

[7] Tr. 121 (Jungling).

[8] Stip. ¶ 8; Complainant's Exhibit ("CX-") 1; Tr. 4299-4300 (Justine Hurry).

[9] Stip. ¶ 9; CX-1; Tr. 1089 (Tew). Tew was also associated with Alpine Securities and part of the firm's management team from August 4, 1989 through December 17, 2018. Tr. 1125 (Tew).

[10] Stip. ¶ 10; CX-1 Tr. 4153-54 (Doubek).

[11] Tr. 2819 (Doubek).

From July 31, 2015 through August 1, 2018, Frankel served as the firm's chief executive officer and chief compliance officer (and as a director for part of that time).[12] Although Frankel's employment with Alpine Securities ended in August 2018, he served as a consultant to the firm through October 31, 2018.[13]

In August 2018, Tew (the firm's sole board member) assumed the role of chief compliance officer and interim chief executive officer.[14] He testified that, after Frankel left, he talked regularly and often with John Hurry about the operation of Alpine Securities.[15] Tew also served as the firm's president from July 2011 through December 2018, when he was terminated.[16]

Joseph Walsh has served as Alpine Securities' chief operations officer since September 24, 2018.[17] He also served as the firm's chief executive officer from January through April 2019, when Doubek replaced him as chief executive officer.[18] Doubek testified that, while he served as a board member and as chief executive officer, he communicated with John Hurry daily about managing the firm.[19] Doubek also served as the firm's chief compliance officer from May 10, 2019 through his termination in June 2021.[20]

Jason Kane joined Alpine Securities as in-house counsel in January 2019.[21] Kane served as Alpine Securities' chief compliance officer from January through May 10, 2019 and as its anti-money-laundering compliance officer from January through June 26, 2019.[22] Kane remained associated with Alpine Securities, but stepped down as chief compliance officer in April or May

---

[12] Stip. ¶ 11; Tr. 1630 (Frankel).

[13] Stip. ¶ 11.

[14] Stip. ¶ 12; CX-1; Tr. 1089-90 (Tew). Tew testified that John Hurry asked him to serve as interim chief executive officer after Frankel left, and he agreed. Tr. 1090 (Tew). At that time, the firm employed approximately 28 individuals. Tr. 1093 (Tew).

[15] CX-1; Tr. 1095 (Tew).

[16] Stip. ¶ 12. Tew testified that, in December 2018, he learned that Alpine Securities intended possibly to roll back employees' 2018 salary increases, including increases for six or seven essential employees. Tr. 1125-26 (Tew). Tew became concerned about employee morale and was not happy that this decision had been made without consulting him. Tr. 1126-27 (Tew). He placed calls to husband and wife John and Justine Hurry. He was unable to speak with either of them, so he sent an email to Justine to relay his concern. Tr. 1127 (Tew). Two hours later, Justine Hurry called Tew and fired him. Tr. 1127 (Tew).

[17] Stip. ¶ 13; CX-1.

[18] Stip. ¶ 13; CX-1; Tr. 2810-11, 3018 (Doubek). Doubek testified that he assumed the position of chief executive officer in March 2019. Tr. 2810-11 (Doubek). Walsh testified that Doubek became chief executive officer in April 2019. Tr. 3330 (Walsh). This inconsistency in the evidence is not relevant to this decision.

[19] Tr. 2819, 3152-57 (Doubek). Doubek testified that John Hurry often threatened him with termination in order to force Doubek to carry out his directives and plans for Alpine Securities. Tr. 3141-42 (Doubek).

[20] Stip. ¶ 15; CX-1; Tr. 4153-54 (Doubek).

[21] Stip. ¶ 14.

[22] Stip. ¶ 14; CX-1.

2019 because "decisions were seemingly being made without [his] advice or input or approval."[23] He resigned from Alpine Securities in June 2019.[24]

David Brant joined Alpine Securities in December 2016 and became the firm's chief financial officer in May 2017.[25] Brant left Alpine Securities in December 2020 because he disagreed with Doubek as to whether the firm was in net capital compliance.[26] Randall Jones joined Alpine Securities in March 2011.[27] He worked for eight years at Alpine Securities, then firm management forced him to work at affiliated broker-dealer Scottsdale Capital Advisors Corp. ("Scottsdale") for three or four months.[28] While at Alpine Securities, he served as a compliance analyst/associate, then became an anti-money-laundering officer.[29] Jones ended his tenure with Alpine Securities as a manager and director of business development in late January/early February 2019.[30] He voluntarily left Scottsdale in May 2019.[31]

Several former members of Alpine Securities' management team appear to have acrimonious relationships with John Hurry. This is particularly so with respect to Frankel, Jones, and Doubek.[32] We rely on Frankel's and Jones's testimony with respect to pivotal issues in this case only when there is other corroborating evidence. Overall, however, we found Frankel's and Jones's testimony to be credible in that it was consistent with the documentary evidence and other testimony about the state of affairs at Alpine Securities during the period at issue.

Doubek was Alpine Securities' chief executive officer and a board member when the hearing commenced in 2020.[33] His tenure as a board member began in late 2018 and he became

---

[23] Tr. 1393-94 (Kane). Kane testified that he "didn't want to maintain the title that, in [his] view, would suggest that [he] was in agreement and approving all of these procedures." Tr. 1394 (Kane).

[24] Tr. 1401-02 (Kane). Kane testified that he was on a conference call with Doubek and regulators from Utah. Doubek discussed the firm's intention to charge and collect fees, including the $5,000 monthly account fee, retroactively. Tr. 1401 (Kane). Kane resigned during the call. Tr. 1402 (Kane).

[25] Stip. ¶ 16; Tr. 1860-61 (Brant).

[26] Tr. 4706-08 (Brant).

[27] Tr. 1953 (Jones).

[28] Tr. 1954, 2006-09 (Jones).

[29] Tr. 1955 (Jones).

[30] Tr. 1956, 2004 (Jones).

[31] Tr. 2020 (Jones). Jones resigned from Scottsdale and left with a clean Uniform Termination Notice for Securities Industry Registration (Form U5), but a negative comment was added one month after he left. Tr. 2024-26 (Jones). Initially, Jones' interactions with John Hurry were infrequent and benign. Between July and September 2018, that changed, and their interactions increased substantially. Tr. 1961 (Jones). He originally liked working at Alpine Securities, but became more uncomfortable with Hurry's involvement in the firm in September 2018. Tr. 2011 (Jones). Jones testified that "everyone reported to John Hurry and had to answer to him." Tr. 1962 (Jones).

[32] Tr. 1752-61 (Frankel), 2011-13 (Jones), 2996-97 (Doubek).

[33] Tr. 2799 (Doubek).

chief executive officer and chief compliance officer in the first half of 2019.[34] As such, he has knowledge particular to the events at issue in this case.

Alpine Securities terminated Doubek during a break in the hearing on June 24, 2021.[35] Doubek's Form U5 states that an internal investigation by the firm indicated that Doubek "colluded with a customer to misappropriate in excess of $1.3 million in firm funds" and that he engaged in other actions contrary to the firm's business interests and regulatory responsibilities.[36] Subsequent to Doubek's departure from Alpine Securities, the firm filed a law suit against him related to his approval of the firm's payment of an invoice to outside consultant Jim Kelly, who worked for the firm at John Hurry's request.[37]

We acknowledge that Doubek has an incentive to testify negatively about Alpine Securities. We find, however, that his remarks were measured and consistent with documentary evidence and the testimony of other members of the firm's management team. His testimony appeared forthright and honest and generally was well-corroborated. Overall, we credit his testimony, which included some statements that were against his own personal interests.

## 2. Alpine Securities' Affiliated Entities

At all relevant times, holding company SCA Clearing LLC ("SCA Clearing") owned Alpine Securities.[38] In 2018 and 2019, a series of trusts owned SCA Clearing—John Hurry and his wife, Justine Hurry, served as managing trustees, and the beneficiaries of the trusts were the members of the Hurry family (John and Justine Hurry and their children).[39] SCA Clearing also owns Scottsdale, a FINRA member firm and one of Alpine Securities' correspondent firms.[40] Accordingly, John Hurry was an indirect owner of Alpine Securities during the period relevant to the Complaint.

Alpine Securities Holding Corporation ("Alpine Holding") is another affiliated entity owned indirectly by trusts of which John Hurry was the managing trustee and the Hurry family was the beneficiary.[41] Beginning in 2014, Alpine Holding served as a source of credit for Alpine

---

[34] CX-1.

[35] Tr. 4153-54 (Doubek).

[36] CX-217, at 3, 18; Tr. 2996 (Doubek).

[37] Tr. 1506-08 (Kelly), 2997-98 (Doubek).

[38] Stip. ¶ 4; Tr. 3581 (FINRA Member Supervision Risk Monitoring Director Jeffrey Fortune).

[39] Stip. ¶ 4; Tr. 139-40 (Jungling), 4502 (John Hurry). John Hurry described himself as an indirect owner of Alpine Securities. Tr. 4437 (John Hurry). He stayed current on the firm's business by talking frequently with its chief executive officer. Tr. 4438 (John Hurry). Subsequent to Enforcement's filing of the Complaint, Alpine Securities revised its ownership structure. John Hurry now personally owns SCA Clearing. Tr. 140 (Jungling).

[40] Stip. ¶ 7; Tr. 139 (Jungling), 3581 (Fortune). Currently, Alpine Securities is Scottsdale's only clearing firm. Tr. 4539 (John Hurry). Subsequent to Enforcement's filing of the Complaint, Scottsdale revised its ownership structure so that Justine Hurry now personally owns Scottsdale's current holding company. Tr. 134 (Jungling).

[41] Stip. ¶ 6.

Securities.[42] Before offering Alpine Securities a line of credit, Alpine Holding lent money to another broker-dealer.[43]

On February 12, 2018, Alpine Holding amended its original "Credit Agreement" with Alpine Securities.[44] Under the terms of the February 2018 Credit Agreement, Alpine Securities paid an annual fee of 10% of the $4 million credit limit ($400,000) and a monthly fee of 1.5% of the credit limit ($60,000).[45] Alpine Securities paid interest on borrowed funds at an annual rate of 36%.[46]

On May 17, 2018, Alpine Holding again amended the Credit Agreement. Alpine Holding increased the credit limit to $5 million and maintained the annual fee at 10% (paid in two installments per year of $250,000 each) and the monthly fee at 1.5% of the credit limit ($75,000).[47] For this line of credit, Alpine Securities paid an annual interest rate of 36%.[48]

On February 20, 2019, Alpine Holding again amended the Credit Agreement. In this version, the credit limit stayed at $5 million and the monthly fee increased to 8% ($400,000).[49] Additionally, Alpine Holding required Alpine Securities to pay the remaining $250,000 of the annual fee for the prior line of credit, and the interest rate increased to 120% annually.[50] Alpine Securities no longer paid an annual fee. Between early 2018 and June 2019, Alpine Securities paid $2,440,000 in monthly fees and $580,435 in interest to its affiliated lender (exclusive of annual fees) to maintain access to its line of credit.[51]

Under the terms of each iteration of Alpine Securities' Credit Agreement, Alpine Holding could terminate or amend the agreement at any time, regardless of whether the agreement was up

---

[42] Tr. 3581, 3646-47 (Fortune).

[43] Tr. 4431 (John Hurry).

[44] Alpine Securities executed two sets of Credit Agreements on February 12, 2018. The first gave the firm a $3 million line of credit. Joint Exhibit ("JX-") 25, at 2. The second increased the line of credit to $4 million. JX-26, at 1.

[45] JX-25, at 2; JX-26, at 1; Tr. 1890-93 (Brant).

[46] JX-25, at 7.

[47] JX-27, at 3, 10; Tr. 1734 (Frankel), 1890 (Brant), 3651-52 (Fortune).

[48] JX-27, at 9. Then chief executive officer Frankel testified that John Hurry established the terms of the agreement, and Frankel signed it. Tr. 1736 (Frankel). Frankel noted that John and Justine Hurry owned all of the affiliated entities, so all the money stayed within the overall Hurry family operation. Tr. 1737 (Frankel).

[49] JX-28, at 3, 8; Tr. 2435-36 (FINRA Member Supervision Risk Monitoring Analyst Robert Ishak), 3422 (Walsh). Then chief executive officer Walsh testified that board members Justine Hurry and Doubek directed him to sign the amended loan agreement because the firm had no other options and needed the line of credit to stay operational. Tr. 3422-24 (Walsh).

[50] JX-28, at 2, 8; Tr. 2436, 2477 (Ishak).

[51] CX-168; Tr. 4649-51 (Brant).

for renewal.[52] None of the amendments included terms more beneficial to the firm than the prior version. Generally, after each amendment, Alpine Securities ended up with a less favorable loan agreement.[53] Doubek and Brant indicated to FINRA that the firm had no other options for a line of credit.[54]

Another affiliated entity, SCAP9 LLC ("SCAP9"), owns the building out of which Alpine Securities operates and leases the property to the firm.[55] The Hurry family trusts indirectly own SCAP9. John Hurry is managing trustee of the trusts, and the Hurry family (John and Justine Hurry and their children) are the beneficiaries of the trusts.[56] SCAP9 does not own any real estate other than the building in which Alpine Securities is housed and does not engage in any business other than owning and leasing that building to Alpine Securities; there are no other tenants.[57] Alpine Securities' current lease is dated December 14, 2016.[58] In 2018, Alpine Securities paid monthly rent of approximately $47,891 plus a monthly assessment for common area maintenance ("CAM") and other fees.[59] In 2019, the firm paid monthly rent of approximately $49,807 plus CAM and other fees.[60]

### B.    Alpine Securities' Financial Condition in 2017 and 2018

As a clearing firm, Alpine Securities' minimum net capital requirement during the relevant period was $250,000.[61] Alpine Securities was profitable during 2017 and the first three months of 2018.[62] For the 13 months from March 2017 through March 2018, Alpine Securities reported net income of $8,628,596.[63] In January 2018 alone, the firm reported net profits in excess of $1.4 million.[64] In February 2018, it reported net profits of approximately $752,000, and in March 2018, it reported net profits of approximately $528,000.[65]

---

[52] Tr. 2477, 2483 (Ishak).

[53] Tr. 2478-79 (Ishak).

[54] Tr. 2482 (Ishak).

[55] Stip. ¶ 5; JX-29; Tr. 4502-03 (John Hurry).

[56] Stip. ¶ 5; Tr. 4502-03 (John Hurry).

[57] Tr. 4504 (John Hurry). Personnel employed by the Hurry family operates SCAP9. Tr. 4504 (John Hurry).

[58] JX-29; Tr. 4505-06 (John Hurry). The term of the original lease was one year, but presumably has been extended as Alpine Securities has not changed its location.

[59] CX-169, at 20-31; Tr. 2836-38 (Doubek).

[60] CX-169, at 32-38.

[61] JX-24; Tr. 1864 (Brant).

[62] JX-24; Tr. 1866-69, 1874 (Brant). In 2017, Alpine Securities generated net income of $8,419,595. CX-24; Tr. 2397 (Ishak). In the first quarter of 2018, it generated net income of $2,755,309. CX-24; Tr. 2397 (Ishak).

[63] CX-176, at 4; Tr. 1869 (Brant).

[64] CX-176, at 4; Tr. 1874 (Brant).

[65] CX-176, at 4; Tr. 1874 (Brant).

Alpine Securities was a member of National Securities Clearing Corporation ("NSCC").[66] At all times relevant to the Complaint, NSCC imposed on its member firms such as Alpine Securities illiquidity and volatility charges, deposit requirements, and excess net capital requirements in order to clear and settle trades.[67] As of January 2018, NSCC required Alpine Securities to maintain excess net capital of $1 million and to meet its deposit requirements as necessary.[68] Beginning in July 2019, NSCC increased the excess net capital requirement to $2.3 million.[69] NSCC increased it again in September 2019 to $2.6 million and again in October 2019 to $3 million.[70]

Alpine Securities had a practice of distributing the firm's profits monthly to its parent.[71] In every month in 2017 when Alpine Securities was profitable, the firm distributed profits to its parent.[72] In the first three months of 2018, Alpine Securities distributed more than $3 million to its parent.[73] At the same time, the firm had to borrow funds from its affiliated lender at 36% interest to cover NSCC deposit requirements.[74] In early 2018, then chief executive officer Frankel asked John Hurry to allow the firm to discontinue its transfers of profits to its parent because of the firm's declining financial condition.[75] For the remainder of 2018, the firm did not transfer profits to its parent.

In early 2018, Alpine Securities became less profitable. In the second quarter (ending May 31, 2018), Alpine Securities reported a net loss of ($44,707).[76] In the third quarter (ending September 30, 2018), Alpine Securities reported a net loss of ($71,238).[77] Alpine Securities' losses resulted from a combination of factors, including the firm's loss of its ex-clearing

---

[66] Tr. 2392 (Jones).

[67] Stip. ¶ 17.

[68] Stip. ¶ 18.

[69] Stip. ¶ 22.

[70] Stip. ¶ 23.

[71] Tr. 1142, 1223 (Tew), 1872 (Brant), 2382-83 (Ishak), 4449-50 (John Hurry). In every month in which Alpine Securities reported a profit on its Financial and Operational Combined Uniform Single (FOCUS) Report, it simultaneously filed a request for a capital withdrawal with FINRA so that it distributed its profits to its parent company monthly. Tr. 2381-83 (Ishak). FINRA generally approved such requests within days as long as Alpine Securities was able to maintain sufficient excess net capital post distribution. Tr. 2383 (Ishak).

[72] Tr. 1142, 1223 (Tew), 1872 (Brant).

[73] Tr. 1876 (Brant).

[74] Tr. 1904-06 (Brant). Brant testified that Alpine Securities could use the line of credit for any of its liquidity needs. He stated that the firm primarily used it to meet NSCC deposit requirements, but also for meeting customers' cash withdrawal requests. Tr. 4736-37 (Brant).

[75] Tr. 4450 (John Hurry).

[76] JX-24, at 118; Tr. 1878 (Brant).

[77] JX-24, at 184; Tr. 1879 (Brant).

relationships.[78] Alpine Securities handled the vast majority of its business, when it was profitable, through ex-clearing relationships, which enabled the firm to handle significant volume without maintaining significant capital.[79] Doubek opined that, in addition to losing its ex-clearing relationships, Alpine Securities was saddled with other expenses, such as significant legal expenses, excess staff, a steep rent (paid to an affiliated entity),[80] and an expensive line of credit (from an affiliated entity).[81]

### 1. Alpine Securities' Mounting Legal Expenses

During the relevant period, the Securities and Exchange Commission ("Commission") named Alpine Securities as a defendant in a federal civil action in the Southern District of New York.[82] The Commission alleged that Alpine Securities violated the federal securities laws by filing deficient suspicious activity reports ("SARs") and failing to file reports on sales of stock where a SAR had been filed in relation to a deposit.[83] On October 9, 2019, the District Court entered judgment against Alpine Securities and imposed a civil penalty of $12 million.[84] Alpine Securities appealed and, on December 4, 2020, the United States Court of Appeals for the Second Circuit affirmed the judgment of the District Court.[85]

---

[78] Until mid-2018, Alpine Securities utilized "ex-clearing," as opposed to "regular way" clearing, for more than 95% of its business. Tr. 1646-47 (Frankel), 2392 (Ishak). Because of the illiquidity and volatility of penny stocks, NSCC required significant deposits of funds for Alpine Securities to clear these trades. Tr. 2392 (Ishak). The firm's reliance on ex-clearing relationships enabled it to clear and settle trades for its customers without using its own capital to meet NSCC deposit requirements. Tr. 146 (Jungling), 2392-93 (Ishak), 3019 (Doubek). The firm maintained ex-clearing relationships with entities that had relationships with larger clearing firms and relied on those firms' credit for clearing. Tr. 2392 (Ishak).

[79] Tr. 1646-47 (Frankel) (stating that without ex-clearing relationships, Alpine Securities would require "a significant amount more cash to be able to do that same amount of business"), 2036-40 (Jones) (indicating that, when the firm lost its ex-clearing relationships, the firm could execute far fewer trades each day), 2390-91 (Ishak) (testifying that Alpine Securities was forced to reduce its penny stock business because it could not afford to handle its previous volume of trades), 2708-09 (Nummi) (stating that Alpine Securities' loss of its last ex-clearing relationship caused the firm's business to fall "off a cliff"), 2817 (Doubek) (testifying that the firm's revenue was down because the loss of ex-clearing relationships constrained its ability to generate revenue).

[80] *See* III.A.2, *supra*.

[81] Tr. 3167 (Doubek). *See also* III.A.2, *supra*. Furthermore, under Frankel, the firm had not been collecting all the fees on its fee schedule. Board member Nummi testified that Alpine Securities had written off well in excess of $1 million in uncollected fees. Tr. 2686-87 (Nummi). Nummi flagged this issue, but he never saw Frankel implement a plan to collect the fees. Tr. 2696-97 (Nummi). *See also* Tr. 2817-18 (Doubek) (testifying that, when he joined the firm at the end of 2018, the firm was not billing many of the fees on its schedule).

[82] Stip. ¶ 23; Respondent's Exhibit ("RX-") 171; Tr. 1691-93 (Frankel).

[83] Stip. ¶ 23.

[84] Stip. ¶ 23.

[85] *SEC v. Alpine Sec. Corp.*, 982 F.3d 68 (2d Cir. 2020).

Alpine Securities attributed its financial distress, in part, to its mounting legal expenses to defend itself against the Commission's regulatory action.[86] The firm's largest increase in expenses between 2017 and 2018 was in its legal costs.[87]

### 2. Alpine Securities' Loss of Ex-Clearing Relationships and Resulting Loss of Revenue

In late 2017 and early 2018, Alpine Securities began losing ex-clearing relationships one by one.[88] In April 2018, Alpine Securities lost the last of its ex-clearing relationships.[89] As a result, the firm was able to execute far fewer trades and therefore generate far fewer transaction-based commissions, which served as the main source of its revenues.[90]

Frankel attempted, but failed, to find other ex-clearing relationships for Alpine Securities.[91] The firm retained outside consultant Jim Kelly to assist with finding new ex-clearing relationships and possible outside funding for the firm.[92] Kelly had no success on either point. He believed he was unsuccessful because Frankel did not appear capable as the firm's chief executive officer and counter-parties lacked confidence in him.[93] Kelly also believed that Frankel wanted to buy Alpine Securities and compete with John Hurry and that the firm's and its affiliates' regulatory history hurt the firm's chances of obtaining outside funding and new ex-clearing relationships.[94]

Accordingly, in the summer of 2018, the firm lost its ability to trade without using its own capital to meet NSCC deposit requirements.[95] Alpine Securities lacked sufficient funds to

---

[86] Tr. 1692, 1707, 1782 (Frankel), 1879, 1882, 1885-86 (Brant), 4308 (Justine Hurry). *See also* CX-177 (showing that the firm's legal fees in February and March 2018 were $440,000 and $350,000, respectively); CX-179 (showing that the firm's legal fees in April 2018 were $444,000, in May 2018 were $612,000, in June 2018 were $150,000, in July 2018 were $206,000, and in August 2018 were $465,000).

[87] Tr. 1888-89 (Frankel).

[88] Tr. 3988 (Walsh), 4377 (John Hurry).

[89] Tr. 3988 (Walsh), 4377 (John Hurry), 4743-44 (Brant).

[90] Tr. 2039 (Jones), 2385-91 (Ishak), 4303 (Justine Hurry).

[91] Tr. 1647-48 (Frankel). Frankel testified that ex-clearing firms needed significant amounts of capital and received very little benefit from the relationship. Tr. 1649-50 (Frankel). He opined that this fact, along with Alpine Securities' reputation for having compliance problems, caused ex-clearing firms to sever their ties with Alpine Securities. Tr. 1652, 1662 (Frankel). *See also* RX-167 (stating that the firm's last ex-clearing relationship ended because Merrill Lynch was unwilling to engage in business with Alpine Securities).

[92] Tr. 1505-10 (Kelly).

[93] Tr. 1511-12 (Kelly).

[94] Tr. 1521-28, 1562-67 (Kelly).

[95] Tr. 3019-20 (Doubek), 3647-48 (Fortune).

meet NSCC deposit requirements, so it often relied on its line of credit.[96] Based on NSCC's assessment of Alpine Securities' credit rating and risk profile, NSCC required Alpine Securities to place significant funds on deposit for each trade until it cleared (two days).[97]

Without trading volume, the firm did not generate revenue and was not profitable. In order to execute trades at the same level as it had through its ex-clearing relationships, Alpine Securities required additional capital.[98]

### 3.   Alpine Securities' Staffing Costs

Doubek testified that, in December 2018, Alpine Securities employed ten times more employees than necessary.[99] Towards the end of 2018, the firm commenced a series of employee reductions and pay cuts.[100] For example, the firm asked Frankel to reduce his salary by 75%.[101] In early 2019, after enacting staffing reductions, few representatives remained at Alpine Securities.[102]

### C.   Alpine Securities Develops a New Business Plan

Given the firm's dramatic decrease in profitability in 2018, Alpine Securities struggled to continue its practice of distributing profits to its parent on a monthly basis.[103] Hurry determined that, in order to bring the firm back to profitability, management had to shrink the firm "substantially and quickly," implement a new business model, discontinue the firm's retail business, and establish a new set of fees.[104] The business plan included moving active retail accounts that generated revenue to affiliated broker-dealer Scottsdale and closing all remaining

---

[96] Tr. 1122 (Tew), 1645-47 (Frankel), 2037-38 (Jones), 3647-48 (Fortune). If Alpine Securities failed to cover an NSCC deposit requirement, the firm could have lost its NSCC membership, which would have ended its clearing business. Tr. 4749-50 (Brant).

[97] Tr. 1656-72 (Frankel), 2037-38 (Jones), 3020 (Doubek).

[98] JX-8, at 1-2; Tr. 1149, 1167 (Tew).

[99] Tr. 2816 (Doubek).

[100] Tr. 2060 (Jones), 2729 (Nummi), 4309 (Justine Hurry).

[101] Tr. 2749 (Nummi). Frankel refused and resigned from the firm, but he stayed on as a consultant for a limited time. Tr. 2730, 2749 (Nummi).

[102] Tr. 3375-78 (Walsh).

[103] CX-165, at 2; Tr. 3655 (Fortune), 4450 (John Hurry).

[104] JX-8; Tr. 1967-68 (Jones), 2847-49 (Doubek), 4378, 4555-56 (John Hurry), 4778-79 (Brant). John Hurry testified that the firm had to move all of its retail customers to Scottsdale and continue as a clearing and market-making firm only because the firm could not service its more than 4,000 customers any longer. Tr. 4384-85, 4569-70 (John Hurry). He testified that the firm did not even have sufficient capital to handle customers' liquidation orders. Tr. 4570 (John Hurry). Doubek testified that John Hurry wanted the firm to cut expenses and bill for fees. Tr. 2813-14 (Doubek).

house accounts, particularly those inherited from introducing brokers that had gone out of business.[105]

In August 2018, Alpine Securities revised its fee schedule.[106] In the August 31, 2018 fee schedule, Alpine Securities introduced a new $5,000 monthly account fee, increased from the firm's prior $100 annual account fee.[107] The revised fee schedule also included a fee identified as a "market-making/execution fee" of 2.5% of principal and an "illiquidity and volatility" charge of 1% per day of the deposit required by NSCC.[108] Basically, John Hurry sought to either make inactive accounts profitable or force them to leave the firm.[109] Alpine Securities states in its post-hearing brief that, rather than imposing a $5,000 monthly account fee on customers, it was really "offering [customers] notice of the fee and requesting that, if they wanted not to pay the fee, they simply close their accounts."[110]

### 1.  Notice to Firm Customers

In 2018, Alpine Securities issued statements to customers who had no activity in their accounts on a quarterly basis.[111] After March 2019, the firm issued statements monthly to all customers regardless of whether there was activity in their accounts.[112]

The firm appended the new fee schedule to August 31, 2018 account statements for Alpine Securities' direct customers who had activity that month (not customers of correspondent firms). The firm's method of notifying customers of the new fee schedule was to state, in standard size print in a text box at the top of the account statement, "Please take note and review the Revised Fee Schedule that is included at the end of this statement."[113] The firm attached the

---

[105] Tr. 1695 (Frankel), 3032-33 (Doubek), 3474 (Walsh).

[106] Stip. ¶ 26; JX-4; Tr. 4547 (John Hurry). Although evidence suggests that the firm's board saw the revised fee schedule, board member Nummi testified that the board did not approve the revised fee schedule. Rather, he testified, John Hurry informed the board that the new schedule was adopted seemingly without board approval. Tr. 2738-39 (Nummi). Board member Justine Hurry testified that Alpine Securities' board discussed the firm's loss of ex-clearing relationships, need for capital that would be outside the reach of the firm's general creditors, significant legal costs, and desire to reduce the number of employees. JX-6; JX-7; JX-9; Tr. 4303, 4306, 4309, 4330-31 (Justine Hurry). Justine Hurry also acknowledged that the board discussed revising the fee schedule, charging a monthly minimum, and closing retail accounts, but did not indicate that the board approved the enactment of a specific revised fee schedule. Tr. 4314-16 (Justine Hurry). Given the many members of Alpine Securities' management who testified that John Hurry directed their actions, we credit Nummi's testimony, which is not contradicted by any evidence, that John Hurry developed and enacted the new fee schedule.

[107] Stip. ¶ 27; JX-4.

[108] Stip. ¶ 28; JX-4.

[109] Tr. 3158, 3165-66 (Doubek). *See also* Tr. 4667 (Brant) (stating that the purpose of the new fee schedule was to reduce retail business and keep only very active accounts).

[110] Alpine Securities' Post-Hearing Submission ("Alpine Sec. Br.") at 28.

[111] Stip. ¶ 55; Tr. 227-28, 1332 (Jungling), 1426-27 (Kane).

[112] Tr. 227-28, 1332 (Jungling).

[113] JX-11, at 1; Tr. 3981-83 (Walsh).

fee schedule to the back of the statement and did not otherwise provide any special notice to customers of the new fee schedule.[114]

Alpine Securities again appended the revised fee schedule to the September 30, 2018 account statements for its direct customers and those customers introduced through Scottsdale.[115] The September 30, 2018 account statements also included a notice in standard size print in the text box at the top of the statement:

> Alpine has recently made significant changes to both its systems and business model . . . Alpine will be moving away from the retail business to a wholesale model . . . we have recently changed our fee schedule. This change includes a new fee of $5,000 per month per account. . . . We understand how impactful this change and fee could be to you as a client and we are prepared to work with you through this change.[116]

Alpine Securities' October, November, and December 2018 customer account statements included no notice of a new fee schedule, the $5,000 monthly account fee, and the firm's change in business plan.[117] The text box at the top of the customer account statements did not even include information in standard type, although the statements included the new fee schedule appended to the back.[118]

Alpine Securities' January 2019 customer account statements noted in standard print in a text box at the top of the statement that the firm recently made significant changes to its business model.[119] It also stated:

> . . . the recently updated Fee Schedule includes a new monthly account fee of $5,000 reflecting the change to our business model. We understand that many accountholders may not want to incur this fee, so we are working with every customer to close their accounts and avoid the fee either by: (1) liquidating positions currently held in the account; (2) returning all securities & funds to you as the accountholder; (3) writing off any worthless securities; or (4) referring you to our affiliated firm Scottsdale Capital Advisors to conduct ongoing business.[120]

---

[114] Tr. 1325 (Jungling).

[115] Stip. ¶ 29; JX-12; Tr. 4085 (Walsh).

[116] JX-12, at 2; Tr. 1329 (Jungling).

[117] JX-13; JX-14; JX-15; Tr. 225-25, 1325-26, 1329 (Jungling), 4091-92 (Walsh).

[118] The firm's December 2018 customer account statements stated, in the text box at the top of the statement, that Alpine Securities had converted to a new back-office system in 2018. JX-15, at 1.

[119] Stip. ¶ 36; JX-16, at 1; Tr. 3082 (Doubek), 3991-93 (Walsh). Customers introduced through Primary Capital, LLC, however, did not receive this notice. CX-55, at 32; Tr. 4092-93 (Walsh).

[120] JX-16, at 1; Tr. 3082 (Doubek), 3993-94 (Walsh). The text box also directed questions to Alpine Securities' "House Account" email. JX-16, at 1.

This was the first time that the firm offered customers specific options for closing their accounts.[121] Walsh and Doubek concluded that the notices, as written, were not getting customers' attention.[122] Doubek described the notices as "a small blurb," and believed that something more "dominant" was necessary to capture customer attention.[123]

Walsh and Doubek drafted a one-page notice letter to add to the front of the firm's February 2019 customer account statements.[124] At the top of the cover page, in upper case, it stated, "IMMEDIATE ACTION REQUIRED."[125] The notice alerted customers to the firm's change in business model and stated that, if the firm did not receive customers' direct instructions to close their accounts by *May 1, 2019*, the firm would liquidate positions to cover all outstanding fees including the $5,000 monthly account fee.[126] This was the first time that Alpine Securities advised customers that it would liquidate positions to cover the $5,000 monthly account fee.[127] The notice provided other options. For customers with "Cleared OTC Stocks" in their accounts, it stated that customers could (1) sell the shares if there was an active market; (2) allow Alpine Securities to return the shares; or (3) write off stock worth less than $400 as worthless.[128]

The notice further indicated:

Alpine will not transfer free-trading shares to outside accounts for regulatory & compliance reasons. Cleared shares must be returned the way they were originally delivered subject to applicable fees (see attached Fee Schedule). Please send an email request to have your certificates returned or electronically returned to the Transfer Agent. Be advised that the cost for returning a cleared certificate is currently $1,000 and that fee is being raised to $1,500 effective April 1, 2019 with the amended fee schedule attached.[129]

---

[121] Tr. 468-69 (Jungling).

[122] Tr. 2848-50, 3078, 3085-86 (Doubek), 3999 (Walsh). Walsh also considered changing the frequency of Alpine Securities' account statement delivery to provide better notice. Tr. 3481 (Walsh). At this point, the firm still issued account statements monthly only if the customer had activity in the account. Otherwise, the firm issued account statements quarterly. Tr. 3482-83 (Walsh).

[123] Tr. 2851 (Doubek).

[124] Tr. 3086-87 (Doubek), 3475-76, 3994-96 (Walsh).

[125] Stip. ¶ 37; JX-17, at 1. In February 2019, customers introduced by Primary Capital, however, did not receive the full-page notice. Their customer accounts statements stated only that Alpine Securities no longer had a relationship with a money-market vendor. CX-55, at 38; Tr. 4093-95 (Walsh).

[126] JX-17, at 1; Tr. 2852-61 (Doubek).

[127] Tr. 470-71 (Jungling).

[128] JX-17, at 1; Tr. 2852-61 (Doubek).

[129] JX-17, at 1; Tr. 2852-61 (Doubek), 4047 (Walsh).

The notice directed customers holding "Uncleared OTC Stocks" to email a request to have their certificates returned. Customers with cash or money market funds in their accounts were directed to request disbursement of their funds. The firm directed customers with listed securities to submit an "ACATS"[130] request with another broker-dealer to have the shares transferred or call Alpine Securities to liquidate the shares.[131]

Alpine Securities' March 2019 customer account statements presented the same notice to the firm's customers and offered the same options—close your accounts by May 1, 2019, or the firm will liquidate your securities.[132] Alpine Securities' April 2019 customer account statements again encouraged customers to close their accounts, but extended the required account closure date to *June 1, 2019*.[133] The firm also removed the option to liquidate securities.[134] Alpine Securities sent its direct customers another, similar notice with their May 31, 2019 monthly account statements.[135]

John Hurry opined that Alpine Securities' issuance of these notices enabled the firm to take the actions discussed in this decision. He testified, ". . . but keep in mind customers do have a duty to read their statements and as far as I understand it, they agreed to take service through the mail and we did what we were supposed to do."[136] As detailed below, however, the firm's back-office changes and reduction in staffing prevented customers from efficiently communicating with the firm and the firm from successfully responding to its customers.

## 2. Implementation of the Fees

Alpine Securities first assessed the $5,000 monthly account fee in approximately 3,000 of its direct customer accounts on October 25, 2018.[137] It also assessed the fee to 1,100 customers introduced by Scottsdale in November 2018.[138] In December 2018, it charged the $5,000 monthly account fee to 600 customers, including customers introduced by Primary Capital and

---

[130] "ACATS" stands for Automated Customer Account Transfer System, which is an automated system for the transfer of assets in a customer's account from one broker-dealer to another.

[131] JX-17, at 1; Tr. 2852-61 (Doubek), 3996-99 (Walsh).

[132] Stip. ¶ 38; JX-18; Tr. 474-75, 739 (Jungling), 2869-72 (Doubek).

[133] Stip. ¶ 39; JX-19, at 1; Tr. 743, 749 (Jungling), 2872-74 (Doubek).

[134] Tr. 477-80 (Jungling), 2872-73 (Doubek). Doubek testified that, if a customer called the firm and asked to liquidate, he believes that the firm would have agreed on a case by case basis. Tr. 2873 (Doubek).

[135] Stip. ¶ 40; JX-20.

[136] Tr. 4572 (John Hurry).

[137] Stip. ¶ 30; Tr. 195, 327 (Jungling), 3991 (Walsh).

[138] Stip. ¶ 31; Tr. 195, 327-28 (Jungling), 4097 (Walsh).

Spencer Edwards, Inc.[139] For Alpine Securities' direct customers, the firm charged the $5,000 fee in each of three months—October, November, and December 2018.[140]

To the extent a customer held cash in an account or an account was linked to a money market account when the firm assessed a $5,000 monthly account fee, the firm collected cash to cover the fee.[141] If a customer did not have cash in the account, the firm placed a debit in the account.[142] In some instances, after corresponding with Alpine Securities, customers were convinced to wire funds or send a check to cover the $5,000 monthly account fee.[143] In other instances, customers' subsequent sales of stock enabled the firm to take the proceeds to cover the fee.

Between October and December 2018, Alpine Securities placed debits of more than $23.7 million in customer accounts to cover $5,000 fees.[144] After regulatory intervention, Alpine Securities reversed approximately $22 million in fees and removed the corresponding debits from customer accounts.[145] But Alpine Securities did not return all of the funds that it seized from customer accounts as a result of the debits.[146]

### D.   Alpine Securities Changes Its Back-Office System and Limits Customers' Options for Communicating with the Firm

#### 1.   Back-Office Conversion

Many of Alpine Securities' customers received only electronic, not paper, account statements by logging on to an electronic portal.[147] In 2018, Frankel entered into an agreement for Alpine Securities to convert to a new back-office system.[148] But Frankel, who worked part-time in Alpine Securities' offices in Salt Lake City and part-time at his home in Florida, did not effectively roll out the system or have enough individuals in place in the Salt Lake City office to seamlessly handle the implementation of the new system.[149] Actual back-office transition began

---

[139] Stip. ¶ 32; Tr. 196, 327-28 (Jungling), 4097 (Walsh), 4674 (Brant). Brant testified that Alpine Securities never intended to charge correspondent firm customers and that it occurred in error. Tr. 4779-80 (Brant). In December 2018, Spencer Edwards filed a Uniform Request for Broker-Dealer Withdrawal (BDW). Tr. 256 (Jungling). Alpine Securities thereafter inherited all Spencer Edwards accounts that cleared through Alpine Securities.

[140] Tr. 4852 (Brant).

[141] Stip. ¶ 33; Tr. 1971-72 (Jones).

[142] Tr. 4853 (Brant).

[143] Tr. 264-65 (Jungling).

[144] Stip. ¶ 34.

[145] Stip. ¶ 35.

[146] CX-4A; Tr. 3893-94 (Jungling), 3550-51 (Walsh).

[147] Stip. ¶ 56.

[148] Tr. 1536 (Kelly).

[149] Tr. 1536-38 (Kelly).

in late August 2018.[150] When the firm rolled out the new system, it did not anticipate and identify potential problems in advance, prepare for them, or sufficiently announce the anticipated change to customers.[151]

The new back-office system caused confusion for customers.[152] As a result of the unannounced implementation of the new system, the customers' account numbers and log-in credentials changed.[153] Additionally, the web address for Alpine Securities' customers to log in to view their accounts also changed.[154] The new web address was on the August 2018 statement prepared by the new vendor, but many customers saw the August 2018 statement only by logging in (which they could not do without the new web address).[155] And, the emails that provided customers with new log-in information failed to include a link to the proper website.[156]

Customers suffered a variety of problems. Some were able to log in, but even after logging in, they could not view account information.[157] Some received log-in credentials that did not work.[158] Others needed assistance locating or resetting passwords.[159] Some customers required extra help logging in after receiving new log-in credentials, and some had trouble locating a link to log in.[160] Additionally, several customers were confused by emails related to their securities accounts from an entity other than Alpine Securities and assumed it was spam because Alpine Securities provided them with inadequate advance notice.[161] Although many

---

[150] Tr. 185-86 (Jungling).

[151] Tr. 785 (Jungling), 2727-28 (Nummi).

[152] *See, e.g.*, CX-132 (June 2019 email from a customer to Alpine Securities stating, "I have tried contacting your firm by both phone and email, in which I've received ZERO response. . . . Furthermore I cannot access any online statements, as your system and/or site has continually been down or not accessible in any manner.").

[153] Stip. ¶ 57; Tr. 192-93 (Jungling).

[154] Tr. 207 (Jungling).

[155] Tr. 207-08 (Jungling).

[156] Tr. 214-17 (Jungling).

[157] CX-111, at 56-69; Tr. 210 (Jungling).

[158] CX-111, at 21-23, 42-44, 55-69, 81-85; Tr. 210-11, 1249-50, 1283-84, 1286-87, 1294-97 (Jungling).

[159] CX-111, at 6-20, 24-26, 30-32; Tr. 1248, 1251-53, 1268-69 (Jungling).

[160] CX-111, at 1-5, 36-39, 45-48, 49-54, 74-80; Tr. 1245-46, 1274-75, 1285-86, 1293-94 (Jungling).

[161] CX-111, at 27-29, 33-35, 40-41, 70-73; Tr. 208-10, 1265-66, 1270-71, 1280-81, 1289-90 (Jungling). Alpine Securities objected to Enforcement's email compilation exhibits, like CX-111, for failing to include all emails in a chain of emails between Alpine Securities and its customers. Alpine Securities argued that Enforcement chose emails unfairly to give the impression that Alpine Securities ignored its customers and did not address their issues after the back-office change. We allowed Alpine Securities to enter as rebuttal exhibits the emails that Enforcement omitted. We do not find it helpful that Enforcement omitted emails that, if included in its compilations, would have provided a more complete picture of Alpine Securities' communications with its customers. We do not, however, find that Alpine Securities was denied a fair process because, in advance of the hearing, we allowed Alpine Securities to offer additional emails between the firm and its customers.

customers encountered difficulties accessing their accounts, Alpine Securities' employees eventually helped most, but not all, customers.[162]

## 2. Customer Communications with the Firm

At the time of the back-office conversion, Alpine Securities carried more than 4,000 customer accounts and employed four house representatives to take customer questions.[163] Before March 2019, those same customers received only quarterly statements if they had no activity.[164] Accordingly, even though Alpine Securities' August 2018 account statements stated, in standard print, that the firm intended to change processing systems, many customers either had not seen the notice or were unable to reach someone for more information. Additionally, Alpine Securities had representatives answering its 800 number only until March or April 2019.[165] After that time, no one at the firm answered the phone, and most customers could not leave a message.[166] Customers generally also could not reach particular extension numbers for their representatives.[167]

As of March or April 2019, Alpine Securities directed customers to submit their questions to and otherwise communicate with the firm through the "House Account" email address.[168] Without representatives present, the firm's operations staff handled all House Account emails.[169] Doubek testified that the firm's reduction in staff coupled with its transfer to email-only communications with customers led to problems.[170] Furthermore, during a short time in June 2019, the firm set up the following automatic reply to customer emails sent to the House Account email:

> As stated in previous customer statements, all Alpine Securities accounts which had positions or balances and were not transferred per customer request, had been deemed abandoned. All assets in your accounts have been submitted for processing

---

[162] RX-92; RX-94; RX-95; RX-96; RX-97; RX-98; RX-99; RX-100; RX-101; RX-103; RX-104; RX-105; Tr. 1245-47, 1266-67, 1271-74, 1275-79, 1281-84, 1287-96, 1299-1300 (Jungling).

[163] Tr. 3983 (Walsh).

[164] Tr. 3482-83 (Walsh).

[165] Tr. 420-21 (Jungling).

[166] Tr. 422 (Jungling). Doubek testified that Alpine Securities' phone system was old and insufficient to service customer calls. Tr. 2891, 3228-29 (Doubek). Walsh testified that, in June 2019, customers could not reach anyone on Alpine Securities' phone line. Tr. 3374 (Walsh).

[167] Tr. 422 (Jungling).

[168] Stip. ¶ 54; Tr. 3228-29 (Doubek), 3485 (Walsh).

[169] Tr. 3486 (Walsh). Walsh directed his staff to respond to customer inquiries as quickly as possible. Tr. 3486 (Walsh).

[170] Tr. 2890-91 (Doubek).

to your state of residence for Unclaimed Property/Escheatment. Please contact your state for instructions on how to reclaim your assets.[171]

Not surprisingly, in June 2019, Doubek learned from Utah regulators that customers had complained.[172]

To add to the confusion, for approximately 30 days starting around mid-May 2019, Alpine Securities locked its doors and placed a sign on its door that read:

> Alpine Securities is closing all retail accounts.
> There are no representatives at this location.
> Please direct all inquiries to houseaccounts@alpine-securities.com
> Thank you.[173]

So, at this time, customers could not visit the office in person or call on the phone. Email was the customers' only option for communicating with the firm.[174]

Alpine Securities customer SG[175] testified about her experience trying to communicate with the firm during the relevant period.[176] SG received microcap stock as payment from an issuer, so she opened an account to deposit the stock with Spencer Edwards, a correspondent firm who cleared through Alpine Securities.[177] In late 2018, SG encountered difficulties with accessing her account online, but she did not address the issue.[178] In May 2019, she received two trade confirmation emails from Alpine Securities even though she had not executed or authorized any trades.[179] She tried to use the email to open her account online, but could not access her account.[180] She called Alpine Securities and spoke with Doubek. He told her that Alpine

---

[171] CX-118; Tr. 2893-94 (Doubek). Doubek testified that the firm had not actually transferred abandoned securities to state escheat accounts when the firm's system generated this automatic reply, so contacting state escheat offices would not have helped the customers at the time. Tr. 2894 (Doubek).

[172] Tr. 2890 (Doubek).

[173] CX-56, at 5; CX-79; Tr. 426-26 (Jungling), 3231-32, 3289-90 (Doubek).

[174] Tr. 3291 (Doubek).

[175] Exhibit B to this decision contains a list of all customers referenced by initials in the decision. Only the parties to this proceeding will receive a copy of Exhibit B to this decision.

[176] SG is a contractor for small issuers for whom she files required financial and registration forms on the Commission's EDGAR system. Tr. 2230, 2232 (SG).

[177] Tr. 2231 (SG).

[178] Tr. 2232, 2292-93 (SG). SG agreed to electronic delivery of account statements and to communicate with Spencer Edwards by email. RX-87; Tr. 2306-07 (SG). She admitted that she may have received email notifications that Spencer Edwards was closing and about Alpine Securities' back-office changes, but she generally did not log into her account when she had no activity, so she did not have accurate log-in information after the back-office change. Tr. 2285, 2287, 2301, 2304, 2314-15, 2317 (SG).

[179] CX-107; CX-108; Tr. 2232, 2334 (SG).

[180] Tr. 2234 (SG).

Securities had inherited her account from Spencer Edwards, and her securities were worthless. He stated that Alpine Securities would transfer them to the firm's worthless securities account.[181] (SG did not agree that her stock was worthless.)[182]

Doubek also told her that her account would be assessed a $5,000 monthly fee and $1,500 to obtain a stock certificate.[183] Additionally, he said that she had three months to move the account or lose the securities.[184] She also learned that Alpine Securities had charged other fees, such as a safekeeping fee, of which she was not aware.[185]

Customer MK testified similarly.[186] He also opened his account with Spencer Edwards in 2010 and agreed to receive account statements and confirmations by email.[187] MK did not make a regular practice of reviewing his account statements because he knew which three stocks he held and he rarely traded.[188] At some point, a Spencer Edwards broker told MK that Alpine Securities intended to charge its customers $5,000 per month.[189] MK had difficulties accessing his account in December 2018 and January 2019.[190] He placed two to four calls to Alpine Securities in January 2019. He could not reach anyone, so he left messages, but did not receive a return call.[191] Thereafter, MK communicated with Alpine Securities through a contact form he located on the firm's website.[192]

MK's December 2018 account statement showed a December 11, 2018 debit of $5,000 to cover the monthly account fee.[193] MK's January 2019 account statement showed a redemption of his money market fund that he had not authorized to cover a small portion of the $5,000 debit.[194] In January 2019, MK began trying to move his account, which held three low-priced

---

[181] Tr. 2233-35 (SG).

[182] Tr. 2233-34 (SG).

[183] CX-110; Tr. 2233-34, 2240-41 (SG). Eventually, Alpine Securities reversed the $5,000 fee in SG's account. Tr. 2246 (SG).

[184] Tr. 2236 (SG).

[185] Tr. 2246-47 (SG).

[186] MK is a securities professional who trades his own account and does consulting work for small companies. Tr. 2557 (MK).

[187] Tr. 2561-62 (MK).

[188] Tr. 2563-64 (MK).

[189] Tr. 2507 (MK).

[190] Tr. 2509-10, 2514-15, 2566-67 (MK).

[191] Tr. 2510-13, 2516-17, 2579 (MK). With the help of his former Spencer Edwards broker, MK finally heard from Alpine Securities in July 2019. Tr. 2517 (MK).

[192] Tr. 2582-83 (MK).

[193] CX-95, at 9-13; Tr. 2509-10 (MK). Alpine Securities reversed the $5,000 fee on May 13, 2019. CX-95, at 44; Tr. 2512, 2524, 2624 (MK).

[194] CX-95, at 15-18; Tr. 2510-12 (MK).

securities.[195] Alpine Securities required that he remove the two smaller positions (by treating them as worthless) before it would transfer his other position.[196] He did not want to sell off the positions as worthless, but he did it so as not to lose his other, more valuable position.[197]

On June 13, 2019, MK received an email notice from Alpine Securities identified as "FOR IMMEDIATE REVIEW."[198] The notice stated:

> As previously announced in your statements over the past 9 months, Alpine Securities has updated its business model due to increasing regulation & expense and will no longer carry direct accounts, no exceptions. All accounts must be closed immediately.

> Please be advised that all positions with a market value of $1,500.00 or less have been deemed worthless as the cost to transfer these securities exceeds the value. These positions have been removed via a worthless security sell transaction.

> Effective June 1, 2019 Alpine Securities will take action to close all remaining accounts. This means no further statements will be generated for your account.

> Alpine will liquidate enough positions in your account that have an active market to cover any open debits. All remaining positions will be moved to an Alpine Customer Abandoned Securities Account pending escheatment to the appropriate state.[199]

MK realized that, although his email, phone number, and address had not changed, Alpine Securities deemed his account abandoned.[200] On July 9, 2019, MK placed a limit order to sell his remaining position.[201] On July 10, 2019, MK received a second "FOR IMMEDIATE REVIEW" email.[202] This email stated that Alpine Securities would close all remaining accounts by July 31, 2019. It also stated:

> As of July 31, 2019, all remaining Alpine accounts without verification of a bad address will be subject to the previously enacted $5,000.00 Monthly Account Fee retroactive to November of 2018. Any credit balance and market value in the account as of May 2019 will be offset against the debit created by the application

---

[195] CX-88; Tr. 2517-19, 2572 (MK).

[196] CX-88, at 1-2; CX-90; Tr. 2521-23 (MK).

[197] CX-89; Tr. 2524-27 (MK).

[198] CX-271, at 2-3; Tr. 2534 (MK).

[199] CX-271, at 3.

[200] Tr. 2538-39 (MK).

[201] CX-91, at 1; Tr. 2538-40 (MK).

[202] CX-93; Tr. 2541 (MK).

of the Monthly Account Fee. Alpine will mail any remaining credit balance to the address of record on the account. Regular fees will apply.

In order to cover the fees assessed against the accounts, Alpine will liquidate positions and credit balances in the account to an internal Alpine house account. Once the customer account has a zero balance with no open positions, the account will be closed. No further action will be taken, and no further statements will be sent.[203]

MK was anxious to sell his one remaining position, so he removed his limit order and completed a pre-trade approval form to sell his remaining position at market price.[204] MK received a trade confirmation for the sale, which showed he was charged approximately 14% in commissions and fees, which included $75 to mail him a check (not shown on the confirmation).[205]

Customer CN provides the most extreme example of customer communication problems at Alpine Securities, and the firm's mistreatment of its customers. In 2018 and 2019, CN was not trading much in his account.[206] He received his statements quarterly in hard copy by mail. The last statement he received was in June 2018.[207] Thereafter, he received letters from Alpine Securities indicating that the firm intended to start charging additional fees.[208]

In January 2019, one of CN's holdings hit a high price, so he decided to sell.[209] CN asked for a check for the $3,306 proceeds, but his representative at Alpine Securities told CN that he could not send a check to CN until the firm resolved CN's outstanding fees, and he moved his other holdings out of the account.[210] In a follow-up email on January 23, 2019, the representative identified eight positions in CN's account and recommended that he write off three as worthless and sell five.[211] CN asked his representative to call him, but the representative instead sent the following email on January 31, 2019:

Please see below for reference to what you need to decide to do with your account positions. I do not have time to discuss this with you during market hours, as everyone here is being stretched very thin on time in an attempt to provide service

---

[203] CX-93, at 2; Tr. 2542-43 (MK).

[204] RX-85; Tr. 2546 (MK).

[205] CX-94; Tr. 2547-49 (MK).

[206] Tr. 915 (CN). CN is a retired sheriff who moved his investments to Alpine Securities in 2002. Tr. 913-14 (CN).

[207] Tr. 915-16 (CN).

[208] Tr. 917 (CN).

[209] CX-73, at 10; Tr. 917-18, 920 (CN). The trade settled on January 10, 2019 for $3,306. CX-73, at 10.

[210] CX-69, at 1; CX-70, at 4; Tr. 920-21, 922-25 (CN).

[211] CX-69, at 1.

to all Alpine clients. Please review your account positions and respond via email with how you want to proceed. The attached write-off form will need to be used once for each position you want to write off.[212]

Later on January 31, 2019, CN again asked to talk to the representative, and received the following response:

> Unfortunately we do not have the time to sit down and highlight the information with you. You will need to decide if you want to sell the shares that are shown below . . . or transfer them to another broker. The other shares will need to be written off, as they are either no longer active or would cost more to sell than they are worth. Please examine your positions and let the house team know how to proceed. Email communication is best, as we do not have enough time and resources to spend with every client on this matter.[213]

On February 24, 2019, CN directed the firm to sell four positions and write off four positions.[214] Alpine Securities still had not paid CN for his January 10, 2019 sale of stock, and he again asked for a check.[215] On March 17, 2019, CN emailed again asking about the proceeds from his January 10 stock sale and for a call so he could discuss getting his account closed.[216] No one called him.[217] On March 18, 2021, CN sent the firm a fully executed worthless securities form.[218] The firm responded by email:

> Once the account is cleared of all the positions, the monthly fee will be reversed and the credit balance will be issued to you. If you would like to place a trade, please fill out the attached form and send it to pretrade-approval (sic) . . . you will receive an e-mail trade approval back. Once you receive that, you can call a number to place a trade . . . .[219]

CN was very confused by the pre-trade approval form and did not understand how to complete it, particularly the sections that asked the customer to provide the last closing price, the one-month high, and the "20 Business Day ADV."[220] On April 2, 2019, CN emailed that he did not have "a clue" how to fill out the pre-trade approval form. He stated, "Maybe a phone call

---

[212] CX-69, at 1; Tr. 927-28 (CN).

[213] CX-70, at 1; Tr. 929 (CN).

[214] CX-72, at 3; Tr. 930-31 (CN).

[215] CX-72, at 3; Tr. 931-32 (CN).

[216] CX-72, at 1; Tr. 933-34 (CN).

[217] Tr. 933-34 (CN).

[218] RX-21; Tr. 935 (CN).

[219] CX-73, at 1; Tr. 936-37 (CN).

[220] CX-75; Tr. 939-41 (CN).

would help . . . "[221] No one called.[222] The same day, CN emailed several other questions, including "what does 20 business day ADV mean?"[223] The next day, on April 3, 2019, Doubek emailed that he did not understand what CN had asked.[224] On April 30, 2019, CN answered Doubek's email with his own lengthy email. He asked what happened to the prior representative and why no one would return his calls. He stated that he just wanted to close his account. He indicated that he had not received his quarterly statement, could not access his account online, and never received the proceeds of his January 2019 stock sale. He again asked to talk or meet in person.[225]

Doubek did not call CN, but on April 30 he asked by email for his account number, which CN provided.[226] On May 13, 2019, CN again emailed:

I am writing again to ask if you received my last e-mail with my account number, which you asked for please let me know. Please let know if you are working with me to get my account closed.[227]

On May 23, 2019, CN visited Alpine Securities' office and found the doors locked and a sign on the door that stated that Alpine Securities was closing all retail accounts and that there were no representatives in the office.[228] On or after June 11, 2019, CN received a letter dated May 31, 2019 from Alpine Securities. It stated that all positions with a market value of $1,500 or less have been deemed worthless and have been removed via worthless security sell transactions.[229] On July 12, 2019, CN wrote again to reiterate his questions and confusion.[230] CN still had not received the proceeds of his January sale of stock.

CN complained to regulators about Alpine Securities. On December 3, 2019, CN again emailed the firm to reiterate that he could not log into his account because he did not have a password. He stated that he wanted to sell two remaining positions and close his account. He again asked for one phone call to resolve all of his issues.[231] He felt it was urgent that he close

---

[221] CX-74, at 1.

[222] Tr. 938 (CN).

[223] CX-75, at 3.

[224] CX-75, at 1; Tr. 941-42 (CN).

[225] CX-75, at 1; Tr. 942-43 (CN).

[226] CX-75, at 1; CX-76; Tr. 943-44 (CN).

[227] CX-77; Tr. 945 (CN).

[228] CX-79; Tr. 949-50 (CN).

[229] CX-78, at 1; Tr. 947-48 (CN).

[230] CX-80; Tr. 951-53 (CN).

[231] CX-81, at 9; Tr. 957-58 (CN).

his account, because he understood that the firm was charging him a fee to keep it open.[232] The House Account email responded:

> Thank you for reaching out. We have attached your most recent statement for your review. If you need password assistance, please e-mail support . . . There are four positions in the account all of these positions will need to be removed and then the account closed. Once the positions are removed any remaining cash balance will be sent to the address on file.[233]

Because Alpine Securities placed a debit in CN's account for the $5,000 monthly account fee, the cash proceeds from CN's January 2019 stock sale were used to cover the debit.[234] Thereafter, the customer's account showed a negative cash balance of $1,838.[235] Alpine Securities then moved securities from the customer's account to a firm proprietary account to cover the remainder of the original $5,000 monthly account fee.[236] More than seven months later, in August 2019 when Enforcement commenced this action, the firm reversed the $5,000 monthly account fee, returned securities from its proprietary account to the customer's account, and released the proceeds of the customer's stock sales.[237]

### E.   Alpine Securities' Requests to Withdraw Profits

Clearing firms such as Alpine Securities have to request regulatory approval under FINRA Rule 4110 before withdrawing certain amounts of capital.[238] The approval process is important to FINRA to ensure that firms maintain enough liquid assets to meet their obligations.[239]

From March 2018 through January 2019, Alpine Securities retained its earnings and did not distribute them to its parent.[240] In the latter part of 2018, Alpine Securities took more than $1.7 million in cash from its customers by charging the $5,000 monthly account fee.[241] It

---

[232] Tr. 960 (CN).

[233] CX-81, at 1; Tr. 962-63 (CN). The email recommended that CN write off all four positions. Tr. 963-65 (CN).

[234] Tr. 272-81 (Jungling).

[235] CX-7, at 76; Tr. 279 (Jungling).

[236] Tr. 272-73 (Jungling).

[237] CX-76; CX-78; CX-80; CX-81; CX-82; CX-83; CX-84; CX-85; Tr. 280-81 (Jungling).

[238] Tr. 3570, 3578-79 (Fortune). FINRA Rule 4110(c)(2) states that carrying or clearing firms shall not, without prior written approval of FINRA, withdraw capital, pay a dividend, or affect a similar distribution that would reduce the member's equity, or make an unsecured advance or loan to a stockholder, partner, sole proprietor, employee, or affiliate, where the withdrawals, payments, reductions, advances, loans, etc. in the aggregate, in any rolling 35-calendar day period, on a net basis would exceed 10% of its excess net capital.

[239] Tr. 3578-79 (Fortune).

[240] Tr. 2451 (Ishak), 4450 (John Hurry).

[241] CX-4A.

reported net income of $1,460,117 for the fourth quarter of 2018.[242] Much of this income was driven by the $5,000 monthly account fee.[243]

In the first quarter of 2019, the firm resumed its regular requests to distribute profits to its parent entity.[244] On January 28, 2019, Alpine Securities filed a request with FINRA to withdraw $1,773,119.[245] FINRA Risk Monitoring Analyst Robert Ishak testified that FINRA had "a lot of questions" about the amount of the firm's revenues related to the $5,000 monthly account fee, which the firm could be forced to reverse (if FINRA found the fee excessive and unreasonable).[246] Ishak testified that the firm's "trading volumes were down significantly, there [was] no ex-clear and counterparties, so this [withdrawal request] wasn't revenue coming from [the firm's] core business."[247] Ishak testified that FINRA was "skeptical" about the basis for the "new revenue stream that the firm [was] reporting."[248] While FINRA was engaged in discussions with the firm, on February 1, 2019, Alpine Securities withdrew its request and instead the parent withdrew revenue of $380,000, which did not require FINRA approval.[249]

On February 6, 2019, Alpine Securities requested that FINRA approve a withdrawal of $1,393,119, an amount that represents the original $1,773,119 request less $380,000 that the firm withdrew.[250] Because these profits largely resulted from the $5,000 monthly account fee, FINRA asked for additional information to assess whether the income might be subject to reversal and how that might impact Alpine's capital position.[251] In response, on February 20, 2019, the firm admitted that "[t]echnically, 100%" of the income from the $5,000 fee was subject to reversal but stated it was "highly unlikely that anywhere near that amount will be reversed."[252] The next day, on February 21, 2019, Alpine reduced its withdrawal request to $913,929, presumably to obtain FINRA approval.[253] On February 25, 2019, FINRA approved the request.[254]

---

[242] JX-24, at 250.

[243] Tr. 3656 (Fortune), 4700-01 (Brant).

[244] Tr. 4451-52 (John Hurry).

[245] CX-25; CX-166, at 1-2; Tr. 2423 (Ishak).

[246] Tr. 2424, 2428-29 (Ishak). *See also* Tr. 3586-87, 3589-90 (Fortune).

[247] Tr. 2429 (Ishak). *See also* Tr. 3586-87 (Fortune).

[248] Tr. 2429 (Ishak).

[249] CX-25; CX-165, at 2; CX-184; Tr. 2424, 2426 (Ishak), 3590-91 (Fortune).

[250] CX-25; CX-166, at 3; Tr. 2425-28 (Ishak), 3592 (Fortune).

[251] CX-185, at 4-11; Tr. 2428-33 (Ishak), 3586-90 (Fortune).

[252] CX-185, at 4. *See also* Tr. 2430-33 (Ishak) (testifying that FINRA had concerns about revenue that did not come from the firm's core business and that the firm acknowledged to FINRA that revenues related to the $5,000 fee were fully reversible), 3594-96 (Fortune) (testifying that FINRA wanted to know how much of the withdrawal would be related to the $5,000 fee, and Brant responded that the majority related to the fee and technically was fully reversible).

[253] CX-25; CX-166, at 5; CX-185, at 4.

[254] CX-25; CX-185, at 1-2; Tr. 2434 (Ishak), 3593, 3607, 4816 (Fortune).

Unbeknownst to FINRA at the time of the approval, on February 20, 2019, Alpine Securities had signed a loan amendment that required the firm to pay more to Alpine Holding, its affiliated lender, for its line of credit.[255]

On March 13, 2019, Alpine Securities requested an additional capital withdrawal of $300,000.[256] In light of FINRA's concern that the monthly $5,000 fee largely drove the firm's revenues, FINRA staff again asked follow-up questions.[257] On March 20 and 21, 2019, Alpine Securities complained to FINRA about the time that had passed without approval.[258] On March 22, 2019, FINRA approved the request but was unaware at the time that the firm's affiliated landlord, SCAP9, had billed the firm on March 21, 2019 an unprecedented $610,373 for CAM fees.[259] (Nor did Alpine Securities alert FINRA that the firm would pay the invoice in full on April 3, 2019.)[260]

## IV.    Findings of Violation

In the Complaint, Enforcement restates allegations related to different types of misconduct in numerous causes of action because the misconduct violates multiple different rules. Rather than repeat our findings about each type of misconduct in connection with multiple causes of action, we have organized our findings of violation by misconduct rather than by cause of action.

### A.    Alpine Securities' Misconduct Related to Its $5,000 Monthly Account Fee

We find as alleged in cause five that Alpine Securities' $5,000 monthly account fee was unreasonable and assessed inconsistently and discriminatorily, in violation of FINRA Rules 2122 and 2010. We find as alleged in causes one and two that, between October 2018 and July 2019, Alpine Securities converted and misused customer funds and securities in violation of FINRA Rules 2150 and 2010 by taking customer funds and securities intentionally and without customer authorization to cover the firm's unreasonable $5,000 monthly account fee. We further find as alleged in cause three that, between January and July 2019, the firm moved customer securities from customer accounts without customer authorization to Alpine Securities' proprietary accounts to cover customers' outstanding debits caused by the $5,000 monthly account fee, in violation of FINRA Rule 2010.

---

[255] Tr. 2435-36 (Ishak), 3607 (Fortune).

[256] CX-25; CX-166, at 7; Tr. 2438 (Ishak).

[257] CX-187; CX-188; Tr. 3609-11 (Fortune).

[258] CX-189; CX-190; Tr. 3609-12 (Fortune).

[259] Stip. ¶ 75; CX-25; JX-31; Tr. 2438 (Ishak), 3608-09, 3620 (Fortune), 4713 (Brant).

[260] Tr. 3619 (Fortune).

1.   **Alpine Securities' $5,000 Monthly Account Fee was Unreasonable and Applied in a Discriminatory Manner as Alleged in Cause Five**

FINRA Rule 2122 states that a member firm's "charges" for "services performed, including, but not limited to, miscellaneous services . . . and other services shall be reasonable and not unfairly discriminatory among customers." Rule 2122 applies to all charges and fees for services provided by a member firm, such as exchange or transfer of securities, appraisals, safe-keeping or custody of securities, and other services.[261] Although few cases address violations of FINRA Rule 2122, the language of the rule is very straight forward and clear.

Since 1975, FINRA has advised its member firms that Rule 2122 (and its predecessor, Rule 2430) requires that their fees be reasonable based on relevant circumstances and that a member firm must be prepared to justify that its fees are fair to each customer.[262] In 1992, FINRA predecessor NASD reminded member firms of "their obligation that all fees and charges for services must be reasonable and that adequate prior notice be given to customers."[263] In Notice to Members 92-11, NASD focused on one such fee—a fee for transferring an account through ACATS—and stated that, as with all fees, NASD expects member firms to charge fees at rates related to *the firm's actual costs*.[264] Again in 2003, NASD reminded member firms that all charges to customers must be fair and member firms must stand ready to justify their fees and charges.[265] Notice to Members 03-68 also explains that a member firm must implement a periodic review so that fee-based services for customers remain reasonable.[266]

The concept of reasonable fees aligning with actual costs should not be foreign to Alpine Securities. Indeed, Alpine Securities' own customer account agreement states that Alpine Securities may debit from customer accounts all "reasonable" charges as the firm "may deem *necessary to cover its services and facilities* . . ."[267] Similarly, in a July 21, 2016 response to a FINRA cautionary action letter, Alpine Securities stated that "the firm will be better prepared to

---

[261] FINRA Regulatory Notice 11-08, 2011 FINRA LEXIS 35, at *25 (Feb. 2011), https://finra.org/rules-guidance/notices/11-08 (discussing NASD Rule 2430, predecessor to Rule 2122).

[262] NASD Notice to Members 75-65, 1975 NASD LEXIS 68, at *1 (Oct. 1975) ("Although [NASD's] rules do not specify and delineate exactly how a member may establish . . . charges, [it requires] that they must be fair under the relevant circumstances and a member should be prepared to justify [them].").

[263] NASD Notice to Members 92-11, 1992 NASD LEXIS 42, at *1 (Feb. 1992), https://finra.org/rules-guidance/notices/92-11.

[264] 1992 NASD LEXIS 42, at *1-2 (emphasis added).

[265] NASD Notice to Members 03-68, 2003 NASD LEXIS 78, at *6 n.6 (Nov. 2003), https://finra.org/rules-guidance/notices/03-68 (citing 1975 NASD LEXIS 68, at *1). In January 2013, FINRA requested comment on a proposal to provide more examples of miscellaneous services for which firms charge fees, including charges and fees for setting up new accounts, research, customer portfolio analysis, and other similar fees. FINRA Regulatory Notice 13-07, 2013 FINRA LEXIS 9, at *26 (Jan. 2013), https://finra.org/rules-guidance/notices/13-07.

[266] 2003 NASD LEXIS 78, at *7-8.

[267] JX-32, at 7, ¶ 2.

justify its charges to FINRA in future examinations."[268] In order to evidence the firm's assessment of the reasonableness of its fees, it established and maintained a matrix of its fees containing a definition of each fee, the "direct hard cost which can be allocated for each fee," the rationale for any soft costs, and a reasoned basis for any risk-weighted costs of the fee.[269] Alpine Securities' former director Nummi even testified that he advised the firm that the $5,000 monthly account fee would have to be "directly correlated to actual costs."[270]

### a.  The Firm's $5,000 Monthly Account Fee was Unreasonable

The obligation for Alpine Securities' fees to be reasonable and related to the firm's actual costs, and for the firm to be able to justify its fees, is clear in Rule 2122. But Alpine Securities not only offers a nonsensical and inadequate explanation of the basis for its $5,000 fee, it also indirectly admits that the fee was designed to be unreasonable to force customers to leave the firm.[271]

---

[268] CX-36, at 2; Tr. 1634-35 (Frankel).

[269] CX-36, at 3; Tr. 164-72 (Jungling).

[270] Tr. 2719-20 (Nummi). *See also* Tr. 2664-65 (Nummi) ("And I believe at the tail end as I discussed earlier, there was some discussion of the ability to charge up to $5,000, and my opinion was that that would be acceptable if in fact you were passing through the actual cost of processing those securities.").

[271] Alpine Securities argues that, by interpreting Rule 2122 as requiring the firm to justify the reasonableness of its $5,000 monthly account fee by connecting the fee to the firm's actual costs, FINRA is engaging in an illegal rule making. Alpine Sec. Br. at 18-25 ("Because Enforcement has predicated its claim of 'unreasonable' charges on a rule interpretation that was never properly filed with the SEC, never subjected to notice and comment, and never approved by the SEC, its interpretation may not form the basis for a claimed violation."). Alpine Securities relies on the 10th Circuit's decision in *General Bond & Share Co. v. SEC*, 39 F.3d 1451 (10th Cir. 1994). In *General Bond & Share*, the court concluded that NASD engaged in an improper rule change when it found that the general ethical obligation in Article III, Section 1 of NASD's Rules, the precursor to FINRA Rule 2010, could be interpreted to preclude member firms from accepting payments from issuers in return for market making in the issuer's security. 39 F.3d at 1454. The court found that such an interpretation in effect established "a new standard of conduct." 39 F.3d at 1459-60. We reject Alpine Securities' argument that *General Bond & Share* applies here.

Enforcement's interpretation is not new or unique. As early as 1975, FINRA (then, NASD) notified member firms that they must stand ready to justify their fees and demonstrate that they are fair and reasonable under all relevant circumstances. Rule 2122, like its predecessor, Rule 2430, requires that member firms charge "reasonable" fees. FINRA has consistently reminded member firms to be ready to justify the reasonableness of their fees. In 2003, FINRA issued Notice to Members 03-68, which cited to a 1975 NASD Notice to Members that, like the 2003 Notice, reminded member firms that they are expected to charge fees and prices that are fair and reasonable based on all relevant circumstances and that member firms must be prepared to justify the fairness of fees and prices. *See* 2003 NASD LEXIS 78, at *6 n.6 (Nov. 2003) (quoting NASD Notice to Members 75-65, 1975 NASD LEXIS 68, at *1). Indeed, this concept is so ubiquitous in the securities industry that several members of Alpine Securities' management team testified that the $5,000 monthly fee was based on the firm's costs, although they failed to prove it, as the firm did not demonstrate that it conducted any analysis to calculate and justify the $5,000 monthly account fee. Under these circumstances, we find that Enforcement's interpretation is reasonably and fairly implied by Rule 2122. *Cf. Sig Specialists, Inc.*, Exchange Act Release No. 51867, 2005 SEC LEXIS 1428, at *19-21 (June 17, 2005) (rejecting respondent's reliance on *General Bond & Share* and holding that the obligations to which the NYSE held respondent were reasonably and fairly implied by the NYSE's rule).

In 2018, the firm increased the price it charged customers simply for having an account at Alpine Securities from $100 per year to $60,000 per year ($5,000 monthly).[272] John Hurry testified that the firm's compliance and other costs went up significantly, so the firm increased its fees.[273] Yet the firm offered no comparison of current and former costs and established no relationship to what it actually cost the firm to maintain a customer account. It also offered no explanation for the sudden jump from $100 per year to $60,000 per year. Nor did it tie that increase to the actual costs that the firm bore. Instead, firm management spoke in generalities about "costs" but provided no analysis, let alone the analysis required under its own fee matrix.

FINRA Exam Manager Stacie Jungling testified that, during the investigation that led to the Complaint, the firm failed to produce its fee matrix for the $5,000 monthly account fee when it responded to FINRA's Rule 8210 requests, and did not otherwise explain the rationale for this significant fee increase.[274] In December 2018, FINRA staff specifically asked for the fee matrix and for further explanation of the rationale for the $5,000 fee.[275] Alpine Securities responded that the $5,000 monthly account fee replaced the firm's $250 annual inactive account fee based on the costs the firm incurred for each inactive account.[276] It stated:

> This general (sic) involves multiple persons and must be reviewed and retained correspondence. Time and costs varies and postage and handling. Also unique AML and Accounting risks. Customer allocated CPA based on activity. Believe way under allocated for CPA.[277]

Jungling repeated the request for Alpine Securities' cost rationale, but received no response or justification.[278]

Nor could the firm justify its new $5,000 monthly account fee at the hearing. Brant, Alpine Securities chief financial officer during the relevant time, testified that the $5,000 monthly account fee was not "associated with the costs that the firm was incurring."[279] Board

---

[272] *Compare* JX-3 (Alpine Securities' July 31, 2018 Schedule of Miscellaneous Account and Service Fees showing $100 annual account fee and $250 inactive account fee for accounts with no trading in a 12-month period) *with* JX-4 (Alpine Securities' August 31, 2018 Schedule of Miscellaneous Account and Service Fees showing $5,000 monthly account fee and no annual or inactive account fee).

[273] Tr. 4378-79 (John Hurry).

[274] CX-256; Tr. 174-78 (Jungling).

[275] CX-256; Tr. 174-80 (Jungling).

[276] JX-10, at 2; Tr. 182-83 (Jungling).

[277] JX-10, at 2. Doubek and Walsh identified this entry in Alpine Securities' response to Enforcement as the firm's analysis and support for the $5,000 fee. Tr. 3308-3310 (Doubek), 4076-77 (Walsh). No one admitted to preparing the rationale, although Doubek believed the author to be Frankel. Tr. 3049 (Doubek). Frankel denied his involvement. Tr. 1717-20 (Frankel). Alpine Securities refers to it as Frankel's analysis. Alpine Sec. Br. at 6-11. It is not relevant to our conclusions in this case who at Alpine Securities drafted this explanation.

[278] Tr. 181-84 (Jungling).

[279] Tr. 4676 (Brant).

member Nummi testified that, while he served on the firm's board, no one ever showed him an analysis correlating the $5,000 monthly fee to the firm's real costs for handling customer accounts.[280] And former chief executive officer Frankel testified that he never saw an analysis of the $5,000 fee that he was directed to charge.[281]

Nothing in Alpine Securities' purported rationale explains the basis for a $5,000 monthly account fee. Additionally, many of the firm's costs for handling customer accounts were also "covered" by the myriad other fees that the firm charged customers, such as the illiquidity and volatility fee, the DTC custody fee, and the market-making/execution fee, all of which are addressed elsewhere in this decision.[282] The members of Alpine Securities' management team did not defend the reasonableness of the fee. Instead, they testified that John Hurry insisted that they charge the fee.[283]

Far from analyzing the $5,000 fee and correlating it to actual costs, John Hurry and the firm designed the fee to be unreasonable so that customers, for whom the firm could no longer buy and sell securities (because of the loss of its ex-clearing relationships), would close their accounts and leave the firm.[284] John Hurry testified as follows:

Q: Mr. Hurry, you had customers, the firm lacked the capability to sell their stock, you could not make money on those customers, so the plan was to charge them a bunch of fees, take their securities and close their accounts, that was the plan you advocated for?

---

[280] Tr. 2665-66, 2746, 2760 (Nummi).

[281] Tr. 1712-13 (Frankel).

[282] See IV.C.1 and C.2, V.A.2, infra.

[283] See CX-227 and CX-228 (firm's November 5 and November 16, 2018 statements to FINRA that John Hurry developed the $5,000 fee and instructed Alpine employees to implement it); Tr. 1098, 1104-05 (Tew) (testifying that the $5,000 fee was not reasonable and that he was never able to override the decisions of John Hurry), 1707-09 (Frankel) (testifying that he told John Hurry that a $5,000 monthly account fee was improper because it did not approximate Alpine Securities' costs of maintaining accounts), 1972-75 (Jones) (testifying that he did not think charging the $5,000 monthly account fee was "the right thing to do" and that he shared his views with firm management and John Hurry), 2664-65, 2720, 2739-40, 2746-47, 2760 (Nummi) (testifying that the firm could charge a $5,000 monthly account fee only if the firm correlated it with its actual costs, but no one from the firm ever correlated the fee to the firm's costs), 3141-47 (Doubek) (testifying that John Hurry threatened him with job loss if he did not impose fees that Doubek believed to be unreasonable).

[284] John Hurry also blames overzealous regulation for Alpine Securities' fee increases. Tr. 4614-15 (John Hurry). In September 2019, Alpine Securities issued a notice to all customers that John Hurry had drafted. CX-33; Tr. 4614-19 (John Hurry). In it, John Hurry states that Alpine Securities feels "it is imperative to fight back against overzealous, if not illegal actions taken by the SEC, DTC, FINRA, and state regulators." CX-33, at 1; Tr. 4616 (John Hurry). He states that overzealous regulation costs money for firms like Alpine Securities and will result in a lack of access to capital for "middle class and lesser middle class" businesses. Tr. 4622, 4617-25 (John Hurry). He encourages Alpine Securities' customers to "participate by contacting [their] congressman to positively effect new laws to stop the tyranny and chiefdoms created by the current administrative state." CX-33, at 1; Tr. 4616 (John Hurry).

A: I think what I said, yes, *obviously you are giving me the technical of what happens*. It was also the plan to hopefully the customers would take responsibility, look at their statements, make arrangements to move . . . The firm had a limited amount of time to implement a plan, to turn itself profitable. So I left a lot of that up to the management team in terms of how they were going to do that but they still had to implement the plan. *The technical thing of what you're saying is not wrong* but the way you're saying it was really not the spirit of what was trying to happen.[285]

Tew described the process as "feeing down" an account.[286] Doubek also testified that part of the rationale for the $5,000 fee was to induce customers to close their accounts.[287] Brant too testified that the purpose of the fee was that "people would turn around and close their accounts instead of pay the fee."[288]

     In defense of its actions, Alpine Securities claims that it always intended to reverse $5,000 fees in accounts that customers willingly closed.[289] Except in May 2019, Doubek emailed staff, "We will not reverse any more monthly account fees. This was an accommodation for those customers who proactively contacted us to transfer their securities and close their account."[290] Furthermore, when the firm began assessing the fee in October 2018, all cash in every customer account was taken to cover the debit related to the $5,000 fee. Thereafter, if any activity occurred in the account that resulted in cash (such as a sale of securities) or cash appeared in a linked money market fund, that cash also was taken to cover any debit related to the $5,000 fee.[291] Although the firm returned some cash it seized,[292] it did not return the majority

---

[285] Tr. 4571-73 (John Hurry) (emphasis added). Similarly, Kane testified that the firm intended for the fee to incentivize customers to close their accounts, but the firm failed "to adequately give every customer that opportunity" and, as a result, customers complained of "extortion" and the firm's "holding their accounts hostage." Tr. 1419-20 (Kane). With respect to the $5,000 fee, Jones understood its purpose as follows: "Any client that was deemed to be insufficient and we did not want to do business with them, they would essentially be forced to close their account." Tr. 1968 (Jones).

[286] Tr. 1170-72 (Tew).

[287] Tr. 3073 (Doubek).

[288] Tr. 4667 (Brant).

[289] Alpine Sec. Br. at 13-15.

[290] Tr. 2907-08 (Doubek). Alpine Securities argues that Doubek forced payment of the $5,000 fee only after "many months of efforts to deal with the accounts." Alpine Sec. Br. at 18, n.86. It also cites to a handful of instances in which the firm "confirmed to the customers that the $5,000 would either be waived or reversed." Alpine Sec. Br. at 14, n.65. These assertions are not defenses. First, as noted in III.C.1, *supra*, many customers received account statements (purportedly containing the firm's outreach) only quarterly and encountered difficulties accessing their accounts online after the back-office change. In any event, regardless of the firm's representations to some customers (and its loss of patience with other customers), the fact remains that, as of the last day of the hearing, Alpine Securities still had not returned to its customers $735,410 cash that it took to cover the $5,000 monthly account fee. CX-4A; Tr. 3892-96 (Jungling).

[291] Stip. ¶ 33; Tr. 264-65 (Jungling).

[292] For example, Customer SCI sold stock in June 2019 and, before mailing SCI a check for the proceeds of the sale, Alpine Securities took cash to cover a $5,000 debit imposed on October 25, 2018. CX-252, lines 91719-91737;

of the cash it removed from customer accounts.[293] Then, in June and July 2019, Alpine Securities moved marketable securities valued at *twice* the amount of the $5,000 debits in customer accounts to a firm proprietary account.[294] The firm intended to liquidate those securities and keep the cash to cover debits, but never actually reached the liquidation stage because regulators intervened.[295] Thus, regardless of Alpine Securities' unsupported claim about "intending" to reverse $5,000 fees, the fact remains that it generated revenue for itself from the fee.[296]

In other instances, Alpine Securities held customers' securities hostage, forcing customers to pay the $5,000 fee if they wanted to move their securities to other broker-dealers. For example, Alpine Securities charged the NB Trust account a $5,000 monthly fee on October 25, 2018.[297] On June 25, 2019, the customer sent the firm a check for $5,395 to cover the monthly fee and the cost of moving securities.[298] In this instance, the firm cashed the check, transferred his securities, and closed the NB Trust account.[299] It never refunded NB Trust's $5,000 monthly account fee.[300]

Alpine Securities charged Customer V a $5,000 monthly account fee on October 25, 2018.[301] On June 20, 2019, Alpine Securities moved the customer's marketable securities into a firm proprietary account called the "liquidate-to-cover-customer-debits" account.[302] On June 25, 2019, the customer wired $5,414 to the firm to cover the monthly account fee and the costs

---

Tr. 3554-56 (Walsh). Later, while regulators focused on the firm, it mailed SCI a check to cover the $5,000 cash taken. CX-252, lines 91719-91737; Tr. 3554-56 (Walsh).

[293] CX-4A; Tr. 3893-94 (Jungling), 3550-51 (Walsh).

[294] CX-4A; Tr. 290, 295-98 (Jungling), 3402-05, 3551-52 (Walsh). Walsh testified that the firm took securities valued at *double* the amount of each customer's debit because OTC securities are illiquid, and the firm wanted to ensure it could generate sufficient proceeds to cover customer debits. Tr. 3402-06, 3525-26, 3551-52 (Walsh).

[295] Tr. 297 (Jungling), 3551-53 (Walsh).

[296] *See* CX-185 (Brant email indicating that, as of February 2019, the firm had realized revenue of $1,235,268 from the $5,000 monthly account fee). The firm hopes to someday revisit its efforts to collect the $5,000 monthly fee. Its September 16, 2019 Notice of Revised Fee Schedule states, "This recently revised schedule does not relieve the accountholder of any obligation to fees or charges *incurred under the prior fee schedule* whether such fees were charged to your account or not." CX-33, at 1 (emphasis added); Tr. 4627 (John Hurry). John Hurry described this addition to the notice as an attempt to make customers "take responsibility" for the fees to which they agreed when they opened accounts with Alpine Securities. Tr. 4628 (John Hurry).

[297] CX-7, at 75; Tr. 323 (Jungling).

[298] CX-101; Tr. 323-24, 384-88, 1357 (Jungling). TM, the account holder for the NB Trust account, submitted the check because Doubek told him that the only way for the account to transfer its remaining securities to another firm was for NB Trust to send a check to cover the $5,000 fee and costs to transfer the remaining securities. CX-101; Tr. 2912-14 (Doubek).

[299] RX-30; RX-31; RX-32; RX-33; RX-243; RX-244; Tr. 324, 387-404 (Jungling).

[300] CX-7, at 75; Tr. 1357 (Jungling), 2915 (Doubek).

[301] CX-7, at 93; Tr. 325 (Jungling).

[302] CX-7, at 93; Tr. 326 (Jungling).

associated with transferring securities out of the account.[303] On that same day, the firm reversed its transfer of the customer's securities into the liquidate-to-cover-customer-debits account.[304] Alpine Securities never returned the funds from the June 25 wire.[305]

Finally, Alpine Securities argues that the $5,000 fee, like all of its fees, was reasonable because (1) customers had adequate notice, and (2) its fees represent an agreement between Alpine Securities and its customers.[306] Neither argument is persuasive.

FINRA Rule 2122 requires that all fees be reasonable and does not provide a carve out for fees that are disclosed.[307] So while disclosure is necessary and appropriate, it does not excuse unreasonable fees. In any event, Alpine Securities provided woefully inadequate disclosure of fees to its customers. Before charging its new fees, the firm did not announce any of its fees, including the $5,000 monthly account fee, in stand-alone communications to customers or on the firm's website. In August and September 2018 account statements, to which it appended the new fee schedule to the back, the firm mentioned the new fee schedule in standard print in a small text box.[308] The October, November, and December account statements did not even include any mention of the fee schedule in the text box.[309] The January 2019 account statements again included a mention buried in standard print in the text box.[310] And customers introduced by Spencer Edwards and Primary Capital did not even receive this level of notice.[311]

Furthermore, less active accounts received statements quarterly. In March 2019, when the firm changed to generating account statements monthly, the firm distributed the statements electronically.[312] But due to Alpine Securities' back-office change in late 2018, many customers had never even set up their online accounts and never received any of these notices.[313] Many of these same customers could not even communicate with the firm because phone calls went unanswered. Member firms who rely on electronic media to distribute information should have a reasonable expectation that their electronic delivery adequately provides the customers with

---

[303] Tr. 325-26 (Jungling). In June 2019, Customer V asked by email how he could transfer his remaining holdings. CX-134; Tr. 2916 (Doubek). The firm directed him to deposit $5,414 (the $5,000 fee plus costs) in his account by June 21, 2019 for his shares to be moved. CX-134; CX-149; Tr. 2917-18 (Doubek).

[304] CX-7, at 93; Tr. 326 (Jungling).

[305] CX-7 at 93; Tr. 326 (Jungling), 2919-20 (Doubek).

[306] Alpine Sec. Br. at 23-27.

[307] *See, e.g.,* NASD Notice to Members 92-11, 1992 NASD LEXIS 42, at *1 (Feb. 1992) ("Members are reminded of their obligation that all fees and charges for services must be reasonable *and* that adequate prior notice be given to customers.") (emphasis added).

[308] JX-11; JX-12.

[309] JX-13; JX-14; JX-15.

[310] JX-16.

[311] CX-54; CX-55; Tr. 241, 249-64 (Jungling).

[312] Tr. 1426-27 (Kane).

[313] Tr. 1427-28 (Kane).

access to the documents comparable to delivery in paper form.[314] Alpine Securities did not have a reasonable expectation of adequate delivery given its back-office conversion, loss of staff, and inadequate telephone service.

Citing the "*Mobile-Sierra* doctrine," Alpine Securities also argues that its $5,000 monthly account fee must be presumed to be reasonable because it is the product of an arm's-length agreement between the firm and its customers.[315] We reject this argument. Under the *Mobile-Sierra* Doctrine, the Federal Energy Regulatory Commission (FERC) must presume that the rate set out in a freely negotiated wholesale-energy contract is just and reasonable, and this presumption can be overcome "only if FERC concludes that the contract seriously harms the public interest."[316] The presumption is based on the premise that wholesale energy contract rates are the "product of fair, arms-length negotiations."[317] Neither the presumption nor its underlying premise is applicable here. Alpine Securities' customers did not agree to pay the $5,000 monthly account fee as part of a contract freely negotiated at arm's length between sophisticated parties with equal bargaining power. The only "agreement" between the firm and its customers is the standard customer account agreement which permits the firm to debit accounts for "reasonable charges" necessary to cover the firm's services and facilities.[318] Alpine Securities changed its fee schedule after most of its customers opened their accounts at the firm and provided insubstantial notice of the change before imposing the fee and taking cash and securities to cover it. We do not find that the $5,000 monthly account fee is the product of a fair, arms-length negotiation, and we reject Alpine Securities' argument in this regard.[319]

For the reasons stated, we find that Alpine Securities' $5,000 monthly account fee was unreasonable and violated FINRA Rules 2122 and 2010, as alleged in cause five.[320]

---

[314] Exchange Act Release No. 37182, 61 F.R. 24644, at 24646-47 (May 15, 1996) (Use of Electronic Media by Broker-Dealers for Delivery of Information); Exchange Act Release No. 36345, 60 F.R. 53458, at 53460 (Oct. 6, 1995) (Use of Electronic Media for Delivery Purposes).

[315] Alpine Sec. Br. at 25-27.

[316] *Morgan Stanley Capital Group, Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 530 (2008).

[317] *Morgan Stanley Capital Group, Inc.*, 554 U.S. at 554.

[318] *See* JX-33.

[319] Alpine Securities also discusses various economic papers dealing with pricing theories. Alpine Sec. Br. at 23-25. No one from the firm's management team testified that the firm relied on these papers in setting Alpine Securities' amended fee schedule. And none of the economic theories applies to FINRA Rule 2122 or discusses reasonable pricing standards under Rule 2122. Furthermore, none of the papers support Alpine Securities' theory that it should not have to justify its fees based on its own actual costs (*see* Alpine Sec. Br. at 22-25). To the contrary, the economic papers discuss different types of costs that may be relevant to setting prices for goods and services.

[320] A violation of another FINRA rule constitutes a violation of FINRA Rule 2010. *David B. Tysk*, Exchange Act Release No. 91268, 2021 SEC LEXIS 534, at *15 n.18 (Mar. 5, 2021).

### b. The Firm Assessed the $5,000 Fee in a Discriminatory Manner

Rule 2122 states that a firm's charges may not be "unfairly discriminatory among customers." Alpine Securities failed to comply with this requirement of the rule.

Alpine Securities did not want to charge its active customers the $5,000 monthly account fee because it wanted to keep those customers (or transfer them to its affiliated broker-dealer, Scottsdale). Thus, as it started charging the $5,000 fee in October 2018, it prepared a list of certain customers that the firm wanted to retain and decided not to collect the fee from those customers.[321] Instead, the firm immediately reversed the $5,000 monthly account fee in those favored customers' accounts.[322] Alpine also reversed the fee for certain (but not all) customers who contacted the firm after discovering that they had been charged the fee.[323] Communications by and among firm management demonstrate that the firm waived the $5,000 fee to keep profitable accounts and sometimes added customer names to the fee waiver list.[324]

For the reasons stated, we find that Alpine Securities assessed its $5,000 monthly account fee in a discriminatory manner, in violation of FINRA Rules 2122 and 2010, as also alleged in cause five.

### 2. Alpine Securities Converted and Misused Customer Funds and Securities and Committed Unauthorized Trading in Connection With the $5,000 Fee, as Alleged in Causes One, Two, and Three

Between October 2018 and July 2019, Alpine Securities intentionally removed cash and securities from customer accounts without authorization to cover an unreasonable $5,000 monthly account fee. In doing so, the firm converted and misused customer funds and securities and acted without customer authorization.

FINRA Rule 2150 states that no member shall make improper use of a customer's securities or funds. A member firm misuses customer funds or securities when it uses the funds or securities for some purpose other than as directed by the customer.[325] "Misuse of a customer's securities or funds rises to the level of conversion where [a member firm], without authority,

---

[321] CX-45; Tr. 333-34 (Jungling), 1996-97 (Jones), 4677 (Brant).

[322] CX-46; Tr. 333-34 (Jungling), 1116 (Tew), 4678-82 (Brant).

[323] Tr. 336 (Jungling), 1109-11 (Tew), 2905-06 (Doubek).

[324] CX-46; Tr. 1115-1116 (Tew) (testifying that, when the firm received pushback on the $5,000 fee, the business decision was to keep larger, more active accounts happy), 1995-97 (Jones) (testifying that the criteria for adding customers to the list was "the better accounts" which would eventually transition from Alpine Securities to Scottsdale), 4386 (John Hurry) (testifying that the firm really had to focus on keeping customers that "we think we could make money on and service the best").

[325] *Dep't of Enforcement v. Taboada*, No. 2012034719701, 2016 FINRA Discip. LEXIS 7, at *62-63 (OHO Mar 18, 2016), *aff'd*, 2017 FINRA Discip. LEXIS 29 (NAC July 24, 2017); *Dep't of Enforcement v. Mielke*, No. 2009019837302, 2014 FINRA Discip. LEXIS 24, at *43 (NAC July 18, 2014), *aff'd*, Exchange Act Release No. 75981, 2015 SEC LEXIS 3927 (Sept. 24, 2015).

intentionally takes property that does not belong to [it]."[326] "[C]onversion casts doubt on a person's 'ability to comply with the regulatory requirements of the securities business and to fulfill his fiduciary duties in handling other people's money.'"[327] The conversion of customer funds and securities separately and independently violates FINRA Rule 2010 because conversion violates the ethical obligations of FINRA Rule 2010.[328] Additionally, the misuse of customer funds under FINRA Rule 2150 also violates Rule 2010 because a violation of any FINRA Rule, including Rule 2150, constitutes a violation of the ethical conduct required by Rule 2010.[329]

A member firm violates FINRA Rule 2010 and commits unauthorized trading when it purchases, sells or transfers securities in or out of a customer's account without authorization.[330] Unauthorized trading is a serious breach of the duty set forth in Rule 2010 to observe high standards of commercial honor and just and equitable principles of trade.[331] It goes to the "heart of the trustworthiness" of a member firm and is a "fundamental betrayal" of the duty a broker-dealer owes to its customers.[332]

Alpine Securities' customer account agreement enabled the firm to "debit from [a customer's] account any and all *reasonable* charges as it may deem necessary to cover its services and facilities . . . "[333] But the $5,000 monthly account fee was not reasonable. In June and July 2019, Alpine Securities intentionally took $1,714,200 and securities positions valued at $1,154,946 from customer accounts to cover the $5,000 monthly account fee.[334]

The firm's actions were intentional. At Doubek's direction, Walsh "repurposed an old Alpine proprietary account . . . and renamed it to liquidate to cover customer debits."[335] The firm concluded that, if any customer account held marketable securities, it needed to move enough of those securities to the new "liquidate to cover" proprietary account to cover debits (including

---

[326] *Dep't of Enforcement v. Wicker*, No. 2016052104101, 2021 FINRA Discip. LEXIS 31, at *18 (NAC Dec. 15, 2021), *appeal docketed*, No. 3-20705 (SEC Jan. 13, 2022).

[327] *Kenny Akindemowo*, Exchange Act Release No. 79007, 2016 SEC LEXIS 3769, at *22 (Sept. 30, 2016) (citing *Daniel D. Manoff*, Exchange Act Release No. 46708, 2002 SEC LEXIS 2684 (Oct. 23, 2002).

[328] *Dep't of Enforcement v. Vedovino*, No. 2015048362402, 2019 FINRA Discip. LEXIS 20, at *12-13 (NAC May 15, 2019); *Dep't of Enforcement v. Casas*, No. 2013036799501, 2017 FINRA Discip. LEXIS 1, at *20 (NAC Jan. 13, 2017).

[329] *Richard F. Kresge*, Exchange Act Release No. 55988, 2007 SEC LEXIS 1407, at *42 (June 29, 2007).

[330] *William J. Murphy*, Exchange Act Release No. 69923, 2013 SEC LEXIS 1933, at *35-36 (July 2, 2013), *aff'd sub nom. Birkelback v. SEC*, 751 F.3d 472 (7th Cir. 2014); *Janet Gurley Katz*, Exchange Act Release No. 61449, 2010 SEC LEXIS 994, at *74 (Feb. 1, 2010).

[331] *Murphy*, 2013 SEC LEXIS 1933, at *31-32 (citing *Katz*, 2010 SEC LEXIS 994, at *22).

[332] *Katz*, 2010 SEC LEXIS 994, at *72.

[333] JX-32, at 7; JX-33, at 7 (emphasis added).

[334] CX-4A; Tr. 282-95, 3892-96 (Jungling).

[335] Tr. 3525 (Walsh).

debits related to the $5,000 monthly account fee).[336] Management did not want to rely on the OTC markets last trade price to value customer shares because those prices may be unreliable in the illiquid OTC market.[337] Instead, Alpine Securities devised a system whereby it took securities valued at *double* the amount of the debit in each customer's account because the firm's plan was to sell the securities to cover outstanding debits, and it did not want to come up short.[338] Similarly, the firm systematically seized any cash in a customer's account or a linked money market account for debits related to when the firm assessed the $5,000 monthly account fee or the customer later sold stock, and treated the cash as income for the firm.[339]

Alpine Securities contends that its purpose in charging a $5,000 monthly account fee was to close retail accounts, not to generate income.[340] This claim is not supported by the firm's actions and is not a defense. The firm expended considerable effort to ensure that it transferred enough marketable securities to the liquidate-to-cover-customer-debits account and it seized all available cash. Its actions demonstrate that it intended to generate revenue for itself. As of February 2019, the firm had realized income of $1,235,268 from the $5,000 monthly account fee.[341]

Alpine Securities argues, as a defense, that it "did not liquidate a single customer security."[342] But Enforcement need not demonstrate that Alpine Securities intended to permanently deprive its customers of their funds and securities (although it has shown that intent).[343] The Commission decisively found that repayment, reversal, or lack of intent to permanently deprive does not preclude a finding of conversion. In *Mission Securities Corporation*, a case with a similar fact pattern, the applicants transferred their customers' securities to proprietary accounts and liquidated the securities without authorization to pay the firm's operating expenses.[344] The Commission found that Mission Securities did in fact intend to deprive their customers permanently, but further stated that, even if Mission Securities had

---

[336] Tr. 3402-06, 3525-26 (Walsh), 3854-56 (Brant).

[337] Walsh testified that, although the last trade price is the price that the firm used to value customer positions on account statements, the last trade price in the OTC market is "unrealistic." Tr. 3403-05 (Walsh).

[338] Tr. 3402-06, 3525-26, 3551-52 (Walsh).

[339] Tr. 3410 (Walsh), 4859-62 (Brant).

[340] Alpine Sec. Br. at 5.

[341] CX-185, at 4; Tr. 3594-95 (Fortune).

[342] Alpine Sec. Br. at 4.

[343] *See Dep't of Enforcement v. Doni*, No. 2011027007901, 2016 FINRA Discip. LEXIS 10, at *54 (OHO Apr. 18, 2016), *aff'd*, 2017 FINRA Discip. LEXIS 46 (NAC Dec. 21, 2017); *Dep't of Enforcement v. Waldock*, No. 2012031142101, 2014 FINRA Discip. LEXIS 19, at *25 (OHO May 8, 2014).

[344] *Mission Sec. Corp.*, Exchange Act Release No. 63453, 2010 SEC LEXIS 4053, at *3 (Dec. 7, 2010).

repaid its customers and they had not been harmed, the firm's conduct would still constitute conversion and violate the ethical standards of the securities industry.[345]

Furthermore, although Alpine Securities never sold the customers' securities from its proprietary liquidate-to-cover-customer-debits account, by all accounts, it intended to do just that.[346] The firm reversed course because regulators from Utah intervened, not because it never intended to liquidate securities.[347] And, Alpine Securities never intended to, and never did, return all of the cash it seized from customer accounts.[348]

The firm's treatment of its customers demonstrates Alpine Securities' intent. The firm charged CN $5,000 on October 25, 2018.[349] In January 2019, CN sold securities for $3,306.[350] Alpine Securities thereafter seized the cash proceeds from the account to cover the monthly account fee, and the customer's account showed a negative cash balance of $1,838.[351] Then Alpine Securities moved securities from the customer's account to the liquidate-to-cover-customer-debits account to cover the remainder of the original $5,000 monthly account fee.[352] The firm acted similarly in Customer ET's account. Alpine Securities charged ET's account

---

[345] 2010 SEC LEXIS 4053, at *20-21 (citing *Joel Eugene Shaw*, Exchange Act Release No. 34509, 1994 SEC LEXIS 2493 (Aug. 10, 1994) (finding that representative converted customer funds even though representative repaid those funds after his firm discovered the misconduct)).

[346] Walsh testified as follows:

> Q: [The firm's] intent, right, [was] to ultimately sell securities out of that account to the street to cover the amounts that the customer debits had; right?
>
> A: Right.
>
> Q: And that's why you told us earlier it was marketable securities that you were looking for; right? Securities that you could actually sell to the street; right?
>
> A: Right.
>
> Q: and the only reason you ultimately didn't do that is because the State of Utah told you not to; right?
>
> A: One of the reasons.

Tr. 3552 (Walsh).

[347] Tr. 3552 (Walsh). Walsh also testified that the firm took securities valued at double the amount of each customer's debit to ensure that, when liquidated, the securities provided enough money to cover customer debits. Tr. 3402-06, 3525-26, 3551-52 (Walsh).

[348] Tr. 305-06, 3894 (Jungling), 3413-14, 3550-51 (Walsh).

[349] CX-7, at 76; CX-85, at 3; Tr. 271-81 (Jungling).

[350] CX-85, at 22-25; Tr. 279 (Jungling).

[351] CX-7, at 76; Tr. 272-81 (Jungling).

[352] Tr. 272-73 (Jungling). More than seven months later and after regulatory intervention, in August 2019, after numerous emails between CN and Alpine Securities, the firm reversed the $5,000 monthly account fee and returned securities from its proprietary account to the customer's account. CX-75; CX-76; CX-78; CX-79; CX-80; CX-81; CX-82; CX-83; CX-84; CX-85; Tr. 280-81 (Jungling).

$5,000 on December 31, 2018.[353] On January 2, 2019, the firm redeemed $57 from the customer's linked money market account.[354] In June 2019, ET sold securities for $11,421, and the firm seized a portion of the proceeds ($4,943) of the sale to cover the remaining debit from the $5,000 fee.[355] On June 19, 2019, Alpine Securities mailed ET a check for $6,403 (the sales proceeds that the firm did not seize to cover the $5,000 monthly fee).[356]

Similarly, in the account of Customer AA, the firm charged a $5,000 monthly account fee on December 31, 2018, and redeemed funds from the customer's linked money market fund on January 2, 2019.[357] This left a balance of $3,396 unpaid (for the $5,000 fee), for which the firm debited the customer's account and correspondingly moved the customer's marketable securities to the liquidate-to-cover-customer-debits account.[358]

Another example is the account of Customer WP. Alpine Securities charged a $5,000 monthly account fee on October 5, 2018. In the next five days, the firm seized $2,862 cash from the account, leaving a debit balance of $2,137.[359] Although Alpine Securities adjusted the debit to WP's account in May 2019, as of the hearing in this matter, the firm had not repaid WP his seized cash.[360] Alpine Securities charged Customer TI a $5,000 monthly account fee on November 28, 2018. Over the course of several days, the firm seized $3,398 cash from the account and left a debit of $1,601.[361] Although Alpine Securities adjusted the debit in March 2019, it never returned the cash to TI, and TI has closed the account.[362]

None of the firm's customers authorized the firm's transfers of their securities to the firm's proprietary account or its seizures of cash to cover the $5,000 monthly account fee. Some customers paid some or all of the $5,000 fee because they were forced to do so in order to regain possession of their other holdings, but no customer authorized a removal of funds and securities to cover the unreasonable fee.[363] In most instances, the customers were not even aware of the $5,000 monthly account fee, let alone that the firm was taking their cash and securities to cover it.

---

[353] CX-7, at 92; Tr. 309 (Jungling).

[354] CX-7, at 92; Tr. 309-10 (Jungling).

[355] CX-144, at 3; Tr. 310-12, 318-19 (Jungling).

[356] CX-7, at 92; Tr. 312-20 (Jungling).

[357] CX-7, at 2.

[358] Tr. 268-70 (Jungling).

[359] CX-7, at 77; Tr. 3414-15 (Walsh).

[360] Tr. 3414-15 (Walsh).

[361] CX-7, at 89; Tr. 3416-18 (Walsh).

[362] Tr. 3416-18 (Walsh).

[363] Tr. 3406 (Walsh).

Accordingly, we find that Alpine Securities violated FINRA Rules 2150 and 2010 by converting and misusing customer funds and securities, as alleged in causes one and two. We further find that, by moving securities from customer accounts to a firm proprietary account, without customer authorization, Alpine Securities violated FINRA Rule 2010, as alleged in cause three.

### B.   Alpine Securities' Misconduct Related to Customers' Securities that It Improperly Deemed "Worthless" and "Abandoned"

We find as alleged in causes one and two that, between May and July 2019, Alpine Securities converted and misused customers' securities in violation of FINRA Rules 2150 and 2010 by intentionally taking without customer authorization every customer position valued at $1,500 or less. We also find as alleged in causes one and two that, between June and July 2019, Alpine Securities converted and misused customers' securities in violation of FINRA Rules 2150 and 2010 by intentionally taking without customer authorization every customer position improperly deemed "abandoned" by the firm.

We further find as alleged in cause three that, between May and July 2019, the firm executed unauthorized transactions in violation of FINRA Rule 2010 by selling hundreds of positions improperly deemed worthless to itself for one cent per position without customer authorization. Additionally, we find as alleged in cause three that, between June and July 2019, the firm committed unauthorized trading in violation of FINRA Rule 2010 by moving customers' securities (improperly deemed abandoned by the firm) from customer accounts to a firm escheat account without customer authorization.

Finally, we find as alleged in cause four that Alpine Securities sold hundreds of customers' positions (that the firm improperly deemed worthless) to itself for an unfair price of one penny per position that was not reasonably related to the current market prices for the securities, in violation of FINRA Rules 2121 and 2010.

### 1.   Alpine Securities Converted and Misused Customer Securities Improperly Deemed Worthless and Abandoned and Committed Unauthorized Trading, as Alleged in Causes One, Two, and Three

"Conversion generally is an intentional and unauthorized taking of and/or exercise of ownership over property by one who neither owns the property nor is entitled to possess it."[364] To prove conversion, Enforcement need not prove the intent to permanently deprive.[365] Conversion independently violates FINRA Rule 2010.[366] FINRA Rule 2150 prohibits the

---

[364] *Dep't of Enforcement v. Casas*, 2017 FINRA Discip. LEXIS 1, at *20.

[365] *Dep't of Enforcement v. Doni*, 2017 FINRA Discip. LEXIS 46, at *26-27.

[366] *Kenny Akindemowo*, 2016 SEC LEXIS 3769, at 22.

improper use of customer securities, and a violation of Rule 2150 constitutes a violation of FINRA Rule 2010.[367]

A member firm violates FINRA Rule 2010 by engaging in trading that is not authorized by the customer.[368] "It is well settled that unauthorized trading in a customer's account is 'a serious violation of just and equitable principles of trade.'"[369] The Commission has characterized unauthorized trading as a "fundamental betrayal" of the duty owed to a customer.[370]

### a. Conversion, Misuse, and Unauthorized Trading of Securities Improperly Categorized as Abandoned

In June 2019, after Alpine Securities had already appropriated customers' securities to cover debits, the firm next improperly identified all remaining retail accounts as abandoned. Alpine Securities systematically moved positions from customers' accounts into the firm's escheat accounts, improperly deeming those securities abandoned.[371] In doing so, it acted without customer authority and converted and misused customer securities.

Alpine Securities claims that its actions in this regard were a mistake, not intentional actions.[372] We disagree and find that the firm's actions were intentional. Starting on June 7, 2019 and continuing throughout the month, Alpine Securities removed a large number of securities that the firm labeled as "abandoned" from customer accounts without notice to or approval from the customers.[373] In a May 31, 2019 letter that the firm did not send to customers until approximately June 11, 2019,[374] the firm indicated that, effective June 1, 2019, securities held in "abandoned" accounts would be moved to the firm's abandoned securities accounts pending escheatment to the appropriate state.[375] Walsh testified that, in June of 2019, the sense of

---

[367] *Mission Sec. Corp.*, 2010 SEC LEXIS 4053, at *2 n.2.

[368] *Murphy*, Exchange Act Release No. 69923, 2013 SEC LEXIS 1933, at *31; *Dep't of Enforcement v. Griffith*, No. 2010025350001, 2015 FINRA Discip. LEXIS 55, at *15 (NAC Dec. 22, 2015).

[369] *Dep't of Enforcement v. Ul Haq*, No. ELI2004026701, 2009 FINRA Discip. LEXIS 3, at *15 (NAC Apr. 6, 2009) (citing *Jonathan Garrett Ornstein*, Exchange Act Release No. 31557, 1992 SEC LEXIS 2972 at *4 (Dec. 3, 1992)). *See also Murphy*, 2013 SEC LEXIS 1933, at *33-34 (July 2, 2013) (finding respondent violated precursor to Rule 2010 when he made trades not approved by the customer as part of the trading strategy); *Wanda P. Sears*, Exchange Act Release No. 58075, 2008 SEC LEXIS 1521, at *8 (July 1, 2018) (finding respondent violated precursor to Rule 2010 when she executed trades without customers' permission).

[370] *Keith L. DeSanto*, Exchange Act Release No. 35860, 1995 SEC LEXIS 1500, at *16 (June 19, 1995), *aff'd*, 101 F.3d 108 (2d Cir. 1996) (unpublished table decision).

[371] Stip. ¶ 68; Tr. 500 (Jungling).

[372] Alpine Sec. Br. at 1, 39.

[373] Tr. 501-03, 510-12 (Jungling), 4114-15 (Walsh).

[374] CX-58; CX-59; Tr. 3362-63 (Walsh).

[375] CX-58, at 2; Tr. 501-02, 512 (Jungling). The abandoned securities accounts were proprietary accounts to which the firm, not the customers, had access. The customers lost control over the securities when they were removed from their accounts. Tr. 504-05 (Jungling). Doubek testified that Alpine Securities had an abandoned securities account

urgency to close retail accounts increased, and he was instructed to close *all* accounts by the end of June.[376] In total, Alpine Securities declared 645 positions abandoned from 545 customer accounts.[377] The estimated value of the customers' securities that Alpine Securities moved to its proprietary holding accounts was more than $54.5 million.[378]

After receiving customer complaints in response to the May 31 letter,[379] the firm set up an automatic reply to emails directed to its House Account email address.[380] The automatic reply referenced the May 31, 2019 letter (mailed June 11, 2019), and stated that all accounts still holding positions have been deemed abandoned and have been submitted for processing to the customer's residential state's escheat department.[381] It directed customers to "[p]lease contact your state for instructions on how to reclaim your assets."[382] The firm's automatic reply was not even accurate, as the firm had not actually submitted assets deemed abandoned to any state escheat accounts.[383] In fact, the firm had only transferred assets to its own proprietary escheat accounts. Customers who attempted to contact their states could not reclaim their assets because Alpine Securities still held them.[384]

Alpine Securities not only moved customers' securities from their accounts to a proprietary account without authorization or consent, but the firm also failed to follow its own procedures for declaring an account abandoned. Alpine Securities claims that it acted pursuant to

---

set up for each state. The abandoned securities moved from the firm's proprietary accounts to state escheat accounts only when each state was willing to accept escheated funds and securities. Tr. 2884 (Doubek).

[376] Tr. 3522 (Walsh).

[377] CX-21; CX-254; Tr. 3859-66 (FINRA Member Supervision Risk Monitoring Analyst Troy Mulhern).

[378] CX-21. Mulhern testified that he calculated position values based on the firm's customer account statements. Tr. 3860 (Mulhern). Some positions (marked in red on CX-21) include approximate and uncertain values because the share number and symbol may have been aged. Tr. 3865 (Mulhern). Mulhern testified that customers would not necessarily have received these amounts from stock sales. Tr. 3866 (Mulhern).

[379] *See, e.g.*, CX-68 (email inquiries from Customer R Law Firm).

[380] CX-118; Tr. 513-14 (Jungling).

[381] CX-118; Tr. 513-14 (Jungling).

[382] CX-118; CX-146; Tr. 2891-94 (Doubek).

[383] CX-142; Tr. 515-17 (Jungling).

[384] Tr. 2893-94 (Doubek). For example, Customer SO emailed on June 20, 2019 to question why her account had been closed. She asked what became of her holdings, valued at approximately $25,000. CX-141, at 3, 5; Tr. 522-23 (Jungling). The House Account team responded that positions with a market value of $1,500 or less were moved "via a worthless security sell transaction," other positions were liquidated to cover outstanding debits, and the remainder were moved to an "Alpine Customer Abandoned Securities Account pending escheatment to the appropriate state." CX-141, at 4. After additional emails back and forth, the firm advised Customer SO that her account had been deemed abandoned and that she had to contact her state escheat office to reclaim her assets. CX-141, at 1-2; Tr. 524-25 (Jungling). Alpine Securities' statement was untrue, as the firm still held Customer SO's assets in its proprietary account. Her state escheat office advised her that it had received nothing from Alpine Securities. Tr. 525-26 (Jungling).

a provision in its customer account agreement.[385] The evidence shows that claim is simply not true. The firm's abandoned security policy, which was part of the standard account application, stated that an account would be deemed abandoned if there was no activity in the account or contact from the customer during the prior *three years*.[386] The firm did not follow its own procedures.[387]

Indeed, Doubek testified that, when he instructed Walsh to move all positions from open retail accounts to an abandoned securities account, he did not specifically instruct him to comply with the account agreement's provisions because the goal was to get retail accounts closed.[388] Walsh similarly testified that he did not attempt to follow the account agreement's provisions before taking positions as abandoned and that he may have ignored customers' indications of interest.[389] He also testified that he made no effort to review and follow the escheat laws of the individual states in which Alpine Securities operated, and that Doubek did not ask him to do that.[390]

Examples of customers' demonstrations of interest in their accounts abound. The record includes email correspondence, communications by telephone, deposits and withdrawals, and securities transactions during the months leading up to the firm's seizures.[391] But Alpine

---

[385] Alpine Sec. Br. at 2, 31.

[386] JX-32, at 13; JX-33, at 13; Tr. 504, 526-28 (Jungling). Specifically, the firm's customer account agreement stated, with respect to inactive and abandoned accounts, that: (1) if an account has not had activity for more than 12 months, Alpine Securities may classify the account as inactive and charge an inactive account service fee; (2) if an account is classified as inactive and the firm has been unable to contact the customer by electronic or regular mail during the same period, the firm may classify the account as dormant and may charge a dormant account fee; and (3) if a deposit or withdrawal has not been made on the account, the customer has not otherwise indicated an interest in the account, or the firm has no other contact with the customer *for three years*, the account will be presumed to be abandoned. JX-32, at 13 ¶ 32; JX-33, at 13 ¶ 32 (emphasis added). It further states, "Funds in abandoned accounts will be remitted in accordance with state law." JX-32, at 13 ¶ 32; JX-33, at 13 ¶ 32.

[387] Tr. 527-28 (Jungling), 2886-89 (Doubek).

[388] Tr. 2889-90 (Doubek).

[389] *See* Tr. 3365-68 (Walsh) (Q. In June 2019 when you moved all remaining assets out of accounts as abandoned, you didn't follow the provisions in the account agreement, did you? A. No.), 3370-73 (Walsh) (Q. So regardless of whether there was activity or withdrawals or deposits or contact as of June, all accounts were abandoned; is that correct? You don't have to look at Ms. Fritz, you can answer the question. A. First of all, I could look at whoever I want . . . That is correct, all accounts were deemed inactive and abandoned if we had not been contacted and the accounts had not been closed as of June 2019. That is correct.), 3546-48 (Walsh) (Q. You didn't follow any of the details, as you put it, in this provision before taking positions as abandoned; correct? A. Correct.), 3565-66 (Walsh) (Q. Just to be clear, Mr. Walsh, back in June 2019, you didn't purport to follow that provision; did you, Mr. Walsh? A. I did not.). Walsh was aware of the abandoned account provision in the customer account agreement before Alpine Securities removed customers' securities from their accounts. A regulator from the state of Utah met with Walsh at Alpine Securities and directed his attention to that section of the customer account agreement and told him to follow it. Walsh nonetheless ignored the provision when he took customers' securities out of their accounts. Tr. 3522-24, 3546-48 (Walsh).

[390] Tr. 3390 (Walsh) (Q. In June 2019 Mr. Walsh, you didn't undertake to determine whether taking positions as abandoned complied with any particular state law, correct? A. Correct.). *See also*, Tr. 3389-91 (Walsh).

[391] CX-22; CX-23; Tr. 542-47 (Jungling).

Securities never bothered to check.[392] In all, 23 customers communicated with Alpine Securities by email in the months leading up to June 2019, yet had their accounts deemed abandoned.[393] At least 65 customers engaged in some type of trading activity in their accounts during the months leading up to June 2019, yet the firm deemed their accounts abandoned.[394] In short, the firm made no real attempt to discern if its customers' accounts were in fact abandoned.[395]

Alpine Securities argues that the firm never intended to liquidate the securities it took as abandoned or benefit from the seizures.[396] Even if true, this provides no defense to our finding of conversion and misuse. There is no requirement in the law that Alpine Securities benefit from the property it converts and misuses.[397] In any event, Alpine Securities intentionally removed customers' securities from customers' accounts and, without authorization, put them into accounts to which the customers had no access, and that the firm controlled. This conduct constitutes conversion and misuse.

Alpine Securities claims that it never "owned" the securities it took from its customers. It states that "the movements made no change to the ownership of any security—they remained owned by Alpine's customers and could be retrieved by the customers . . . ."[398] The evidence shows otherwise. After the seizures, Alpine Securities' stock record indicated that the firm's customers were no longer the owners of the stock.[399] At that point, the firm's escheat account

---

[392] Tr. 3367-68 (Walsh). For example, one customer contacted the firm by email in January 2019, yet the firm deemed his account abandoned and moved his positions to a proprietary escheat account in June 2019. CX-113, at 2; CX-254, at 10-11; Tr. 528-30 (Jungling). Another customer communicated back and forth with the firm by email throughout April and May 2019, yet Alpine Securities deemed his account abandoned and moved his positions to a proprietary escheat account in June 2019. CX-113, at 4; CX-254, at 11; RX-117; RX-118; RX-119; RX-120; Tr. 531-38 (Jungling). Another customer communicated with Alpine Securities by email in May 2019, yet the firm deemed her account abandoned and moved her positions to a proprietary escheat account in June 2019. CX-113, at 110; CX-254, at 20; Tr. 539-41 (Jungling).

[393] Tr. 539-41 (Jungling). *See also* CX-113, at 126-29; CX-254, at 14; Tr. 4120-23 (Walsh) (testifying, after being shown another example of a customer who emailed twice in the months before June 2019, that he did not check whether customers had emailed the House Account before taking securities as abandoned).

[394] CX-22; Tr. 542-46 (Jungling).

[395] *See Dep't of Enforcement v. Mission Sec.*, 2010 FINRA Discip. LEXIS 1, at *24-27 (rejecting firm's argument that conversion was justified because the customers had abandoned their accounts where the firm did not follow state laws regarding abandonment).

[396] Alpine Sec. Br. at 5, 29.

[397] *See Denise M. Olson*, Exchange Act Release No. 75838, 2015 SEC LEXIS 3629, at *28 (Sept. 3, 2015) (finding conversion even though applicant voluntarily repaid converted funds); *Dep't of Enforcement v. Johnson*, No. 2018056848101, 2021 FINRA Discip. LEXIS 23, at *17 (NAC Oct. 6, 2021) (rejecting argument that respondent's failure to spend converted funds defeats finding of conversion), *appeal docketed*, No. 3-20646 (SEC Nov. 2, 2021).

[398] Alpine Sec. Br. at 31.

[399] Walsh testified:

> Q. So looking at the stock record, it's the customer state [of residence] that is long, right, not the customer?
>
> A. Right.

48

was long the stock, the customers' accounts were not.[400] The customers who happened to open their accounts electronically after the seizures found an empty account with no securities.[401] The firm's escheat accounts that held the customers' stock were under Alpine Securities' control, not the customers' control.[402]

Faced with a flood of customer complaints and inquiries from regulators including FINRA,[403] beginning around June 25, 2019, Alpine Securities began reversing the firm's "abandoned" securities seizures.[404] But Alpine Securities' reversal of its violative actions is not a defense.[405] Accordingly, we find that, in connection with improperly deeming customer securities abandoned, the firm took customers' securities without authorization and converted and misused customers' securities, in violation of FINRA Rules 2150 and 2010, as alleged in causes one through three of the Complaint.

### b. Conversion, Misuse, and Unauthorized Trading of Securities Improperly Identified as Worthless

At the end of May 2019, Alpine Securities' management was dissatisfied with its customers' failure to close accounts quickly enough to satisfy John Hurry.[406] So the firm decided to unilaterally force closures. Between May 28 and 30, 2019, without customer authorization, Alpine Securities moved customers' securities positions worth less than $1,500 to the firm's

---

Q. Right. And so -- because you actually did move the securities out of the customer's accounts; right?

A. Right.

Q. And the customer that happened to open up their account on, you know, imagine you get online on, you know, June 17th, would have seen nothing in the account, right, 'cause that was gone; right?

A. Right.

Tr. 4111-12 (Walsh). *See also* Tr. 1061-62 (Jungling).

[400] Tr. 4111-12 (Walsh).

[401] Tr. 4112, 4114 (Walsh).

[402] In any event, FINRA precedent does not require a finding that the respondent deprived the owner of his or her property to find conversion. *Dep't of Enforcement v. Doni*, 2017 FINRA Discip. LEXIS 46, at *28; *Dep't of Enforcement v. Johnson*, 2021 FINRA Discip. LEXIS 23, at *19, *appeal docketed*, No. 3-20646.

[403] The firm's reversals coincided with Enforcement's Rule 8210 requests for information regarding abandoned accounts. CX-22; Tr. 549-50 (Jungling). *See also* Tr. 2890-91 (Doubek) (testifying that he received inquiries from state regulators).

[404] CX-22; Tr. 547-50 (Jungling). The firm completed the reversal by the end of July 2019. Tr. 746 (Jungling).

[405] *See Stephen Grivas*, Exchange Act Release No. 77470, 2016 SEC LEXIS 1173, at *10, 28 (Mar. 29, 2016) (finding conversion where respondent repaid converted funds); *Dep't of Enforcement v. Johnson*, 2021 FINRA Discip. LEXIS 23, at *17-18 (finding that respondent's return of converted funds is not exculpatory), *appeal docketed*, No. 3-20646. *Cf. Howard Alweil*, Exchange Act Release No. 31278, 1992 SEC LEXIS 2576, at *4 (Oct. 1, 1992) (finding that subsequent ratification of an unauthorized transaction does not negate finding of violation).

[406] Doubek testified that John Hurry had grown tired of waiting for customers to close their accounts and, in May 2019, the firm decided to seize securities positions valued at $1,500 or less. Tr. 2875-79, 3092-94 (Doubek).

"worthless securities account," an account owned and controlled by the firm.[407] In total, the firm moved more than 2,200 positions that it deemed worthless from more than 1,400 customer accounts.[408] The firm unilaterally decided that every securities position in every customer account valued at $1,500 or less was worthless, including customers' positions in listed and other marketable securities, and bought the positions from the customers for one penny per position.[409]

Alpine Securities did not have customer authorization to take these securities.[410] The firm argues that a series of haphazard and untimely notices and a negative consent letter constitute authorization.[411] We reject this argument. No prior notice alerted the customers that the firm would unilaterally seize securities valued at $1,500 or less.

For example, in a notice included in the February 28, 2019 customer account statements sent to some, but not all, customers, Alpine Securities offered customers the opportunity to write-off positions as worthless if they were worth less than *$400*.[412] Walsh testified that he told Doubek that the firm should not take securities valued at $1,500 or less as "worthless" without giving notice to the customers, but Doubek instructed him to take the securities anyway because the process of closing down accounts was taking too long.[413]

---

[407] Stip. ¶ 62; Tr. 430-34 (Jungling). Walsh testified that, between May 28 and 30, 2019, Alpine Securities took thousands of positions out of customer accounts on the grounds that they were worthless based on a $1,500 threshold. Tr. 3351-53 (Walsh).

[408] CX-14; Tr. 439-443 (Jungling). The total value of the positions that Alpine Securities took from customers was $349,340, of which approximately $267,956 were positions valued in excess of $400 (Alpine Securities' prior worthless threshold). CX-14; Tr. 3711-14 (FINRA Member Supervision Examination Manager Ted Luecke).

[409] Stip. ¶¶ 62, 63, 65; Tr. 3333, 3361 (Walsh). *See also* JX-30; Tr. 451 (Jungling) (testifying that JX-30 is the firm's spreadsheet listing all positions that Alpine Securities purchased for one penny into the worthless securities account). Before May 2019, any customer seeking to dispose of worthless securities had to initiate the process by submitting a worthless security form with Alpine Securities. Tr. 2065, 2205-07 (Jones). None of the customers listed on JX-30 filed any such form. Tr. 433, 438, 454-55 (Jungling), 3336-39 (Walsh).

[410] Tr. 3336-37, 3338-39 (Walsh) (testifying that these trades were initiated by Alpine Securities and done without authorization from the customers, either by signed worthless security forms or otherwise).

[411] Alpine Sec. Br. at 15-17. *See also* Tr. 2846, 2860-61 (Doubek) (testifying that the firm took securities valued at $1,500 or less even though it had not received worthless security forms from all customers, but that the firm had provided sufficient notice to customers).

[412] Stip. ¶ 58; JX-17, at 1; Tr. 484 (Jungling). Kane, the firm's former chief compliance officer and AML compliance officer, testified that when he joined the firm in December 2018, Alpine Securities' worthless securities policy applied to positions valued at $400 or less. Tr. 1389-91 (Kane).

[413] Tr. 3339-43 (Walsh). Doubek testified that Walsh misunderstood his directions. He stated that he told Walsh to remove stocks worth $1,500 or less in May 2019, but he did not mean to do it without notice or a negative consent letter. Tr. 3240-41, 4273-76 (Doubek). Walsh testified that Alpine Securities' original plan was to journal out securities worth $400 or less based on the negative consent letter. Tr. 3518 (Walsh). He testified that, on the morning of May 30, 2019, Doubek instructed him to raise the threshold to $1,500, and he objected because he was concerned about the lack of notice. Tr. 3519 (Walsh). Doubek explained that it related to the firm's new $1,500 recertification fee. Tr. 3349 (Walsh). On this point, we find Walsh's testimony credible. The firm had recently increased its recertification fee to $1,500, and Doubek corroborated Walsh's claim that the $1,500 target was based on the firm's recertification fee. *See* Tr. 2853-55 (Doubek) (testifying that the firm had increased the DTC recertification fee to $1,500), 2879-80 (Doubek) (testifying that the $1,500 "worthless" demarcation was based on

Next came Alpine Securities' "Negative Response Worthless Security Letter," dated March 15, 2019, which the firm sent to certain customers with positions that the firm valued at *$400* or less.[414] In the March 31, 2019 customer account statements for Alpine Securities' direct customers, the firm included a notice stating that, for positions worth less than *$400*, "liquidation may incur greater fees and commissions than the position value."[415]

The firm sent to most, but not all, customers a similar notice with its April 30, 2019 statements.[416] Alpine Securities failed to provide its customers with notice of its intent to seize securities valued at *$1,500* or less in any customer account statements before the seizures.[417] The notice explained that the customers' shares were deemed worthless and would be sold to the firm's worthless securities account for one penny per position.[418] The notice continued, "[b]y not responding to this notification, you hereby acknowledge and agree you assign all shares of the [identified] security to Alpine Securities."[419] Finally, the notice advised customers that, if they objected to assigning their shares to Alpine Securities' worthless securities account, they could sign the attached customer objection and return it to the firm.[420]

The firm knew that a negative consent letter did not provide adequate authorization for it to seize customers' securities. Former chief compliance officer Kane told firm management that a negative consent letter was not compliant with FINRA guidance as a method of obtaining customer authorization for executing transactions.[421] Alpine Securities has offered no authority to support the suggestion that a negative consent letter is sufficient to find customer authorization to trade.[422] Nonetheless, the firm bought its customer's securities, without authorization, for one penny per position.

---

the recertification fee). Additionally, the firm's May 31, 2019 letter to its customers makes clear that all accounts would be closed immediately and that the firm had *already* deemed worthless and seized positions valued at $1,500 or less. *See* JX-20.

[414] Stip. ¶ 59; CX-116, at 1.

[415] Stip. ¶ 60; JX-18, at 2.

[416] Stip. ¶ 60; JX-19, at 1.

[417] JX-16; JX-17; JX-18; JX-19; Tr. 449 (Jungling), 3426-27 (Walsh).

[418] Stip. ¶ 59; CX-116, at 1; Tr. 483-84 (Jungling).

[419] Stip. ¶ 59; CX-116, at 1. The notice stated that the firm could move the securities to its worthless securities account 30 days from the date of the notice, although it did not move them until later. Stip. ¶ 59. The notice also stated, "[i]f Alpine Securities receives this notice as returned mail, then Alpine Securities reserves the right to implement this sale and assignment." CX-116, at 1.

[420] CX-116, at 1.

[421] Tr. 1440-41 (Kane).

[422] Nor could Alpine Securities offer support for the use of a negative consent letter under these circumstances. The use of negative response letters is appropriate "only in limited circumstances," such as the bulk transfer of customer accounts to a new firm in certain situations. *See* NASD Notice to Members 02-57, 2002 NASD LEXIS 70, at *5-10 (Sept. 2002), https://finra.org/rules-guidance/notices/02-57. "Limited circumstances" generally does not include the firm's taking of its customers' securities positions. Indeed, FINRA has made clear that negative consent is not

Furthermore, not all of Alpine Securities' customers who were the subject of the firm's targeted seizures actually received a copy of the negative consent letter. In *May 2019*, Alpine Securities took every customer position worth $1,500 or less, but it only sent negative consent letters to customers with positions worth $400 or less back in *March 2019*.[423] *Importantly, Alpine never sent letters to customers with positions valued between $400 and $1,500*. Furthermore, Walsh testified that Alpine Securities ran different queries in March when it sent the letters and in late May when it actually took the securities from the customers.[424] As such, the firm did not even know whether the customers from whom it took positions worth $400 or less had even received the negative consent letter; it knew for sure that customers with positions valued between $400 and $1,500 had not received the letter.

Not only did Alpine Securities seize customers' securities without authorization, but it went so far as to ignore some customers who objected to the negative consent letter and tried to stop the firm from taking their securities. Walsh's testimony confirmed that the firm ignored customer objections and nonetheless seized customer securities over their objections. For example, Customer KN objected to assigning her position to the firm and wrote "please close my account and send me the balance."[425] Walsh testified that he accomplished what the customer asked by taking her securities as worthless. He understood "please close my account" to be authorization to take her securities positions for one penny, even though she also said she objected to assigning her positions to the firm.[426] Alpine Securities took KN's position in May 2019. Similarly, Customer ED signed the statement that he objected to an assignment of his securities to Alpine Securities and returned it to the firm.[427] Even though he objected, Alpine Securities took his position for one penny.[428] The firm also removed securities from the account of a customer who contacted the firm to try to close their accounts before the May 2019 seizure.[429]

Alpine Securities sent customers a notice after the fact. In May 2019, the firm stated in an undated notice included in customer account statements issued at the end of May:

---

permissible even for merely trading on a net basis with non-institutional customers. *See* NASD Notice to Members 06-47, 2006 NASD LEXIS 84, at *6 (Sept. 2006), https://finra.org/rules-guidance/notices/06-47.

[423] Tr. 2860-68 (Doubek), 3334, 3357, 4103-06 (Walsh).

[424] Tr. 4103-06 (Walsh).

[425] CX-116, at 1; Tr. 3395 (Walsh).

[426] Tr. 3540-41 (Walsh).

[427] CX-116, at 3; Tr. 3397-98 (Walsh).

[428] JX-30, at 23; Tr. 3399 (Walsh). *See also* Tr. 485-92 (Jungling) (testifying that several customers objected in writing, but the firm nonetheless seized their securities).

[429] *See, e.g.*, JX-30, at 14; CX-122; RX-128; Tr. 491-98 (Jungling) (demonstrating that, although Customer JB contacted the firm in early May to try to sell holdings and close her account, the firm nonetheless seized her securities later in May as part of its mass "worthless" seizure).

> Please be advised that all positions with a market value of *$1,500.00* or less have been deemed worthless as the cost to transfer these securities exceeds the value. *These positions have been removed via a worthless security sell transaction.*[430]

Walsh testified that this letter was the *first notice* (albeit after the fact) that the firm provided to customers that the firm considered $1,500 the worthless threshold.[431]

Alpine Securities' actions were intentional, as evidenced by the planning the firm undertook before the seizures.[432] Doubek testified that John Hurry had a sense of urgency about closing customer accounts still open in May 2019.[433] He also testified that the negative consent letter worked so well for securities valued at $400 or less, the firm decided to also take securities valued at $1,500 or less.[434] The firm planned ahead by drafting and issuing the March 15, 2019 negative response letter (for securities worth $400 or less), waiting a few months, and then taking the securities. Doubek testified that the intent was, if the firm did not hear back from the customer, it would move the securities to the worthless securities account.[435] Walsh's testimony also supports our finding of intent. Walsh testified that the firm used $1,500 as the cut off because Alpine Securities had increased its recertification fee to $1,500.[436] Walsh warned that $1,500 was not an appropriate threshold.[437] Furthermore, as management knew, not all positions required recertification to move the securities from Alpine Securities to another firm—many positions could have been electronically transferred or liquidated—yet the firm moved ahead with seizing *all* positions valued at $1,500 or less based on the recertification fee.[438] This supports our finding that the firm's actions were intentional.

Alpine Securities began reversing the firm's worthless securities seizures on May 29, 2019, and the firm completed the reversals by November 27, 2019.[439] But the fact that the firm

---

[430] Stip. ¶¶ 40, 61; JX-20, at 1 (emphasis added); Tr. 434-35 (Jungling), 2875 (Doubek), 3427 (Walsh). The firm also sent this letter to customers as a separate hard-copy mailing and separate email between June 11 and 13, 2019, again subsequent to the firm's seizures. CX-58; CX-59; Tr. 435, 458-60, 461-65 (Jungling).

[431] Tr. 3335-36, 4087 (Walsh).

[432] *See William Bruce Smith*, No. 2011029152401, 2014 FINRA Discip. LEXIS 2, at *14-15 (NAC Feb. 21, 2014) (finding intent based on the multiple steps applicant took to surreptitiously secure converted funds).

[433] Tr. 2875-79, 3092-94 (Doubek).

[434] Tr. 2843-45, 2876-77 (Doubek).

[435] Tr. 2864-67 (Doubek). And, as stated, the firm took securities even from customers who did respond.

[436] Tr. 3343, 3352-53 (Walsh). *See also* Tr. 464 (Jungling), 2880 (Doubek).

[437] Tr. 3339 (Walsh).

[438] *See* Tr. 2880 (Doubek) (testifying that customers could liquidate securities without paying the $1,500 recertification fee), 3349-50, 3352-53 (Walsh) (same).

[439] Stip. ¶ 66.

reversed the seizures does not negate findings of conversion and misuse.[440] In FINRA disciplinary actions, Enforcement need not demonstrate the intent to permanently deprive.[441] In any event, we find that the firm did in fact intend to permanently deprive these customers of their property as part of the new business plan and to force retail customers to close their accounts. The firm reversed it seizures of customer stock only because of regulatory intervention, not because that was its plan.[442] Doubek confirmed that the firm's intent when it sent the May 2019 letter stating that the seizures had occurred was to close all accounts and have no further communications with the firm's customers.[443] Alpine Securities never intended to return seized securities, and did so only to avoid regulatory repercussions.

Finally, Alpine Securities has also argued that it did not benefit from the seizures because it did not liquidate the securities it seized.[444] There is no "benefit" requirement in the definition of conversion. Alpine Securities converted its customers' securities when it took the securities out of its customers' accounts. What Alpine Securities did with the securities after it took them is not relevant to our finding of conversion.[445] Similarly, a showing of benefit to the wrongdoer is not an element of proof required in unauthorized trading cases.

Accordingly, we find that Alpine Securities violated FINRA Rules 2150 and 2010 by converting and misusing customers' securities, as alleged in causes one and two, and executing unauthorized transactions, as alleged in cause three.

### 2. Alpine Securities Paid Unfair Prices to Acquire Securities it Improperly Deemed Worthless, as Alleged in Cause Four

FINRA Rule 2121 requires that member firms, in securities transactions in both listed and unlisted securities, buy for its own account from a customer at a price that is fair, taking into consideration all relevant circumstance. FINRA's rules obligate member firms to deal fairly with

---

[440] Nor does it negate our finding that the firm engaged in unauthorized trading. Even a customer's subsequent ratification of a trade does not defeat a finding of unauthorized trading. *See Katz*, 2010 SEC LEXIS 994, at *72-75 (holding that post-trade approval or ratification after the fact does not establish authorization).

[441] *See Dep't of Enforcement v. Doni*, 2017 FINRA Discip. LEXIS 46, at *28 ("There also are no FINRA decisions holding that an element of conversion is the intent to permanently deprive the rightful owner of his property."); *Dep't of Enforcement v. Mission Sec. Corp.*, No. 2006003738501, 2008 FINRA Discip. LEXIS 61, at *11 (OHO Dec. 18, 2008) (finding conversion where a member firm unilaterally declared 18 customers' securities worthless), *aff'd*, 2010 FINRA Discip. LEXIS 1, *aff'd*, 2010 SEC LEXIS 4053.

[442] Tr. 3520-21 (Walsh) (testifying that, after receiving feedback from FINRA during his on-the-record testimony as part of a FINRA investigation, he returned to the office and reversed all seizures of stock valued between $400 and $1,500).

[443] Tr. 2875-76 (Doubek).

[444] Alpine Sec. Br. at 33.

[445] *See Dep't of Enforcement v. Johnson*, 2021 FINRA Discip. LEXIS 23, at *19-20 (rejecting respondent's argument that his failure to spend the funds he converted must defeat a finding of conversion).

customers when buying securities from, and selling them to, customers.[446] The Commission has held that a violation of any FINRA rule, including FINRA Rule 2121, constitutes a violation of FINRA Rule 2010.[447]

Alpine Securities paid its customers unfair prices for their securities. The basis for our conclusion is not that one penny per position is unfair for securities that the customer concludes are worthless. Rather, we find that these customers did not conclude that their securities were worthless and did not submit worthless security forms to the firm. The prices that Alpine Securities paid its customers bore no relationship to the actual market prices for the positions, some of which were in listed securities.[448] In fact, the firm was actively trading some of the securities for other customers at higher prices, while calling them "worthless" for the customers at issue here.[449] Regardless of whether the securities were listed or actively trading, across the board, the firm paid one penny per position without customer approval to treat the securities as worthless simply because the firm wanted to force accounts closed.

Tellingly, Enforcement identified worthless security seizures where there was a priced bid on the day of the seizure and daily trading volume for 120 days prior.[450] The firm seized other securities identified as worthless from Alpine Securities' customers while Scottsdale's customers were actively trading the same stock at higher prices.[451] For example, two Scottsdale customers liquidated WTII shares during the month prior to Alpine Securities' seizures. Alpine Securities paid its customers one penny per position for WTII stock while Scottsdale's customers sold WTII stock at better prices.[452] Similarly, two weeks before and two weeks after Alpine Securities seized IMUN stock from customers, both Scottsdale and Alpine Securities customers liquidated IMUN at higher prices and for lower quantities.[453] Alpine Securities cleared for Scottsdale at the time, and should have been aware of these trades.[454]

---

[446] *Dep't of Mkt. Reg. v. Lane*, No. 20070082049, 2013 FINRA Discip. LEXIS 34, at *21 (NAC Dec. 26, 2013), *aff'd*, Exchange Act Release No. 74269, 2015 SEC LEXIS 558 (Feb. 13, 2015); *Dep't of Enforcement v. Lee*, No. C06040027, 2007 NASD Discip. LEXIS 6, at *34-35 (NAC Feb. 12, 2007), *aff'd in relevant part*, Exchange Act Release No. 57655, 2008 SEC LEXIS 819 (Apr. 11, 2008).

[447] *William Scholander*, Exchange Act Release No. 74437, 2015 SEC LEXIS 841, at *7 n.6 (Mar. 4, 2015).

[448] Tr. 3361 (Walsh). *See also* CX-13; Tr. 3735 (Luecke) (testifying that CX-13 is a record of listed securities positions that Alpine Securities seized as worthless).

[449] CX-12; CX-15; CX-16.

[450] CX-12; Tr. 3836 (Mulhern). There were thousands of worthless transactions on Alpine Securities' blotter, but Enforcement isolated all securities with trading volume and a priced bid on the seizure day. Tr. 3839 (Mulhern). From that list, it compiled the 25 rows on CX-12 as a sample of securities seized by Alpine Securities from customers where there was a priced bid and trading volume for a 120-day look back from the trade date. Tr. 3841-46 (Mulhern).

[451] CX-15; Tr. 3847-48, 3876, 3880 (Mulhern).

[452] *See* CX-15, at 1; Tr. 3848 (Mulhern).

[453] *See* CX-15, at 2; Tr. 3849 (Mulhern).

[454] Tr. 3850-51 (Mulhern).

Alpine Securities' seizures of securities from its customers also occurred on the same day and in close time proximity to Scottsdale customers' liquidations.[455] For example, a customer of Scottsdale liquidated 50,000 shares of CYDY for 38 cents per share. On the same day, May 30, 2019, Alpine Securities executed two worthless seizures from customers of the same stock approximately 20 minutes before the Scottsdale customers.[456] Based on the share price that the Scottsdale customers received, the positions for which Alpine Securities paid its customers one penny could have sold for more than $1,000 each.[457]

As a result of Alpine Securities' unauthorized seizures of customers' positions for one penny, many customers complained to the firm. Customer MDG emailed Alpine Securities on June 5, 2019:

> I finally got access to my account again and saw that Alpine had unceremoniously liquidate (sic) my 1.8 million shares of LOGL as worthless!!!! WTF!!!!!! How do you get away with liquidating stock and closing an account without discussing with the client any changes to your processes.[458]

Although Alpine Securities paid one penny to Customer MDG for his position in LOGL, on the trade date, the market value of the position was approximately $1,002.[459]

Customer DS also complained to Alpine Securities on June 11, 2019. He emailed the firm:

> I noticed that 200 shares of AZRX was sold for $0.0005 per share in my personal account despite the fact that the stock was trading at approximately $3.00 per share. Can you explain this trade?[460]

Although Alpine Securities paid one penny to DS for his position, the market value of the position was $438.[461] Similarly, the firm purchased Customer SH's position in MU stock for one penny.[462] The market value of the stock at the time was $1,304.[463]

One of Alpine Securities' more egregious seizures involves Customer CN. On Sunday, February 24, 2019, CN emailed Alpine Securities placing sell orders for his positions in ONVO,

---

[455] See CX-16; Tr. 3853 (Mulhern).

[456] Tr. 3853-54 (Mulhern).

[457] See CX-16, at 1; Tr. 3854-55 (Mulhern).

[458] CX-126, at 1; Tr. 3720-21 (Luecke).

[459] CX-14, at 7; Tr. 3724 (Luecke).

[460] CX-128, at 1; Tr. 3737-39 (Luecke).

[461] CX-13, at 2; Tr. 3740 (Luecke).

[462] CX-97.

[463] CX-13, at 1; Tr. 3740-42 (Luecke).

OMBP, RSCF, and SPI.[464] Based on the market price of those securities on Monday, February 25, 2019, the first trading day after CN sent the email, CN's 10,000 shares of OMBP had a market value of $200, his 600 shares of ONVO had a market value of $678, his 69,333 shares of RSCF had a market value of $4,159, and his 33 shares of SPI had a market value of $81.[465] Alpine Securities ignored CN's instructions to sell and instead took the OMBP, ONVO, and SPI positions into the worthless securities account.[466] The firm journaled the RSCF position out of the account to cover a debit in the account.[467] The record is replete with examples showing that the market value of the securities positions that Alpine Securities took from customers for one penny was much more than what the firm paid.[468] And, more importantly, the firm's customers had not agreed to treat their securities as worthless. Alpine Securities did not reverse the vast majority of its "worthless" stock seizures until November 2019, after FINRA and other regulators intervened.[469]

Based on the evidence, we find as alleged in cause four that Alpine Securities paid its customers unfair prices that were not reasonably related to the current market price for securities that it improperly deemed "worthless." Accordingly, we find that Alpine Securities violated FINRA Rules 2121 and 2010, as alleged in cause four.

### C.    Alpine Securities' Misconduct Related to Other Unreasonable Fees and Charges

We find as alleged in cause four that Alpine Securities charged its customers a 2.5% market-making/execution fee which, when combined with other charges, resulted in unfair and excessive prices and commissions in excess of 5%, in violation of FINRA Rules 2121 and 2010.

We also find as alleged in cause five that Alpine Securities charged customers an unreasonable illiquidity and volatility fee and an unreasonable $1,500 fee for certificate withdrawal, in violation of FINRA Rules 2122 and 2010.

---

[464] CX-72, at 2-3; Tr. 3767-68 (Luecke).

[465] CX-19; Tr. 3768-69 (Luecke).

[466] Tr. 3770 (Luecke).

[467] CX-85, at 41, 48, 54; Tr. 3770-72 (Luecke). In September and October 2019, Alpine Securities reversed these movements out of CN's account. Tr. 3773 (Luecke). In December 2019, CN continued to struggle to close his Alpine Securities account. RX-17; Tr. 3773-74 (Luecke). The firm advised CN that his OMBP, ONVO, RSCF, and SPI positions would cost more to liquidate than they were worth. RX-17. Accordingly, CN executed a worthless securities letter on January 2, 2020. CX-282; Tr. 3774-76 (Luecke). Those positions remained in Alpine Securities' worthless securities account for months and, in mid-2021, the firm sold them for approximately $22,737. CX-281; Tr. 3776-80 (Luecke).

[468] *See* CX-12; CX-13; CX-14; CX-15; CX-16.

[469] CX-18; Tr. 3765-66 (Luecke).

### 1. Alpine Securities' 2.5% Market-making/Execution Fee Resulted in Unfair Prices, as Alleged in Cause Four

FINRA Rule 2121 requires that member firms buy from and sell to customers at prices that are fair, taking into consideration all relevant circumstances. "FINRA's rules obligate FINRA member firms to deal fairly with customers."[470] FINRA's requirement of fair dealing extends to pricing.[471] The Commission has held consistently that markups and markdowns in excess of 5% are acceptable only in exceptional cases.[472] "Once evidence has been presented that markups are five percent or more . . . the burden shifts to the firm . . . to present facts otherwise justifying higher markups."[473]

Alpine Securities' August 31, 2018 fee schedule introduced a market-making/execution fee identified as "2.5% of the best available price," to be assessed on a per transaction basis.[474] The fee had two components. The firm charged a market-making fee where it acted in a principal capacity and as a market maker with respect to a particular transaction.[475] The firm charged an execution fee as an additional commission in trades in which it acted as an agent.[476]

The firm advised Enforcement that the market-making fee "represents [Alpine Securities'] markup/markdown charged on trades in which Alpine acts as the market-maker in executing the trades in a principal capacity . . . [and] reflects Alpine's entry into the market-making line of business and is reflective of the customary method of charging for such service."[477] The firm further indicated that the fee "was driven by considerations of the fair and reasonable market value of the unique nature of the execution and settlement services provided by Alpine . . . ."[478] Alpine Securities charged its customers a 2.5% market-making/execution fee on every trade in addition to its 4.5% standard commission, 1.5% settlement fee, and $95 ticket charge, resulting in its customers paying a total commission of well in excess of 5%, and in

---

[470] *Dep't of Mkt. Reg. v. Lane*, 2013 FINRA Discip. LEXIS 34, at *21, *aff'd*, 2015 SEC LEXIS 558 (citing *Dep't of Enforcement v. Lee*, 2007 NASD Discip. LEXIS 6, at *34, *aff'd in relevant part*, 2008 SEC LEXIS 819).

[471] *Dep't of Enforcement v. J.W. Korth*, No. 2012030738501, 2019 FINRA Discip. LEXIS 18, at *16 (May 22, 2019), *appeal docketed*, No. 3-19206 (SEC June 18, 2019). A violation of FINRA Rule 2121 or any FINRA rule is also a violation of FINRA Rule 2010. *William Scholander*, 2015 SEC LEXIS 841, at *7, n.6.

[472] *Lane*, 2015 SEC LEXIS 558, at *26 (citing *Inv. Planning, Inc.*, Exchange Act Release No. 32687, 1993 SEC LEXIS 1897 (July 28, 1993)).

[473] *Lane*, 2015 SEC LEXIS 558, at *26.

[474] Stip. ¶ 45; JX-4.

[475] Stip. ¶ 46; Tr. 567-68 (Jungling).

[476] Stip. ¶ 47; Tr. 567-69 (Jungling). As of our issuance of this decision, the market-making/execution fee remains on Alpine Securities' current fee schedule. Stip. ¶ 48.

[477] CX-229, at 2; Tr. 570-75 (Jungling).

[478] CX-229, at 2, Tr. 570-75 (Jungling). Frankel testified that John Hurry decided on 2.5% for this fee. Tr. 1721 (Frankel).

many instances well in excess of 10% per trade.[479] The evidence does not demonstrate that Alpine Securities was a market maker in every instance when it charged a market-making fee, and the firm never disclosed the market-making fee on its trade confirmations.[480]

Beginning on about November 21, 2018, Alpine Securities began charging customers the market-making component of the fee.[481] Based on the trade blotter provided by Alpine Securities to Enforcement, between November 21, 2018 and September 24, 2019, Alpine Securities charged a market-making fee in 236 principal transactions (involving retail customers, not through correspondent firms) totaling $45,495.[482] The 236 trades totaled a combined principal amount of $1,819,790. In addition to the market-making fee, the firm also charged total commissions of $79,546, ticket charges totaling $17,935, one execution fee of $261, and total settlement fees of $16,088.[483] Adding the charges together, Alpine Securities charged customers total fees of $159,325, which equaled an average commission of 8.75% per trade on principal transactions.[484]

Beginning on March 1, 2019, Alpine Securities began charging customers the execution fee for trades routed away on an agency basis.[485] Based on the trade blotter provided by Alpine Securities to Enforcement, between March 1, 2019 and September 24, 2019, Alpine Securities charged an execution fee in 204 agency trades (involving retail customers, not through correspondent firms) totaling $44,675.[486] The 204 trades equaled a combined principal amount of $1,787,019. In addition to the execution fee, the firm also charged total commissions of $78,180, ticket charges totaling $19,190, and total settlement fees of $15,595.[487] Adding the charges together, Alpine Securities charged customers total fees of $157,640, which equaled an average commission of 8.82% on each agency trade.[488]

On the 440 retail trades in which Alpine Securities charged a market-making fee or an execution fee, the firm's total charges (fees and commissions) were between 5% and 10% for

---

[479] CX-8; CX-9; Tr. 576-81, 585-89 (Jungling). Customer MK, for example, received a confirmation for a July 11, 2019 stock sale. CX-94. The confirm showed that, in total, he was charged approximately 11.66% in commissions and fees. CX-94; Tr. 598 (Jungling). This amount included an execution fee, a commission, a settlement fee, and a ticket charge. CX-94. MK testified that Alpine Securities first falsely labeled his account as abandoned and took his positions. After the firm returned his securities to his account, he sold them. Tr. 2547 (MK).

[480] CX-10; CX-120; Tr. 591-92, 594-97 (Jungling).

[481] Tr. 567-70, 578 (Jungling).

[482] CX-9, at 1; Tr. 577-80 (Jungling).

[483] CX-9, at 1; Tr. 568-70, 577-80 (Jungling).

[484] CX-9, at 1; Tr. 577-80 (Jungling). On one trade, the firm charged both a market-making fee and an execution fee (which usually applies only to agency trades) of $261. CX-9, at 1; Tr. 579, 594 (Jungling).

[485] CX-9; Tr. 581 (Jungling).

[486] CX-9, at 2; Tr. 581-83 (Jungling).

[487] CX-9, at 2; Tr. 568-70, 581-83 (Jungling).

[488] CX-9, at 2; Tr. 581-83 (Jungling).

approximately 225 trades and between 10% and 15% for approximately 130 trades.[489] Alpine Securities has not refunded $83,199 that it collected for market-making/execution fees.[490]

Alpine Securities' markups and markdowns exceeded 5%. Accordingly, the burden shifts to the firm to demonstrate that the facts surrounding the transactions justify higher markups and markdowns.[491] But Alpine Securities has not demonstrated any factors that would justify charging an additional 2.5% over and above its standard commissions and fees. In fact several witnesses testified that John Hurry adopted the market-making/execution fee simply as a way of generating more income on each trade.[492] The firm's own explanation of the market-making/execution fee during Enforcement's investigation offers little justification for charging markups and markdowns well in excess of acceptable rates:

> The analysis of the Market-Making Fee and Execution Fee was driven by considerations of the fair and reasonable market value of the unique nature of the execution and settlement services provided by Alpine, though this analysis is not expressly documented in the Fee Analysis spreadsheet.[493]

We find, as alleged in cause four, that Alpine Securities' 2.5% market-making/execution fee caused the firm to charge excessive commissions and fees in violation of FINRA Rules 2121 and 2010.

### 2.  Alpine Securities Charged Unreasonable Illiquidity and Volatility and Recertification Fees, as Alleged in Cause Five

FINRA Rule 2122 states that a firm's "charges" for services provided must be reasonable and not unfairly discriminatory among customers. Rule 2122 applies to all charges and fees for services provided by a member firm.[494] A violation of any FINRA rule, including Rule 2122, is a

---

[489] CX-9, at 3; Tr. 583-84 (Jungling).

[490] CX-29A; Tr. 672-75, 3920-22 (Jungling).

[491] *See Steven P. Sanders*, Exchange Act Release No. 40600, 1998 SEC LEXIS 2302, at *14 (Oct. 26, 1998) (rejecting argument that NASD, now FINRA, impermissibly shifted the burden to applicant and affirming that, once NASD demonstrated that applicant's markups exceeded 5%, the burden properly shifted to applicant to justify higher markups).

[492] *See,* Tr. 1118 (Tew) (testifying that John Hurry wanted the firm to become a market maker in various securities to keep the 2.5% that other market makers were making off of the firm's customers' trades), 1998-2000 (Jones) (testifying that the market-making/execution fee was developed by John Hurry as a way to make more money on each trade).

[493] CX-229, at 2; Tr. 560-61 (Jungling).

[494] FINRA Regulatory Notice 11-08, 2011 FINRA LEXIS 7, at *25 (discussing NASD Rule 2430, which is the predecessor to Rule 2122).

violation of FINRA Rule 2010, which requires member firms to observe high standards of commercial honor and just and equitable principles of trade.[495]

### a. Alpine Securities' Illiquidity and Volatility Fee Was Unreasonable

To help the firm meet NSCC deposit requirements, the firm decided to charge customers a fee. Alpine Securities added to its March 31, 2018 fee schedule an "illiquidity and volatility fee."[496] For each transaction, Alpine Securities assessed a fee of 1% per day of the firm's estimated NSCC illiquidity and volatility deposit and charged this fee to its customers.[497] For securities that NSCC labeled as illiquid or volatile, NSCC required Alpine Securities to set aside on deposit or "pledge" a certain amount of excess net capital until the trade cleared.[498] NSCC did not retain the funds it required Alpine Securities to pledge. NSCC returned those funds to Alpine Securities once the trade cleared (generally within two days), but the firm kept the illiquidity and volatility fee it charged its customers.[499] Alpine Securities charged the illiquidity and volatility fee in addition to its standard commissions and trade-related fees which already totaled in excess of 5%.

John Hurry determined the amount of the illiquidity and volatility fee.[500] When asked at the hearing how Alpine Securities determined the appropriate amount for the illiquidity and volatility fee, he gave a lengthy answer about determining the "high watermark" for potential NSCC deposit requirements, but provided no firm explanation.[501] He concluded by stating "that one percent might sound high but reality (sic) it is not allocated other than a small percent," because the firm had to commit its capital to trade.[502] The 1% per day charge when annualized, excluding weekends, equals approximately 250%.[503] The firm also charged a $150 minimum on

---

[495] *Dep't of Enforcement v. North Woodward Fin. Corp.*, No. 2011028502101, 2016 FINRA Discip. LEXIS 35, at *14 n.16 (NAC July 19, 2016).

[496] Stip. ¶ 49; JX-4; Tr. 551-52, 555-56 (Jungling). The firm did not begin charging the illiquidity and volatility fee until September 11, 2018. Tr. 550-51 (Jungling).

[497] Stip. ¶ 49. When Alpine Securities lost its ex-clearing relationships in mid-2018, it also lost its ability to trade without using its own capital to meet NSCC's deposit requirements. *See* III.B.2, *supra*.

[498] Tr. 552-53 (Jungling). Doubek testified that NSCC assessed "a margin call" (or deposit requirement) to guard against the risk of not settling a trade between the trade date and the settlement date. Tr. 3190 (Doubek). He stated that, as a result, the firm had to determine how much it could trade for any given day based on actual cash on hand available to wire to NSCC to be held until the trade settled (generally two days). Tr. 3202 (Doubek).

[499] Tr. 563 (Jungling), 1901 (Brant), 3211-12 (Doubek).

[500] Tr. 1123-24 (Tew) (testifying that John Hurry decided to implement the 1% per day illiquidity and volatility fee), 1723-24 (Frankel) (testifying that 1% per day was John Hurry's idea and, because he lent money to the firm to pay NSCC's deposit requirements, he got to set this fee).

[501] Tr. 4420-24 (John Hurry).

[502] Tr. 4423-24 (John Hurry).

[503] Tr. 553 (Jungling). In contrast, Alpine Securities paid an annualized interest rate of 36% under the May 17, 2018 loan agreement with Alpine Holding and an annualized interest rate of 120% under the February 20, 2019 loan agreement with Alpine Holding. JX-27, at 9; JX-28, at 8.

trades for which 1% per day was less than $150.[504] If a customer placed a trade that the firm ultimately could not execute, the firm still charged the customer the minimum fee as a processing fee, regardless of its inability to execute the trade.[505]

To ensure a customer's ability to pay the illiquidity and volatility fee, the firm implemented a pre-trade approval process whereby the firm required the customer to first complete a pre-trade authorization form and email it to Alpine's pre-trade approval email.[506] The firm used information on the form to calculate its own estimate of how much capital NSCC would require the firm to set aside to complete the trade and advised the customer of the dollar amount of the fee.[507] If the customer agreed to the fee, he or she could call the firm to place the trade.[508] If a customer chose not to pay the fee (and did not place a trade), the firm nonetheless charged a $150 processing fee.[509] Sometimes Alpine would suggest the customer pare back the amount of the trade to reduce the fee.[510]

Alpine Securities argues that many customers signed a pre-trade approval form in which they agreed to pay the illiquidity and volatility fee. The firm argues that the fee therefore must be considered reasonable because two equal parties (the firm and the customer) willingly agreed to a negotiated fee.[511] This argument assumes that the two parties participated in an arms-length negotiation with equal bargaining power. Nothing could be further from the truth. The desperate communications between the firm's customers and the firm demonstrate that the customers were anxious to sell their securities and close their accounts before Alpine Securities moved their holdings to the firm's abandoned securities accounts. They had no choice but to pay the illiquidity and volatility fee if they wanted to liquidate their stock instead of losing their positions.[512] The pre-trade approval form does not justify the firm's excessive illiquidity and volatility fee.

---

[504] CX-229, at 2; Tr. 559-60 (Jungling).

[505] Tr. 559-60 (Jungling).

[506] CX-121; Tr. 553-54, 556-57 (Jungling), 3210-11 (Doubek).

[507] Tr. 554, 557-58 (Jungling), 3213 (Doubek).

[508] Tr. 554 (Jungling). The fee applied only to sales. Tr. 554 (Jungling). Because the vast majority of Alpine Securities' business involved penny stock liquidations, customers rarely contacted the firm to purchase securities. Tr. 554-55 (Jungling).

[509] Tr. 559 (Jungling). In response to Enforcement's March 2019 Rule 8210 request for information related to Alpine's illiquidity and volatility fee, the firm represented that customers "are charged either the 1% [per day] fee or the minimum charge of $150 for all trades that settle regular way. Most customers are afforded the courtesy of paying the capped $150 charge which represents less than the actual 1% [per day] of the NSCC illiquidity and volatility charge." CX-229, at 2. Jungling testified that, contrary to the firm's representation, most customers were charged more than $150. Tr. 562-63 (Jungling).

[510] Tr. 3212-13 (Doubek).

[511] Alpine Sec. Br. at 12.

[512] *See* JX-22 (warning on May 31, 2019 that "[a]ll remaining positions will be moved to an Alpine Customer Abandoned Securities Account pending escheatment to the appropriate state.").

Based on information provided by Alpine Securities to Enforcement, between September 2018 and July 2019 (when Enforcement filed the Complaint), the firm collected approximately $1,527,925 in illiquidity and volatility fees.[513] The amount of those fees that the firm has not refunded to customers is $1,491,625.[514]

The preponderance of the evidence demonstrates that Alpine Securities' illiquidity and volatility fee was unfair and unreasonable, in violation of FINRA Rules 2122 and 2010, as alleged in cause five.

### b. Alpine Securities' $1,500 Certificate Withdrawal Fee Was Unreasonable

Beginning in October 2016, Alpine Securities charged customers a $1,000 fee for certificate withdrawals from DTC.[515] Effective April 2019, the firm increased the DTC certificate withdrawal fee to $1,500.[516] After the institution of this proceeding, the firm reduced the fee to $500 plus mailing, DTC, transfer agent, and other passthrough costs.[517]

DTC has always charged the firm $500 to obtain a certificate.[518] Alpine Securities' fee increase was not precipitated by an increase in the amount that DTC charged the firm. And obtaining a certificate from DTC does not require significant work on the part of the firm. Walsh testified that the only work required is completing an electronic form on a terminal. He estimated that this takes less than one hour.[519] Doubek testified that the fee went from $1,000 to $1,500 because John Hurry did not feel that $1,000 adequately covered the firm's costs, but in this proceeding the firm offered no evidence to support this claim.[520] Indeed, Walsh and Doubek testified that they were unaware of the firm conducting any analysis to support this fee increase.[521]

Alpine Securities' increase in its certificate withdrawal fee coincided with the firm's decision to consider "worthless" all positions valued at $1,500 or less.[522] In Alpine Securities' February 2019 account statements, the firm announced that it would not permit customers who had deposited shares by physical certificate to free-transfer them out, but rather would require

---

[513] CX-11; Tr. 563-66 (Jungling).

[514] CX-29A; Tr. 3921-22 (Jungling).

[515] Stip. ¶ 51.

[516] Stip. ¶ 52.

[517] Stip. ¶ 52. At some point, the firm first reduced the fee to $1,035. Stip. ¶ 52.

[518] Stip. ¶ 53; CX-156; Tr. 3346 (Walsh).

[519] Tr. 3346 (Walsh).

[520] Tr. 2854-55 (Doubek). *See also* Tr. 3223 (Doubek) (testifying that the firm's increase of the DTC recertification fee occurred at the direction of John Hurry).

[521] Tr. 3251-52 (Doubek), 3345 (Walsh).

[522] Tr. 2879-80 (Doubek), 3343, 3349, 3352-53 (Walsh).

customers either to liquidate those shares or to withdraw them in certificate form.[523] Then, in its April 2019 statements, at the same time that it increased its certificate withdrawal fee, Alpine Securities stated that the firm would no longer permit customers to liquidate their positions.[524]

Alpine Securities' $1,500 DTC certificate withdrawal fee was unreasonable, particularly given that the firm used this inflated fee as an excuse to force customers to sell securities valued at $1,500 or less to the firm for one penny. As alleged in cause five, we find that Alpine Securities' $1,500 DTC certificate withdrawal fee was unreasonable and excessive, in violation of FINRA Rules 2122 and 2010.

### D.      Alpine Securities Executed One Unauthorized Capital Withdrawal

Cause six of the Complaint alleges that, in making payments under the amended loan agreement between Alpine Holding and Alpine Securities, between March and July 2019, the firm essentially paid an affiliated entity amounts that exceeded 10% of the firm's excess net capital, in violation of FINRA Rules 4110(c)(2) and 2010. Cause six also alleges that, by paying an unexpected CAM bill from Alpine Securities' affiliated landlord, SCAP9, on April 3, 2019, the firm essentially paid an affiliated entity an amount that exceeded 10% of the firm's excess net capital, in violation of FINRA Rules 4110(c)(2) and 2010.

Enforcement bears the burden of proof in FINRA disciplinary proceedings and must prove the allegations of the complaint by a preponderance of the evidence.[525] We find that Enforcement has met that burden with respect to the firm's payment of a SCAP9 CAM invoice, but not with respect to the firm's payments under the amended loan agreement. Accordingly, as explained in more detail below, we find one violation only with respect to part of the allegations of cause six of the Complaint.

FINRA Rule 4110(c)(2) states that carrying or clearing firms shall not, without prior written approval of FINRA, withdraw capital, pay a dividend, or affect a similar distribution that would reduce the member's equity, or make an unsecured advance or loan to a stockholder, partner, sole proprietor, employee, or affiliate, where the withdrawals, payments, reductions, advances, loans, etc. in the aggregate, in any rolling 35-day period, on a net basis would exceed 10% of its excess net capital. The purpose of Rule 4110 is to further the goal of financial stability in clearing and carrying firms.[526]

Alpine Holding began serving as a source of credit for Alpine Securities in 2014 and, over the years, required the firm to agree to loan amendments under terms that became

---

[523] JX-17.

[524] JX-19.

[525] *Luis Miguel Cespedes*, Exchange Act Release No. 59404, 2009 SEC LEXIS 368, at *18 and n.11 (Feb. 13, 2009).

[526] FINRA Notice to Members 09-71, 2009 FINRA LEXIS 201, at *8 (Dec. 2009), https://finra.org/rules-guidance/notices/09-71.

increasingly costly for the firm.[527] John and Justine Hurry testified that the firm had no alternative but to agree to these terms because Alpine Securities was high risk and no other entity was willing to loan money to the firm.[528]

The version of the amended loan agreement applicable during the relevant period is dated February 20, 2019. It granted Alpine Securities a credit limit of $5 million and required the firm to pay a monthly fee of 8% ($400,000).[529] The line of credit carried an interest rate of 120% annually.[530]

Enforcement argues that, by agreeing to the last loan amendment and paying the fees and interest required under the loan agreement, the firm was, in effect, enabling its parent to receive unauthorized capital withdrawals. The basis for Enforcement's argument is the timing of Alpine Securities' series of withdrawal requests and the timing of the February 2019 loan amendment. On January 28, 2019, Alpine Securities requested approval to withdraw $1,773,119 in "profits," much of which was cash collected for the $5,000 monthly fee.[531] Four days later, FINRA still had not approved the request, so on February 1, 2019, Alpine Securities withdrew the pending request and instead withdrew $380,000, which did not require approval from FINRA.[532]

On February 6, 2019, the firm requested approval to withdraw $1,393,119, an amount which represented the original $1,773,119 request less the $380,000 that the firm withdrew.[533] Understanding that these profits largely resulted from the $5,000 monthly account fee, FINRA staff asked for additional information.[534] Alpine Securities answered FINRA staff's questions but, on February 21, 2019, reduced its withdrawal request to $913,929.[535] FINRA approved the request on February 25, 2019.[536] Unbeknownst to FINRA staff, on February 20, the day before the firm reduced its withdrawal request from $1,393,119 to $913,929, Alpine Securities entered

---

[527] See III.A.2, supra.

[528] Tr. 4308 (Justine Hurry) (testifying that the firm was not successful in finding a lender because it was considered high risk), 4423-24 (John Hurry) (testifying that no bank wanted to loan money to the firm because of the firm's level of risk and SEC litigation pending against the firm), 4436-38 (John Hurry) (testifying that, given pending SEC litigation against the firm, the lender was susceptible to a $5 million loss), 4534-36 (John Hurry) (testifying that lending to Alpine Securities placed the lender at "100 percent risk all of the time and [the firm was] only paying part of the time").

[529] JX-28; Tr. 2435-36 (Ishak), 3422 (Walsh). Walsh testified that, when he was chief executive officer, board members Justine Hurry and Doubek directed him to sign the amended loan agreement because the firm had no other options and needed the line of credit to stay operational. Tr. 3422-24 (Walsh).

[530] JX-28; Tr. 2436, 2477 (Ishak).

[531] CX-25; CX-166; Tr. 2435 (Ishak).

[532] CX-25; CX-166.

[533] CX-25; CX-166.

[534] CX-185; Tr. 2428-33 (Ishak), 3586-90 (Fortune).

[535] CX-25; CX-166.

[536] CX-25; CX-185, at 1-2; Tr. 2434 (Ishak), 3593, 3607, 3592-93 (Fortune).

into the amended loan agreement with Alpine Holding, its affiliated lender. The terms of the February 20, 2019 amended agreement increased the firm's monthly fee, increased the rate of interest that the firm paid, and accelerated a $250,000 payment due to Alpine Holding under the prior loan agreement.[537]

Walsh, Alpine Securities' then-chief executive officer who executed the loan amendment, testified that he was not given any indication as to why the existing line was being amended but instead was simply directed to sign it.[538] The firm did not ask for the amendment but instead was required to agree to its terms on a "take it or leave it" basis.[539] On March 13, 2019, Alpine Securities requested an additional capital withdrawal of $300,000.[540] In light of FINRA staff's concern about the firm's monthly $5,000 fee, FINRA staff again asked follow-up questions.[541] On March 20 and 21, 2019, Alpine Securities complained to FINRA about its failure to approve the withdrawal request.[542] On March 22, 2019, FINRA approved the request.[543]

At the time of its approval, FINRA staff was unaware that the firm's affiliated landlord, SCAP9, had billed the firm on March 21, 2019 an unprecedented $610,373 for CAM fees.[544] (Nor did FINRA know that the firm would pay the invoice in full on April 3, 2019.) Previously, SCAP9 had billed the firm for CAM fees monthly in the regular rent invoice, and the monthly CAM fees generally totaled approximately $4,600 to $8,000 and once yearly included an expense adjustment from the prior year of approximately $7,000.[545] SCAP9 bought the building in 2012, and this was Alpine Securities' first receipt of an off-cycle bill in excess of $600,000, an amount nearly equal to Alpine Securities' total annual rent.[546]

Brant, Walsh, and Doubek were concerned as to the legitimacy of this unexpected CAM invoice.[547] Doubek discussed the bill with John Hurry and one of Hurry's business managers.[548] Doubek and Brant requested and never received support or backup documentation for the

---

[537] *See* JX-28; CX-25.

[538] Tr. 3422-25 (Walsh).

[539] Tr. 4711 (Brant).

[540] CX-25; CX-166, at 7; Tr. 2438 (Ishak).

[541] CX-187; CX-188; Tr. 3610-11 (Fortune).

[542] CX-189; CX-190; Tr. 3609-12 (Fortune).

[543] CX-25; Tr. 2438 (Ishak), 3608-09 (Fortune).

[544] Stip. ¶ 75; JX-31; Tr. 3619-20 (Fortune), 4720-25 (Brant).

[545] CX-169, at 20-38; Tr. 2836-38 (Doubek), 3617 (Fortune), 4721 (Brant). Fortune testified that the monthly CAM fees more than covered the building's annual real estate tax assessment. CX-174; Tr. 3617-19 (Fortune).

[546] *See* CX-169 (showing monthly rent in 2019 of approximately $49,807); Tr. 4457 (John Hurry), 4721 (Brant), 2838 (Doubek).

[547] Tr. 2821-25 (Doubek), 4722-25 (Brant).

[548] Tr. 2825-26 (Doubek).

invoice.[549] During the course of several conversations, John Hurry advised Doubek that the lease allows the lessor to charge the lessee for back-up documentation and that Alpine Securities would have to pay a sizeable bill for that information.[550] Doubek also advised John Hurry that FINRA may request an explanation of the CAM invoice, and Hurry responded, "if I hear another F'ing question about this, you are fired, the firm is shut down. I will throw the firm out of the building."[551] The firm never received an explanation or documentation supporting the extraordinary CAM invoice.[552] As directed by John Hurry, on April 3, 2019, the firm paid the invoice.[553] And John Hurry agreed during his testimony that, when Alpine Securities paid the $610,373 CAM bill, the firm effectively transferred more than $600,000 in operating profits to SCAP9, an affiliated entity outside of FINRA's jurisdiction.[554] Alpine Securities did not tell FINRA staff about the CAM invoice until May 2019.[555]

John Hurry provided an explanation for the large CAM invoice. He testified that in early 2019 he asked Hurry family employees who operated SCAP9 to calculate outstanding CAM fees for 2018 for other tenants who occupied other buildings owned and operated by entities affiliated with Hurry family trusts.[556] He testified that, while gathering this information, SCAP9 realized that Alpine Securities and other tenants had not been billed for many years' worth of CAM fees.[557] Accordingly, on March 21, 2019, SCAP9 issued a CAM bill to Alpine Securities for $610,373.[558] John Hurry stated that, if the firm expected to receive backup information for invoices, it should have included a provision requiring that in the lease, but it did not.[559] John Hurry also acknowledged that a Hurry family employee had prepared an analysis to determine the amount of CAM fees that the firm owed, so the backup material existed. He testified that he

---

[549] CX-173; Tr. 2826-28 (Doubek), 4722-25 (Brant).

[550] Tr. 2828-30 (Doubek).

[551] Tr. 2830-31 (Doubek). John Hurry testified that Doubek advised him and SCAP9 that FINRA had asked for back-up information to support the CAM invoice once FINRA learned of it. John Hurry explained that, because SCAP9 is not within FINRA's jurisdiction, it declined to provide supporting documentation. Tr. 4524-25 (John Hurry).

[552] Tr. 4722-25 (Brant).

[553] CX-172; Tr. 2832-33 (Doubek).

[554] Tr. 4532 (John Hurry).

[555] CX-25; Tr. 2438-42 (Ishak), 3619-20 (Fortune).

[556] Tr. 4512-23 (John Hurry). John Hurry did not specify how many other tenants occupied buildings owned by Hurry family trusts. John Hurry testified that SCAP9 does not lease the building that Alpine Securities occupies to any other tenants and does not engage in any business other than leasing space to Alpine Securities. Tr. 4503-04 (John Hurry).

[557] Tr. 4513-14 (John Hurry).

[558] JX-31; Tr. 4510 (John Hurry).

[559] Tr. 4514-15 (John Hurry).

did not produce it, even knowing that FINRA had requested it from Alpine Securities, because SCAP9 is not a FINRA member and did not have to produce the materials.[560]

Alpine Securities argues that the funds it sent to its affiliates pursuant to the February 20, 2019 loan amendment and the March 21, 2019 CAM invoice did not implicate FINRA Rule 4110(c) because they were not capital withdrawals but rather were payments made pursuant to a contractual obligation with an independent party. The firm argues that they represented normal business expenses.[561]

Enforcement argues that the plain language of Rule 4110(c) makes clear that its scope is broad enough to encompass these payments because the rule covers not only capital withdrawals and dividend payments but also any efforts to "effect a similar distribution that would reduce" the firm's equity. Thus, Enforcement argues, the rule itself forecloses Alpine Securities' argument that firms can circumvent the rule's requirements by simply characterizing the withdrawal of capital as something else, as Alpine Securities did here. Enforcement argues that the loan amendment and CAM invoice were not normal business transactions with an independent party, but rather sham transactions imposed on Alpine Securities by its owners that had the direct effect of reducing the firm's equity by sending capital to other Hurry-related entities.

Although the timing of the February 2019 loan amendment raises concern when juxtaposed against the firm's withdrawal requests and apparent impatience when waiting for FINRA's approval, we do not find that the preponderance of the evidence demonstrates that the loan payments were in fact unauthorized withdrawals of capital. The reality is that Alpine Securities required capital to meet NSCC's deposit requirements if it intended to continue to execute trades for customers. Given the firm's precarious financial situation and outstanding $12 million civil penalty, there was risk associated with lending to Alpine Securities. This risk is borne out by NSCC's treatment of Alpine Securities based on its own assessment that transacting business with the firm carries a significant level of risk. Furthermore, members of the firm's management testified credibly that they could not locate other financing for the firm, and Jungling confirmed that that was their consensus at the time.[562] We agree that the costs the firm incurred under the loan amendment with its affiliated lender were extremely high and the timing of the loan amendment fortuitously enabled the affiliated entity and, correspondingly, the parent to remove revenue from the firm. We are not able to conclude, however, based on this evidence alone, that the loan payments were in fact unauthorized withdrawals of capital.

Our conclusion regarding the March 21, 2019 CAM invoice, however, is different for several reasons. First, we do not find John Hurry's unsupported and incredible assertion that the

---

[560] Tr. 4522-25 (John Hurry).

[561] Alpine Sec. Br. at 33-38.

[562] Tr. 1076 (Jungling), 1168-69 (Tew), 1507-10, 1513-15 (Kelly), 1825-27 (Frankel), 2807-08 (Doubek), 3422-23 (Walsh), 4842 (Brant).

invoice was for legitimate expenses credible. He claimed that, in fact, Alpine Securities owed more than $5 million in unbilled CAM fees, which we find equally incredible and unsupported. John Hurry testified that Hurry family employees, while gathering information related to other tenants, realized that Alpine Securities had not been properly billed. Ignoring the fact that John Hurry also testified that SCAP9 managed only the building in which Alpine Securities was located and that no other tenants occupied the building, we find it implausible that, with only one tenant to account for, SCAP9 failed to properly bill Alpine Securities CAM fees. Second, we question why John Hurry was unwilling to show Alpine Securities the backup information that a SCAP9 employee purportedly had already gathered. Producing this backup information to Alpine Securities at least, and perhaps in the context of this hearing to us, would make sense, particularly given that the SCAP9 employee had gone to the trouble of collecting it. We question why at least some backup material was not presented in connection with this sizeable and unexpected bill.

Furthermore, this was the first CAM invoice of this nature and size. SCAP9 regularly charged Alpine Securities CAM fees in its monthly invoices, and even when calculated for an entire year, those fees generally were significantly less than this one invoice. Hurry testified that Alpine Securities moved into the space in 2012,[563] yet SCAP9 purportedly did not discover its failure to bill Alpine Securities for an extraordinary amount of CAM fees until the point in 2019 when FINRA was not readily approving Alpine Securities' withdrawal requests. The timing adds to our disbelief. Even now, nearly three years after the invoice was issued and more than two years into this proceeding, Alpine Securities cannot identify expenses of any kind that could possibly justify the amount billed in the March 21, 2019 CAM invoice (much less the $5 million that Hurry claimed was owed).

John Hurry offered as a defense to the firm's inability, and his own unwillingness, to produce any supportive documentation that, under the lease, the landlord was not required to provide any explanation. But, as Enforcement noted, the very provision the firm cites to support its argument actually required the landlord to provide an estimate each year of the operating costs and taxes expected to be incurred as well as a "report" of the costs actually incurred for the prior year.[564] Alpine Securities has not produced such a report, most likely because it received no such report related to the supposed costs billed in the CAMs invoice. Instead, Hurry told Alpine Securities to pay the invoice and stop asking questions. For these reasons, we find that the March 21, 2019 CAM invoice was in reality an unauthorized withdrawal of capital.[565]

Accordingly, we decline to find a violation of FINRA Rule 4110 related to Alpine Securities' payment of lease-related fees and costs. We find that, by paying the March 31, 2019

---

[563] Tr. 4458 (John Hurry).

[564] JX-29, at 3.

[565] Under Rule 4110(c)(2), Alpine Securities was required to obtain FINRA approval of any capital withdrawal that, in any rolling 35-day period, would exceed 10% of the firm's excess net capital. Fortune testified that $610,373, the amount of the March 21, 2019 CAM invoice, was more than 10% of the firm's excess net capital. Tr. 3619 (Fortune).

CAM invoice of $610,373, the firm in fact enabled an unauthorized capital withdrawal in violation of FINRA Rules 4110 and 2010, as alleged in cause six.

### E.    Alpine Securities' General Defenses

The firm contends that it serves the low-priced securities market, which it argues is a sector vital to helping small businesses obtain capital to fund their operations.[566] It argues that the costs of operating in this sector have increased to the point of endangering its existence. John Hurry testified that "access to capital is critical and if small businesses and the middle class or the lesser middle class cannot get access to capital, they cannot get out of that class."[567] Hurry claimed that excessive regulation is killing access to capital.[568] We accept that maintaining and supporting the microcap securities market is important. We do not agree, however, that supporting the microcap market justifies Alpine Securities' misconduct. As John Hurry himself testified, Alpine Securities' business posed serious risk and, as a result, the firm could not readily find lenders. Regulators too recognized that risk and acted to protect Alpine Securities' customers. We reject any suggestion that the firm's actions are justified by its desire to protect the microcap market or that the firm was the victim of overzealous regulation.

During the period under review, Alpine Securities acted solely for the benefit of the larger group of Hurry-related entities, and not for the benefit of its own customers. Indeed, John Hurry testified that Scottsdale's only clearing firm is Alpine Securities, so without the firm, Scottsdale cannot trade.[569] All of the Hurry-related entities—SCAP9, Alpine Holding, SCA Clearing, Scottsdale—profited and benefitted from Alpine Securities' subpar treatment of its customers. Had regulatory intervention not occurred when it did, the evidence suggests that the customers' losses would have increased because the firm reversed course only when forced to do so.

John Hurry also argued, during his testimony, that Alpine Securities' fees across the board were reasonable based on the firm's collection rate alone.[570] John Hurry testified that Alpine Securities always had a low collection rate, which meant that the firm had to increase its fees to generate a profit.[571] He stated, "If I bill the hundred and my collection rate is five percent, I get $5. If you know your collection rate is low . . . you need to compensate for that."[572] We reject this argument as an explanation for Alpine Securities' excessive and unreasonable fees and

---

[566] Alpine Sec. Br. at 1.

[567] Tr. 4622 (John Hurry).

[568] Tr. 4617-23 (John Hurry).

[569] Tr. 4539-41 (John Hurry).

[570] Tr. 4404-14 (John Hurry).

[571] Tr. 4406-09 (John Hurry).

[572] Tr. 4415 (John Hurry).

commissions. Although member firms are entitled and even expected to make a profit on their business, profit does not justify unfair treatment of customers.[573]

## V.   Sanctions

In assessing sanctions, we first turn to FINRA's Sanction Guidelines.[574] Although the Guidelines are not binding, they serve as an important benchmark for determining sanctions.[575] The Guidelines advise adjudicators to "design sanctions that are meaningful and significant enough to prevent and discourage future misconduct by a respondent and deter others from engaging in similar misconduct."[576] The Guidelines advise that sanctions should be more than a "cost of doing business" and should be tailored to address the misconduct at issue in the case.[577] Finally, the Guidelines remind us that FINRA's regulatory mission is to protect investors and strengthen market integrity through vigorous and even-handed regulation.[578] With these directives in mind, and for the reasons discussed below, we expel Alpine Securities from FINRA membership, order the firm to pay restitution to its injured customers as outlined below and on Exhibit A to this decision, and order the firm to comply with the permanent cease and desist order included in this decision.

### A.   Aggravating and Mitigating Factors

Overall, we find aggravating factors and no mitigating factors present.

#### 1.   Evidence of Ongoing Misconduct

Even after the filing of the Complaint and execution of the TCDO, Alpine Securities continued a disturbing pattern of misconduct. "Evidence of misconduct that is not alleged in the complaint, but is similar to the misconduct charged in the complaint, is admissible to determine sanctions."[579] We find Alpine Securities' ongoing misconduct aggravating.

---

[573] *Cf.*, FINRA Supplementary Material 2121.01(a)(2) ("A member may not justify markups on the basis of expenses which are excessive."); *Inv. Planning, Inc.*, Exchange Act Release No. 32687, 1993 SEC LEXIS 1897, at *13 (July 28, 1993) ("the cost of doing business" cannot justify unfair prices); *Universal Heritage Inv. Corp.*, Exchange Act Release No. 19308, 1982 SEC LEXIS 210, at *9 (Dec. 8, 1982) (holding that, although a firm is entitled to a profit, it is not entitled to charge unfair prices); *DMR Sec., Inc.*, Exchange Act Release No. 16990, 1980 SEC LEXIS 1071, at *5 (July 21, 1980) (holding that "while the firm was entitled to a profit, it was not entitled to overcharge customers").

[574] FINRA Sanction Guidelines (2021), http://www.finra.org/sanctionguidelines.

[575] *Newport Coast Sec., Inc.*, Exchange Act Release No. 88548, 2020 SEC LEXIS 917, at *24 (Apr. 3, 2020).

[576] Guidelines at 2.

[577] *Id.* at 2-3.

[578] *Id.* at 1.

[579] *Dep't of Enforcement v. Ahmed*, No. 2012034211301, 2015 FINRA Discip. LEXIS 45, at *121 n.107 (NAC Sept. 25, 2015), *aff'd*, Exchange Act Release No. 81759, 2017 SEC LEXIS 3078 (Sept. 28, 2017). *See also Dep't of Mkt. Reg. v. Burch*, No. 2005000324301, 2011 FINRA Discip. LEXIS 16, at *47 (NAC July 28, 2011) (holding that respondent's "attempted cover-up" of his misconduct both before and during the hearing is aggravating for purposes

### a. Alpine Securities Failed to Comply with the TCDO

Alpine Securities failed to fully comply with the terms of the August 5, 2019 TCDO. The TCDO required Alpine Securities to provide an accounting to Enforcement to demonstrate its compliance.[580] In an August 16, 2019 accounting (and in the Answer to the Complaint), the firm stated that it fully complied with the TCDO, including the requirement to reverse all $5,000 fees, return related funds, and return all securities improperly identified as worthless and removed from customer accounts.[581] The representations in the firm's accounting (and Answer) were false.[582]

Doubek testified that he discussed with John Hurry the TCDO's requirement for Alpine Securities to reverse the $5,000 monthly account fee. John Hurry directed him to accrue for the reversals but not necessarily to repay cash taken. In fact, the firm repaid customers only as they reached out to the firm and requested repayment.[583] John Hurry believed that, if the firm reversed the $5,000 fee for customers who had not contacted the firm (as the firm agreed to do when it entered into the TCDO), it would lose all leverage to encourage the customers to do anything.[584] In fact on August 16, 2019, the day of the accounting that Alpine Securities provided to Enforcement, the firm had not transferred back to customers the funds collected for the $5,000 monthly fee.[585]

The August 2019 accounting also stated, "[a]ll securities previously identified as worthless in 2019 …. have been restored to customers."[586] Yet Doubek testified that he could not say for sure if that was true, even though he was the firm's chief executive officer at the time of the accounting.[587] At the end of November 2019, worthless seizures were finally reversed.[588] Both Alpine Securities' Answer and the August 2019 accounting misrepresented to FINRA the firm's progress in reversing its seizures of securities it improperly deemed worthless.[589]

---

of sanctions); *Dep't of Enforcement v. McCrudden*, No. 2007008358101, 2010 FINRA Discip. LEXIS 25, at *26 n.20 (NAC Oct. 15, 2010) (holding that evidence of misconduct not alleged in the complaint, but similar to that alleged, is admissible for purposes of assessing sanctions).

[580] CX-244, at 3-4; Tr. 2932-38 (Doubek).

[581] *See* CX-245, at 1-2; Tr. 603 (Jungling).

[582] *See* CX-6 (showing timeline of reversals of $5,000 fee); CX-18 (showing timeline of reversals of "worthless" securities movements); Tr. 610 (Jungling) (testifying that Enforcement could not confirm based on information provided by Alpine Securities that all transfers from customer accounts had been reversed).

[583] Tr. 2937-39, 2942, 2946-47 (Doubek).

[584] Tr. 2939 (Doubek).

[585] CX-6; Tr. 619 (Jungling), 2943-44 (Doubek).

[586] CX-245, at 2.

[587] Tr. 2948-49 (Doubek).

[588] Tr. 2949-50, 2954 (Doubek).

[589] Tr. 2948-56 (Doubek), 3440-42 (Walsh).

Walsh, the firm's chief operations officer, testified that Doubek did not tell him about the firm's obligations under the TCDO with respect to the $5,000 fee until December 2019.[590] Doubek did not tell him about the firm's obligations with respect to "worthless" securities until November 2019.[591] Alpine Securities began returning customers' assets as required only after Enforcement issued a Rule 8210 request seeking information about the firm's compliance with the TCDO. Alpine Securities returned the vast majority of the worthless securities positions between November 25 and 27, 2019, nearly four months after the TCDO.[592] Alpine Securities did not complete its reversals of its $5,000 monthly account fee charges until January 2020.[593]

### b. Alpine Securities Engaged in Additional Ongoing Misconduct Subsequent to the TCDO

The TCDO ordered Alpine Securities to reverse the $5,000 monthly account fee.[594] In September 2019, Alpine Securities issued a new fee schedule that excludes the $5,000 monthly account fee, but instead includes four new monthly fees that add up to $5,000—a $100 monthly account fee, a $3,500 minimum ticket charge and OTC deposit-related fee, a $400 inactivity fee, and a $1,000 dormant account fee.[595] Hurry felt that breaking the $5,000 fee into distinct parts would better enable the firm to enforce the fees, which it intends to do.[596] Ultimately, the firm was not able to bill customers for these fees because Enforcement intervened to stop the firm.[597]

After the TCDO, Alpine Securities also instituted a DTC custody fee of $1 per position plus an additional amount depending on the number of shares the customer holds.[598] The DTC custody fee had been on the schedule previously, but had not been billed because Walsh (Alpine Securities' interim chief executive officer) felt it overcharged customers for a fee that he believed should be just a pass-through of the actual fee incurred by the firm.[599] John Hurry insisted that the firm charge the fee. Walsh disagreed so, as a compromise, Doubek agreed to be responsible for billing the fee. At first, he billed a lesser amount and, after three months, he

---

[590] Tr. 3438-40 (Walsh).

[591] Tr. 3440-42 (Walsh).

[592] CX-18; Tr. 611-17 (Jungling), 3440-42 (Walsh).

[593] CX-6; Tr. 624 (Jungling), 4075 (Walsh).

[594] CX-244, at 1-2.

[595] CX-33, at 3; Tr. 637-40 (Jungling), 2973-75 (Doubek). Hurry testified that his idea was to "create some discussion" with FINRA about fees because he was concerned that FINRA didn't understand that the fee was "supposed to be a minimum." Tr. 4608 (John Hurry).

[596] Tr. 2974-76 (Doubek).

[597] CX-34; CX-35; Tr. 641-43 (Jungling), 2975-76 (Doubek).

[598] CX-33, at 4; Tr. 2976 (Doubek).

[599] Tr. 2977 (Doubek). Walsh testified that the DTC custody fee was on Alpine Securities' fee schedule, but he did not charge it as interim chief executive officer because he felt that the firm should simply cover the costs itself. Tr. 3431 (Walsh). He did not think the DTC custody fee should be a profit center for the firm. Tr. 3432 (Walsh). Walsh also did not believe that FINRA would approve of such a fee. Tr. 3433 (Walsh).

billed the full amount listed on the schedule at John Hurry's insistence.[600] Hurry defended the DTC custody fee. He testified that the idea behind the DTC custody fee is "to help cover some of that expense and also the idea to get customers either take your stock out or sell it. [Alpine Securities] is not a place to harbor stock, we don't offer it that way."[601]

While, on its face, the DTC custody fee listed on the September 2019 fee schedule appears to relate to the charges that DTC assessed against the firm, in reality, the firm charged customers much more than what DTC charged Alpine Securities.[602] DTC charged Alpine Securities on a tiered schedule that provided discounts based on the total number of shares held at DTC. For approximately 98% of the shares that Alpine Securities held at DTC, it was charged the lowest tier. Yet the firm charged the vast majority of its customers at the two highest tiers.[603] Walsh testified that he "did the math and [he] felt that can't be right, you know, [he] can't charge that much with the DTC's charging this much."[604]

On December 31, 2019, Alpine Securities sent a letter to all remaining retail customers stating that Alpine Securities would soon close all remaining accounts, with no exceptions.[605] It instructed customers to contact the firm by email immediately "to arrange to have any debt paid, all assets transferred out of Alpine Securities and close your account."[606] It indicated:

> **Per the terms of the Customer Account Agreement that you signed when you opened the account,** Alpine Securities may liquidate property in your account to cover any debt due to Alpine Securities for unpaid fees. Additionally, Alpine Securities may elect to transfer your debt to collection.
>
> All accounts with assets remaining on our books on **February 1, 2020** will be closed. All book entry securities and cash will be transferred to your state's unclaimed property account. All physical certificates Alpine Securities is holding for your benefit will be destroyed. Your account will be closed.[607]

---

[600] Tr. 2978-80 (Doubek).

[601] Tr. 4420 (John Hurry).

[602] CX-28; CX-156; CX-161; Tr. 3293-3304 (Doubek), 3642-45 (Fortune).

[603] Tr. 3303-04 (Doubek).

[604] Tr. 3532-33 (Walsh).

[605] CX-82; Tr. 2981-83 (Doubek).

[606] CX-82.

[607] CX-82; Tr. 2982-83 (Doubek).

When Alpine Securities issued this letter, approximately 2,000 retail accounts remained open at the firm.[608] Once again, Enforcement intervened and stopped the firm before it could take the actions outlined in the letter.[609]

After the TCDO, Alpine Securities also decided to charge customers retroactive fees back to 2016. In September 2019, when the firm rolled out its new fee schedule, it announced that it reserved the right to charge fees for prior services.[610] In July or August 2019, John Hurry directed the firm to hire temporary accountants to review the prior three years to determine which accounts had not been charged fees.[611] Although Doubek questioned the accuracy of the calculations, he nonetheless billed the uncharged fees.[612] Between August and September 2019, the firm started charging retroactive fees back to 2016, although Walsh was not comfortable with the charges.[613] John Hurry thereafter directed the firm to transfer customer debits to a collections account.[614] John Hurry had created an affiliated entity, outside of FINRA's jurisdiction, to which the firm could transfer customer debt. The intent was for the outside affiliated entity to have the ability to collect unpaid debt from the firm's former customers.[615]

Even under new management, Alpine Securities' most recent fee schedule dated September 2021, continues to list four monthly account fees that add up to $5,000 and states, "FEES, CHARGES, AND COSTS ARE THE ACCOUNT HOLDERS (sic) LEGAL OBLIGATION CHARGED TO ACCOUNT OR NOT FROM THE TIME THEY BECOME EFFECTIVE."[616] Alpine Securities' current chief executive officer Ray Maratea testified that, although the firm posted this fee schedule on its website, he intends to conduct an "entire evaluation" of the fees.[617] Yet, the fee schedule remains on the firm's website.

---

[608] Tr. 2983 (Doubek).

[609] Tr. 2985 (Doubek).

[610] CX-33, at 1; Tr. 637, 644 (Jungling).

[611] Tr. 646-47 (Jungling), 2957-60, 3255-56 (Doubek). John Hurry testified that he could not recall if it was his idea or someone else's, but he supported it. Tr. 4587-88 (John Hurry).

[612] Tr. 2960 (Doubek). For example, the firm charged Customer SH's account four 2018 account fees, one 2017 account fee, 2017 and 2018 inactivity fees, and 2016, 2017, and 2018 statement fees in September and October 2019. CX-7, at 41; Tr. 647-63 (Jungling).

[613] Tr. 3433-34 (Walsh). Doubek testified that the firm charged retroactive fees in both open and closed accounts. Tr. 2961, 3040 (Doubek).

[614] Tr. 2967-69 (Doubek).

[615] CX-7, at 4, 79; Tr. 2967-69, 2984, 3260 (Doubek). For example, between August and October 2019, the firm charged the R Law Firm account several safekeeping fees, account fees, and statement fees for 2016 and 2017. CX-7, at 79; Tr. 2965-66 (Doubek). Ultimately in October 2019, the firm transferred outstanding debits in this account to collection. CX-7, at 79; Tr. 2966 (Doubek).

[616] CX-280, at 3 (emphasis in original); Tr. 4909-10 (Alpine Securities' current chief executive officer, Ray Maratea).

[617] Tr. 4902-11 (Maratea).

## 2.  Other Aggravating Factors

In addition to Alpine Securities' continued and ongoing misconduct and failure to comply with the TCDO, we find numerous other aggravating factors. Alpine Securities acted intentionally over an extended period of time and as part of an ongoing pattern of misconduct. These factors, plus the fact that the firm benefitted financially from its misdeeds, are aggravating.[618] All of the misconduct at issue was part of a pattern at Alpine Securities of placing the firm's welfare before that of its customers. The firm encountered financial difficulties, in part because of the legal fees it incurred defending itself in a Commission regulatory action, in part because it regularly transferred its profits to its parent, and in part because a large number of its customers executed few trades. The firm devised a plan to address and reduce the number of retail customers as quickly as possible. As a result of this plan, it intentionally charged excessive fees to scare customers away and seized customers' securities and funds to force accounts closed, all while benefiting from the added revenue. The firm's conduct was premeditated and designed to extract fees from customers while simultaneously forcing them to close their accounts. This misconduct began in 2018 and, as indicated above, continues to the present.

Alpine Securities points to its reversals of $5,000 fee debits and return of seized securities as mitigating. We do not find these actions mitigating. First, as evidenced by our discussion in the restitution section below, Alpine Securities did not fully refund all of the cash that it acquired from its customers for the $5,000 monthly fee, illiquidity and volatility fee, and market-making/execution fee, so it still has not made its customers whole.[619] Even after the reversals and repayments forced upon the firm by regulators, Alpine Securities' customers still lost a total of $2,310,234 in excessive fees and commissions that the firm has not repaid.[620] This too is an aggravating factor.[621] Second, Alpine Securities reversed its securities seizures, for the most part, because of regulatory intervention, a tide of customer complaints, and the TCDO, not because the firm had a change of heart or always planned to return stock. Third, the Guidelines plainly state that subsequent corrective measures and voluntary restitution are mitigating *only* when they occur *before* detection and intervention by a regulator, which is not the case here.[622]

We also find it aggravating that, by providing falsely optimistic information in its August 2019 accounting, the firm attempted to mislead Enforcement into believing that it had complied with the undertakings required in the TCDO when, in fact, it had not. The Guidelines advise

---

[618] Guidelines at 7-8 (Principal Consideration Nos. 8, 9, 13, 16).

[619] CX-29A; CX-30A; Tr. 3920-23 (Jungling).

[620] CX-29A; CX-30A.

[621] Guidelines at 7 (Principal Consideration No. 11).

[622] *Id.* at 7 (Principal Consideration Nos. 3, 4).

adjudicators to consider aggravating such attempts to conceal misconduct and to lull regulators into inactivity.[623]

The Guidelines further recommend that adjudicators consider the level of sophistication of the affected customers.[624] While the record does not enable us to discern the level of sophistication of Alpine Securities' customers, it does enable us to determine that the firm was not adequately available and responsive to its customers. In 2018, it was unprepared for the change in its back-office system and similarly its customers were unprepared by the firm to anticipate and adjust to the change. In 2019, the firm was understaffed and not equipped to respond to telephone inquiries. Although it answered emails, it often took months for individual customers to receive a fully responsive communication from the firm. Additionally, although the firm provided some notice to customers of its many fee and business line changes, those notices were not well telegraphed to account holders. Often, they were printed in standard type and occurred at a time when many customers did not have access to their on-line accounts because of unresolved log-in issues from the back-office change. In sum, we find Alpine Securities' treatment of its customers to be deplorable and well below the standard that customers of member firms are entitled to expect.

The Guidelines additionally recommend that we consider whether Alpine Securities engaged in misconduct notwithstanding prior warnings from FINRA.[625] Here, Alpine Securities committed in a July 21, 2016 response to a FINRA cautionary action letter to be prepared to justify its fees and charges.[626] Yet in this case, we find that it charged unreasonable fees after 2016 that it could not justify. The firm even argued that it should not be forced to relate its charges to its actual and specific costs while, at the same time, arguing more generally that its costs justified its fees and charges.[627] In July 2016, it committed to maintaining a matrix justifying all of its fees and charges. It did not do this. We find that this too is aggravating.

Our sanctions must be remedial and designed to deter future misconduct by the respondent and others inclined to behave similarly.[628] We find that, even under new management, there is little reason to believe that anything will change at Alpine Securities. Indeed, the firm issued the September 2021 fee schedule, which includes four monthly fees that total $5,000 and other excessive fees addressed in this decision, after the current chief executive officer took over. While the firm's new chief executive officer has substantial industry credentials, his testimony suggests that he has only scratched the surface of understanding and controlling Alpine Securities. Indeed, the record suggests to us that many key decisions resulting in the misconduct at issue here came from John Hurry, regardless of who served as chief

---

[623] *Id.* at 7 (Principal Consideration No. 10).

[624] *Id.* at 8 (Principal Consideration No. 18).

[625] *Id.* at 8 (Principal Consideration No. 14).

[626] CX-36, at 2-3.

[627] *See* Alpine Sec. Br. at 19-28.

[628] Guidelines at 2 (General Principle No. 1).

executive officer, and he and his family trusts continue to own the firm.[629] John Hurry's testimony makes it abundantly clear to us that he believes that Alpine Securities acted properly, and he has demonstrated a willful disinterest in the firm's regulatory responsibilities.[630]

An important factor in determining the likelihood that future violations will occur is the degree of intentional wrongdoing evidenced by a respondent's past conduct.[631] Based on our finding that all of Alpine Securities' misconduct in this case was intentional and egregious, and considering the firm's post-Complaint misconduct discussed above, we find that recurrence is highly likely if Alpine Securities remains a FINRA member firm. Accordingly, as discussed below, we find that expulsion is an appropriate sanction and the only alternative for protecting the investing public.

## B.   Sanctions Conclusion

### 1.   Expulsion

Alpine Securities argues that Enforcement has not demonstrated other instances in which a firm has been expelled under similar circumstances and states that it is therefore not appropriate to expel the firm. We do not agree. The appropriate sanction in any case depends on the facts and circumstances of the particular case and cannot be precisely determined by comparison to the sanctions imposed in other cases.[632] In any event, in *Mission Securities*, FINRA expelled a member firm for similar, although less egregious, misconduct.[633] There, the

---

[629] We credit the consistent testimony from many members of Alpine Securities' management and board regarding John Hurry's controlling involvement in the management of the firm. *See* Tr. 1095, 1098, 1104-05, 1118, 1123-24 (Tew), 1707-09, 1721-24, 1736-37 (Frankel), 1961-62, 1972-75, 1998-2000, 2011 (Jones), 2738-39 (Nummi), 2819, 2875-79, 2937-39, 2946-47, 3092-94, 3141-42, 3156-57, 3223 (Doubek).

[630] *See, e.g.,* Tr. 4414-16 (Hurry) (stating that, because Alpine Securities' collection rate is low, the firm cannot simply pass through costs without a significant markup), 4420 (Hurry) (justifying the firm's DTC custody fee as a means to "cover some of that expense and also the idea to get customers either take [their] stock out or sell it"), 4421-24 (Hurry) (providing a lengthy answer but evading actually responding to a question about the basis for the illiquidity and volatility fee), 4522-25 (Hurry) (refusing to provide backup documentation for the unprecedented CAM invoice, even though the landlord had gathered that information for itself), 4544-47 (Hurry) (testifying that he transferred collection rights to Alpine Securities' customer receivables to a Hurry-related entity outside FINRA jurisdiction), 4571-72 (Hurry) (agreeing that Alpine Securities' actions resulted in the firm's charging many fees, taking the customers' securities, and forcing them to close their accounts), 4572 (Hurry) (arguing that the firm's notice to customers of upcoming changes and fees was adequate because "customers do have a duty to read their statements and as far as I understand it, they agreed to take service through the mail and we did what we were supposed to do"), 4587-96 (Hurry) (endorsing retroactively charging Alpine Securities' customers fees that the firm previously neglected to charge), 4614-16, 4617-25 (Hurry) (blaming overzealous regulation for Alpine Securities' fee increases and other actions), 4622 (Hurry) (justifying the firm's conduct based on the principle that access to capital for medium to small businesses is critical to the economy), 4627-28 (Hurry) (testifying that, in his view, the firm continues to maintain the right to retroactively enforce its fees, including the $5,000 monthly account fee).

[631] *See Trevor Michael Saliba*, Exchange Act Release No. 91527, 2021 SEC LEXIS 865, at *46 (Apr. 9, 2021) (citing Supreme Court precedent for proposition that the degree of intentional wrongdoing in a defendant's past behavior is a factor in assessing the likelihood of future misconduct).

[632] *Kimberly Springsteen-Abbott*, Exchange Act Release No. 88156, 2020 SEC LEXIS 2684, at *39 (Feb. 7, 2020).

[633] *Mission Sec. Corp.*, 2010 SEC LEXIS 4053.

Commission affirmed findings that Mission Securities removed purportedly abandoned securities from 18 customers' accounts and liquidated the stock. Here, Alpine Securities converted more than 2000 customers' positions based on the false assertion that they were worthless or abandoned, charged excessive and unfair fees and commissions, executed unauthorized transactions, and withdrew profits without authorization. Alpine Securities' customers' outstanding losses in this case are well in excess of $2 million.

Individually, the violations in this case are amongst the most egregious in the securities industry.[634] The Guidelines recommend consideration of significant sanctions for these individual violations. For conversion, the Guidelines recommend a bar from the industry regardless of the amount converted.[635] For unauthorized trading, the Guidelines recommend a suspension of up to two years.[636] In this case, however, several violation-specific aggravating factors exist, such as that the firm acted in bad faith and intentionally, and not with a genuine misunderstanding as to the customers' authorization. Additionally, the unauthorized transactions occurred in furtherance of other violations, such as conversion and unfair pricing, and involved large numbers of customers and large sums of money, all aggravating factors for unauthorized trading.[637] The Guidelines for intentional pricing violations recommend expulsion of a firm for intentional misconduct particularly where, as here, many customers suffered significant financial losses.[638] There are no Guidelines for unauthorized capital withdrawals, but net capital violations are somewhat analogous and can provide guidance.[639] The Guidelines for net capital violations recommend suspending a firm for up to 30 business days and, in egregious cases, a lengthier suspension or expulsion.[640]

The Guidelines allow for aggregation of violations that result from a single systemic problem or cause.[641] We find that Alpine Securities' conversion and misuse of customer funds

---

[634] *See, e.g., Dep't of Enforcement v. Mehringer*, No. 2014041868001, 2020 FINRA Discip. LEXIS 27, at *41-42 (NAC June 15, 2020) (stating with respect to sanctions that unauthorized trading is evidence of abuse and overreaching that must be addressed decisively by regulators); *Dep't of Enforcement v. Grivas*, No. 201203297201, 2015 FINRA Discip. LEXIS 16, at *28 (NAC July 16, 2015) (holding that "conversion is extremely serious misconduct and is one of the gravest violations" in the securities industry); *Lane*, 2015 SEC LEXIS 558, at *80 (finding that pricing violations are a serious breach of a securities professional's obligation to deal fairly with its customers); *Ornstein*, 1992 SEC LEXIS 2972, at *13 (Dec. 3, 1992) (finding that unauthorized trading is serious misconduct because it results in a loss of investor confidence in the marketplace).

[635] Guidelines at 36.

[636] *Id.* at 100.

[637] *Id.* at 100 (violation-specific consideration nos. 1, 2, 3, 4, 6).

[638] *Id.* at 92.

[639] *See Id.* at 1 ("For violations that are not addressed specifically, Adjudicators are encouraged to look to the guidelines for analogous violations.").

[640] *Id.* at 28.

[641] *Id.* at 4. *See also Dep't of Enforcement v. Felix*, No. 2018058286901, 2021 FINRA Discip. LEXIS 7, at *36 (NAC May 26, 2021), *appeal docketed*, No. 3-20380 (SEC June 28, 2021) (finding that the imposition of a unitary sanction may be appropriate where the respondent's violations are based on related misconduct); *Dep't of*

and securities, unauthorized trading, and violations related to unfair fees and commission
resulted from a systemic problem—the gross mismanagement of the firm and blind adherence to
misguided policies established by a non-registered person, John Hurry, who neither
comprehended nor respected the duty of fair dealing that the member firm owed its customers.
These violations, taken together with the numerous aggravating factors discussed above and the
dearth of mitigating factors compel us, for violations under causes one through five, to expel the
firm and impose a permanent cease and desist order. Additionally, for violations under causes
one through five related to the firm's $5,000 monthly account fee, 1% per day illiquidity and
volatility fee, and 2.5% market-making/execution fee, we order restitution as indicated below.
For an unauthorized capital withdrawal, as alleged in cause six, we impose no additional sanction
in light of the expulsion, but discuss separately below the appropriate sanction had we not
expelled the firm.

## 2.  Restitution

"Restitution is a traditional remedy used to restore the status quo ante where a victim
otherwise would unjustly suffer loss."[642] Restitution is appropriate where, as here, identifiable
individuals have suffered quantifiable losses proximately caused by a respondent's
misconduct.[643] Alpine Securities' customers lost $2,310,234 as a result of the firm's charging its
customers unreasonable $5,000 monthly account fees, illiquidity and volatility fees, and market-
making/execution fees. The firm charged the illiquidity and volatility fee and market-
making/execution fee in addition to its standard commissions and fees.[644]

Jungling testified about Enforcement's calculation of its restitution claim. On
December 13, 2019, Alpine Securities produced a spreadsheet in response to Enforcement's
October 2019 Rule 8210 request for a list of all accounts at Alpine Securities, including
correspondent accounts, that were open at any point between September 1, 2018, and August 5,
2019, the period relevant to the Complaint.[645] Enforcement relied on the spreadsheet produced
by the firm to create an activity run of customer transactions that occurred at the firm between
August 2018 and December 2019.[646] Based on this information, Enforcement calculated (1) the
amount of cash that Alpine Securities took from customer accounts or received from customers,
and has not refunded to customers, in connection with the $5,000 monthly account fee;[647] (2) the

---

*Enforcement v. Silver Leaf Partners, LLC*, No. 2014042606902, 2020 FINRA Discip. LEXIS 36, at *72 (NAC June
29, 2020) (same), *appeal docketed*, No. 3-19896 (SEC July 28, 2020).

[642] Guidelines at 4.

[643] *Id. See also Newport Coast Sec., Inc.*, 2020 SEC LEXIS 917, at *37 (holding that an order requiring restitution
seeks primarily to restore customers to their prior positions by returning the funds of which they were wrongfully
deprived); *Fuad Ahmed*, Exchange Act Release No. 81759, 2017 SEC LEXIS 3078, at *86 (Sept. 28, 2017) (same).

[644] Tr. 576-81, 585-89 (Jungling).

[645] CX-252; Tr. 267-68, 353 (Jungling).

[646] CX-7; Tr. 266-68 (Jungling).

[647] Initially, Enforcement included in its restitution request regarding the $5,000 monthly account fee the amount of
unreversed debits in addition to the amount of cash that the firm had not returned to customers. CX-4; CX-5;

amount the firm charged customers for illiquidity and volatility fees of 1% per day until the trades cleared;[648] and (3) the amount the firm charged customers for market-making/execution fees.[649] We find that the restitution requested is appropriate.

We order the firm to pay restitution to the customers it injured in the amount of $735,410 (related to the $5,000 monthly account fee), $1,491,625 (related to the illiquidity and volatility fee), and $83,199 (related to the market-making/execution fee)—for a total restitution award of $2,310,234 plus post-judgment interest at the rate established for the underpayment of income taxes in Section 6621(a)(2) of the Internal Revenue Code, 26 U.S.C. § 6621(a)(2), from the date of this decision until paid.[650] Exhibit A to this decision identifies the customers to whom the firm must pay restitution by providing the customers' names and portions of their account numbers. Exhibit A indicates the precise amount due to each customer in each of the three categories listed above.[651]

If Alpine Securities cannot locate any customers listed on Exhibit A, unpaid restitution plus accrued interest should be paid to the appropriate escheat, unclaimed-property, or abandoned-property fund for the state of the customer's last known address. Satisfactory proof of payment of the restitution, or of reasonable and documented efforts undertaken to effect restitution, shall be provided to Enforcement staff involved in this case no later than 90 days after the date when this decision becomes final.[652]

### 3.  Other Sanctions

Under cause six, we find that Alpine Securities executed an unauthorized withdrawal of capital, in violation of FINRA Rules 4110 and 2010. There are no specific Guidelines for unauthorized withdrawals of capital. Accordingly, we have considered the Guidelines for net

---

[648] CX-11; Tr. 563-64, 565-66 (Jungling). The firm charged customers the illiquidity and volatility fee between September 2018 and July 2019, when Enforcement filed the Complaint. Tr. 565 (Jungling). In instances in which the firm reversed the illiquidity and volatility fee charge, Enforcement did not include the transaction in its calculation of restitution. Tr. 566 (Jungling).

[648] Tr. 676-86 (Jungling). Enforcement subsequently re-evaluated its calculations and amended its request to include only cash not returned to the customers. CX-4A; CX-5A; Tr. 3887-96, 3917-19 (Jungling). Jungling testified that, if she had learned from the firm of more instances of fee reversals or cash returned, she would have made more changes to the restitution amount requested. Tr. 3931 (Jungling). At the hearing, Alpine Securities produced to Enforcement a spreadsheet suggesting some additional refunds had occurred, but no underlying documentation to support the claim. Tr. 3931 (Jungling). After the issuance of this decision, Alpine Securities may provide Enforcement satisfactory proof of its pre-decision refunds, which may be credited, if fully documented, against our restitution order.

[648] CX-11; Tr. 563-64, 565-66 (Jungling). The firm charged customers the illiquidity and volatility fee between September 2018 and July 2019, when Enforcement filed the Complaint. Tr. 565 (Jungling). In instances in which the firm reversed the illiquidity and volatility fee charge, Enforcement did not include the transaction in its calculation of restitution. Tr. 566 (Jungling).

[649] CX-8; CX-9; CX-10; Tr. 566-68, 576-83, 584-87, 590-91, 593-95 (Jungling).

[650] *See* CX-29A; CX-30A; Tr. 3921-24 (Jungling).

[651] Only the parties to this proceeding will receive a copy of Exhibit A to this decision.

[652] Alpine Securities carries the burden of demonstrating and documenting, to the satisfaction of Enforcement, any amounts paid in furtherance of the restitution award, including amounts paid during the course of the litigation of this matter.

capital violations, which we consider an analogous violation in that Rule 4110 is one of FINRA's financial responsibility rules.[653]

The Guidelines for net capital violations recommend a fine of $1,000 to $77,000 and a suspension of up to 30 days. In egregious cases, the Guidelines recommend a suspension of up to two years or an expulsion. The violation-specific principal considerations suggest considering whether the firm continued in business and attempted to conceal deficiencies. Here, as discussed above, we find significant aggravating and no mitigating factors. The firm attempted to conceal its unauthorized withdrawal of capital as a CAM invoice. It also acted intentionally. While communicating with FINRA to try to get approval of a pending capital withdrawal request, its affiliated landlord issued the invoice and the firm paid the invoice without advising FINRA. Although the firm knew that FINRA was considering a pending capital withdrawal request, and its own management questioned the legitimacy of the CAM invoice, the firm failed to mention the CAM invoice to FINRA. We find this violation to be egregious.

Accordingly, we would impose a suspension of one year and a $75,000 fine for this violation. In light of our expulsion of the firm, however, we decline to impose an additional sanction for this violation.

FINRA Rule 8310(a)(6) states that, after compliance with the Rule 9000 Series, FINRA may impose a permanent cease and desist order against a member firm. FINRA Rule 9291 establishes the content, scope and requirements for such an order because the TCDO entered in this case terminates upon the issuance of this decision.[654] Below, we consider the necessity for issuing a permanent cease and desist order in its place.

As stated in more detail above, we find that Alpine Securities' misconduct occurred over the course of approximately two years and is in part ongoing. Indeed, the firm even violated the TCDO. We find that the firm engaged in a pattern of intentionally flouting regulatory requirements and placing its own interests before that of its customers. These were not technical violations. Rather, the firm took every action to continue in business at the expense of its customers. It charged unreasonable and excessive fees and commissions, converted and misused customer funds and securities, engaged in unauthorized trading, and made an unauthorized withdrawal of revenues. We find that the only lull in its misconduct came after receiving a raft of customer complaints and the intervention of regulators. While committing rule violations that significantly harmed its customers, the firm also made it difficult for customers to communicate with it. We find that the risk of future violations is significant, given the firm's attitude about regulation, the level of its intentionality, and the fees listed in its most recent fee schedule.

---

[653] Guidelines at 1; FINRA Notice to Members 09-71, 2009 FINRA LEXIS 201, at *3 (Dec. 2009), https://finra.org/rules-guidance/notices/09-71 (stating that Rule 4110, one of several financial responsibility rules, plays an important role in supporting the Commission's minimum net capital and other financial responsibility requirements).

[654] CX-244, at 4.

Accordingly, in light of all of the misconduct that we find, we also impose a permanent cease and desist order.[655]

## VI.   Decision Order

We find under causes one and two of the Complaint that Alpine Securities violated FINRA Rules 2150 and 2010 by converting customer funds and securities (cause one) and misusing customer assets (cause two) by engaging in the following violative conduct: (1) between October 2018 and July 2019, improperly taking customer funds and securities purportedly to pay the firm's $5,000 monthly account fee; (2) between March and July 2019, misappropriating customer positions valued at $1,500 or less on the improper grounds that they were worthless; and (3) in June and July of 2019, improperly deeming customer accounts abandoned and moving customer securities into Alpine Securities' abandoned securities account.

We find under cause three of the Complaint that Alpine Securities violated FINRA Rule 2010 by undertaking unauthorized trading as follows: (1) between January and July 2019, moving customer securities from customer accounts to the firm's proprietary accounts to cover outstanding debits resulting from Alpine Securities' excessive fees, including a $5,000 monthly account fee; (2) between March and July 2019, selling hundreds of customers' positions to itself for one penny per position; and (3) in June and July 2019, moving customers' securities to Alpine Securities' abandoned securities account.

We find under cause four of the Complaint that, between March and July 2019, Alpine Securities violated FINRA Rules 2121 and 2010 by (1) selling hundreds of customer positions to itself for one penny per position, which was an unfair price and not reasonably related to the current market price; and (2) charging customers a 2.5% market-making/execution fee which, when combined with other charges, resulted in unfair prices and commission in excess of 5% and not warranted by the circumstances. We find under cause five of the Complaint that Alpine Securities violated FINRA Rules 2122 and 2010 by (1) charging customers an unreasonable and unnecessary $5,000 monthly fee for simply having an account; (2) assessing the $5,000 monthly account fee inconsistently, such that the fee was discriminatory and unfair; (3) charging customers an unreasonable illiquidity and volatility fee; and (4) charging customers an unreasonable $1,500 fee for DTC certificate withdrawals.

We find under cause six of the Complaint that, in March and April 2019, Alpine Securities violated FINRA Rules 4110(c) and 2010 by disguising an unauthorized capital

---

[655] *See* Order Granting Approval of Proposed Rule Change, Exchange Act Release No. 47925, 68 F.R. 33548, at *33550 (June 4, 2003) (stating that, before imposing a permanent cease and desist order, an adjudicator should consider whether the party's violation was isolated or part of a pattern, whether the violation was flagrant and deliberate or merely technical, and whether the party's business presents opportunities to engage in future violative conduct); *KPMG Peat Marwick LLP*, Exchange Act Release No. 43862, 2001 SEC LEXIS 98, at *116 (Jan. 19, 2001) (demonstrating in connection with the imposition of a cease and desist order consideration of the seriousness of the violation, the recurrent nature of the violation, respondent's recognition of the wrongful nature of the misconduct, the degree of harm to the customers, and the respondent's opportunity to commit future violations).

withdrawal as a payment of a $610,373 invoice from the firm's affiliated landlord. We dismiss the allegations under cause six that Alpine Securities violated FINRA Rules 4110(c) and 2010 by disguising an unauthorized capital withdrawal as seven payments to the firm's affiliated lender under an amended loan agreement.[656]

For the misconduct under causes one through five of the Complaint, we expel Alpine Securities from FINRA membership and order the firm to pay restitution of $2,310,234 plus post-judgment interest at the rate established for the underpayment of income taxes in Section 6621(a) of the Internal Revenue Code, 26 U.S.C. § 6621(a)(2), from the date of this decision until paid.[657] Exhibit A to this decision (which is provided only to the parties) identifies the customers to whom the firm must pay restitution. Restitution is due in full, and satisfactory proof of payment of restitution shall be provided to Enforcement staff involved in this case, 90 days after the date when this decision becomes final. In light of our expulsion of the firm, we impose no additional sanctions for violations under cause six.

If this decision becomes FINRA's final disciplinary action, our expulsion of Alpine Securities shall become effective immediately.

We also order Alpine Securities to pay costs in the amount of $41,653.18, which includes a $750 administrative fee and $40,903.18 for the cost of the transcript. The costs shall be due on a date set by FINRA, but not sooner than 30 days after this decision becomes FINRA's final action.

Additionally, we impose the Permanent Cease and Desist Order incorporated into this decision.

## VII.   Permanent Cease and Desist Order[658]

We issue this Permanent Cease and Desist Order pursuant to FINRA Rules 8310 and 9291 for the reasons set forth in the accompanying decision.

Accordingly, it is hereby ordered that Respondent Alpine Securities Corporation (and any successor of Alpine Securities Corporation):

1. **CEASE AND DESIST** from violating FINRA Rules 2150 and 2010. Specifically, Alpine Securities (and any successor) is ordered to cease and desist from converting or misusing customer funds or securities, including, but not limited to, by:

---

[656] The Extended Hearing Panel has considered and rejects without discussion all other arguments of the parties.

[657] The interest rate set in Section 6621(a)(2) of the Internal Revenue Code is used by the Internal Revenue Service to determine interest due on underpaid taxes and is adjusted each quarter.

[658] Pursuant to FINRA Rule 9291(b), where a Respondent is a member firm, the Respondent shall deliver a copy of a permanent cease and desist order to its associated persons within one business day of receiving it.

    a.   selling, journaling, or otherwise transferring securities from customer accounts on the ground that Alpine Securities (and any successor) has deemed such securities to be "worthless";

    b.   selling, journaling, or otherwise transferring securities from customer accounts on the ground that Alpine Securities (and any successor) has deemed such securities or accounts to be "abandoned"; or

    c.   transferring cash from customer accounts, or selling, journaling, or otherwise transferring securities from customer accounts, in order to satisfy debits resulting from excessive, unreasonable, or discriminatory fees.

2.   **CEASE AND DESIST** from violating FINRA Rule 2010. Specifically, Alpine Securities (and any successor) is ordered to cease and desist from effecting unauthorized transactions in customer accounts.

3.   **CEASE AND DESIST** from violating FINRA Rules 2121, 2122, and 2010. Specifically, Alpine Securities (and any successor) is ordered to cease and desist from charging unreasonable or discriminatory fees and from charging unfair prices and commissions, including, but not limited to, by charging:

    a.   a $5,000 monthly account fee, whether as a single fee or combination of fees and charges;

    b.   a $1,500 recertification fee;

    c.   a 1% per day illiquidity and volatility fee; or

    d.   a 2.5% market-making and/or execution fee.

4.   **CEASE AND DESIST** from violating FINRA Rules 4110 and 2010. Specifically, Alpine Securities (and any successor) is ordered to cease and desist from making unauthorized capital withdrawals or similar distributions, including, but not limited, through transactions with affiliates, whenever such withdrawals or similar distributions, within a 35-day rolling calendar period, would exceed 10% of Alpine Securities' excess net capital.

5.   **CEASE AND DESIST** from dissipating or converting the funds or assets of any customers, or causing other harm to investors. Specifically, Alpine Securities (and any successor) is ordered to:

    a.   Cease and desist from transferring, or agreeing to transfer, any customer debit balance or the right to collect on any customer debit balance to any other person or entity without the prior written authorization of FINRA; and

   b.  Deposit $2,310,234 into an escrow account within 10 days of the date of the
       Decision.

                              **SO ORDERED**.

                              *Carla Carloni*

                              Carla Carloni
                              Deputy Chief Hearing Officer
                              For the Extended Hearing Panel

Copies to:
      Alpine Securities Corporation (via overnight courier and first-class mail)
      Maranda Fritz, Esq. (via email, overnight courier and first-class mail)
      Brian Lanciault, Esq. (via email)
      Michael Cruz, Esq. (via email)
      Savvas A. Foukas, Esq. (via email)
      Douglas Ramsey, Esq. (via email)
      Christopher J. Kelly, Esq. (via email)
      Amanda Fein, Esq. (via email)
      Pearline M. Hong, Esq. (via email)
      Kevin Hartzell, Esq. (via email)
      Lisa M. Colone, Esq. (via email)
      Daniel Hibshoosh, Esq. (via email)
      Christina L. Stanland, Esq. (via email)
      Gina M. Petrocelli, Esq. (via email)
      Jennifer L. Crawford, Esq. (via email)